UNITED STATES DISTRICT COURT OF THE
SOUTHERN DISTRICT OF NEW YORK



HELIOS INTERNATIONAL SARL; and IDEA
ITALIANA s.r.l.,

                    Plaintiffs,

    -against-

CANTAMESSA U.S.A., Inc.; FABRIZIO
CANTAMESSA; and ROBERT KHEIT,

                    Defendants.

Civil Action No.

12 CV 8205

**COMPLAINT FOR
DAMAGES AND
INJUNCTIVE RELIEF
WITH JURY DEMAND**



RECEIVED
NOV 0 9 2012
U.S.D.C. S.D. N.Y.
CASHIERS

Plaintiffs Helios International SARL ("Helios") and Idea Italiana s.r.l. ("Idea") (together,

Plaintiffs), by their attorneys, Oberdier Ressmeyer LLP, for their complaint against Defendants

Cantamessa U.S.A., Inc. ("Cantamessa USA"), Fabrizio Cantamessa ("Mr. Cantamessa") and

Robert Kheit ("Mr. Kheit") (together, "Defendants"), allege as follows:

## INTRODUCTION

1.      This is an action seeking damages and injunctive relief for Defendants' copyright

infringement under the Copyright Act, 17 U.S.C. § 101 *et seq.*, violations of the Racketeering

and Corrupt Influenced Organization Act ("RICO"), 18 U.S.C. § 1961 *et seq.*; trademark

infringement, trademark dilution, false designation of origin, and trademark cancellation under

the Lanham Act, 15 U.S.C. § 1051 *et seq.*; and conversion; unfair competition; trespass to

chattels; breach of fiduciary duty; misappropriation of trade secrets; state and common law

trademark infringement, and violation of the New York Consumer Protection Act, N.Y. Gen. Bus. L. § 349.

2.　　Plaintiffs, owners and distributors of the world-famous Cantamessa brand of jewelry, bring this action against Defendants, who were Plaintiffs' former agents, for Defendants' (*a*) criminally-audacious theft of over 185 pieces of Plaintiffs' jewelry worth over $10 million dollars, (*b*) piracy and counterfeiting of Plaintiffs' valuable jewelry designs to make illegal, counterfeit replicas of Plaintiffs' Cantamessa jewelry for commercial sale, and (*c*) misappropriation and infringing use of Plaintiffs' distinctive trademarks (their "Crown Logo" and "Cantamessa" name) in an effort to pass off Defendants' counterfeit business and jewelry as the authentic Cantamessa brand owned by Plaintiffs.

3.　　In 1939, Cantamessa s.r.l. was founded in Valenza, Italy, originally to sell jewelry exclusively to European royal families, and later to an expanded, but still elite, global clientele. Defendant Fabrizio Cantamessa is the disgraced former heir to the Cantamessa family jewelry dynasty.  Under his leadership, Cantamessa s.r.l.—which had flourished for nearly six decades— collapsed.  In 2004, the company, together with its sister company, Res Nova s.r.l., filed for bankruptcy in Italy and Mr. Cantamessa was prosecuted and imprisoned for criminal fraud.

4.　　Cantamessa s.r.l.'s and Res Nova s.r.l.'s assets were acquired out of bankruptcy in 2007 and sold to Plaintiff Idea Italiana s.r.l. ("Idea") that same year.   Idea then launched a worldwide effort to revive the Cantamessa brand.  In addition to retaining high-end designers and sophisticated distributors, Idea endeavored to highlight Cantamessa's seventy-year heritage by engaging Defendant Fabrizio Cantamessa as its global sales agent.

5.　　Within two years, the Cantamessa brand's commercial promise attracted the attention of an international jewelry distributor, Plaintiff Helios International SARL ("Helios").

In 2009, Helios purchased from Idea's principal distributor its entire inventory of Cantamessa jewelry and entered into an exclusive distributorship agreement with Idea.  Helios, too, sought to leverage the heritage of the Cantamessa brand by engaging Mr. Cantamessa as its sales agent. Mr. Cantamessa was paid a handsome commission of five-to-fifteen percent (5-15%) on his sales of Cantamessa jewelry.

6.      As Plaintiffs' trusted fiduciary, Mr. Cantamessa was given unrestricted, unsupervised access to Plaintiffs' multi-million dollar inventory warehouse in Geneva, Switzerland.  Mr. Cantamessa was allowed to take jewelry from the warehouse unmonitored for sale, display or marketing.  Plaintiffs allowed Mr. Cantamessa to serve as cashier on all his jewelry sales.  They also provided him hundreds of thousands of dollars to subsidize his worldwide marketing efforts.

7.      Nevertheless, on information and belief, Mr. Cantamessa secretly resented his new employers, seething with bitterness at their acquisition of his family's eponymous jewelry empire.  In or about 2010, he organized a criminal conspiracy to wrest back the Cantamessa brand from Plaintiffs.

8.       Mr. Cantamessa enlisted a longtime crony, Defendant Robert Kheit, in his conspiracy.  Mr. Cantamessa first purported to engage Mr. Kheit to market Plaintiffs' Cantamessa jewelry in Russia.  Then, in September 2010, Messrs. Cantamessa and Kheit founded Cantamessa U.S.A., Inc. in New York City, purportedly to market Plaintiffs' Cantamessa jewelry in the United States.

9.      But Messrs. Cantamessa and Kheit had no intent to use Cantamessa U.S.A. to represent Plaintiffs' interests.  Rather, they used it as the home base for their illegal, corrupt

scheme to steal Plaintiffs' inventory, jewelry designs, trademarks, and ultimately the entire Cantamessa brand itself.  Defendants' criminal and unlawful acts included the following:

a.        During 2010 and 2011, preying on their position of trust as Plaintiffs' fiduciaries with unfettered, unmonitored access to Plaintiffs' inventory, Defendants stole $7.75 million in inventory from Plaintiffs' warehouse at Geneva.  They resold such inventory without Plaintiffs' knowledge or approval and without accounting for any of the sales proceeds to Plaintiffs.

b.        In March 2011, Defendants tricked Plaintiffs into loaning them an additional $5.1 million in inventory, purportedly for a temporary exhibition in New York City. But when the New York exhibition concluded, Defendants refused to return Plaintiffs' jewelry.  Instead, Defendants converted the jewelry for resale by Cantamessa USA.

c.        In June 2011 and November 2011, Defendants unlawfully and fraudulently registered Plaintiffs' Crown Logo and Cantamessa trademarks with the United States and European Trademark Offices as their own trademarks.

d.        Beginning in early 2012 and, on information and belief, continuing through the present, Defendants have stolen Plaintiffs' copyrighted Cantamessa jewelry designs to be counterfeited by a manufacturer in Thailand.

e.        Defendants have then packaged this counterfeit "Cantamessa" jewelry with Plaintiffs' Crown Logo and Cantamessa name, and marketed and sold it worldwide as Defendants' "heritage brand."  Plaintiffs believe that Defendants' sales of this counterfeited jewelry exceeds even their sales of actual inventory stolen from Plaintiffs.

10.     Defendants' theft of Plaintiffs' Cantamessa brand is now virtually complete. Defendants operate illegal "Cantamessa" sales offices in New York, Moscow, Russia, and Kiev, Ukraine.  They also sell their counterfeited "Cantamessa" jewelry in twelve boutiques throughout Europe and the Caribbean.  Their websites, www.cantamessaworld.com and www.cantamessajewels.com, prominently display Plaintiffs' Crown Logo and Cantamessa trademarks with impunity.

11.     As a result of Defendants' global criminal conspiracy, Plaintiffs have suffered damages of at least $13 million in stolen inventory alone.  In addition, they have suffered presently-unquantifiable damages from Defendants' counterfeiting and sales of Plaintiffs' copyrighted Cantamessa jewelry designs, and Defendants' unlawful registrations and infringement of Plaintiffs' trademarked Crown Logo and Cantamessa name.  Plaintiffs are entitled to damages and injunctive relief against such copyright and trademark infringement.  If not enjoined, Defendants criminal conspiracy of international theft, counterfeiting, and trademark infringement will irreparably destroy Plaintiffs' rights in the valuable Cantamessa brand.

## **THE PARTIES**

12.     Helios International SARL is a limited liability company organized under the laws of Tunisia, with its principal office located at Immeuble La Coupole – Rue Du Lac Windermere – Les Berges Du Lac, 1053 Tunis, Tunisia.

13.     Idea Italiana s.r.l., is a limited liability company organized under the laws of Italy, with its principal office located at Via Giuseppe Mazzini 57, Valenza (AL), Italy 15048.

14.     Cantamessa USA, Inc. ("Cantamessa USA") is a business corporation organized under the laws of the State of New York, with its principal office located at 589 Fifth Avenue, Ste. 813, New York, New York 10017.

15.     Fabrizio Cantamessa ("Mr. Cantamessa") is the founder, former Chief Executive Officer, and current "Chief Designer" of Cantamessa USA.  From 2007 until 2011, Mr. Cantamessa served as Plaintiffs' worldwide sales agent for their Cantamessa jewelry.

16.     Robert Kheit ("Mr. Kheit") is the current Chief Executive Officer and President of Cantamessa USA.  From 2010 until 2011, Mr. Kheit served as Plaintiff's sales agent in Russia for their Cantamessa jewelry.

## JURISDICTION AND VENUE

17.     The Court has original subject matter jurisdiction over Plaintiffs' claims under (*a*) the Copyright Act, pursuant to 28 U.S.C. §§ 1331 and 1338(a), (*b*) RICO, pursuant to 28 U.S.C. §§ 1331, (*c*) the Lanham Act, pursuant to 28 U.S.C. §§ 1331 and 1338(a), (*d*) unfair competition laws, pursuant to 28 U.S.C. §§ 1367(a) and 1338(b), and (*e*) state and common laws, pursuant to 28 U.S.C. §§ 1367(a).

18.     The Court has personal jurisdiction over the Defendants because each resides and/or may be found in New York, does systematic and continuous business in New York, and has performed acts directed at and causing harm in New York, which give rise to this Complaint.

19.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and 28 U.S.C. § 1400(a).

## FACTUAL BACKGROUND

### *The History Of Cantamessa Jewelry*

20.     In 1939, Mr. Cantamessa's grandfather founded Cantamessa s.r.l., an Italian jewelry company headquartered in Valenza, Italy, which catered exclusively to members of royal families in Europe.

21.     In 1988, Mr. Cantamessa took over the management of Cantamessa s.r.l.  By at least 2002, the company was in serious financial straits.

6

22.     In 2004, the design and manufacture of the Cantamessa line of jewelry was taken over by a new company owned by Mr. Cantamessa's brother-in-law, called Res Nova s.r.l. ("Res Nova").   As of that time, Cantamessa s.r.l. began purchasing from Res Nova all its jewelry for marketing and resale to customers.

23.     In or about 2006, Cantamessa s.r.l. and Res Nova filed for bankruptcy with the Tribunale di Alessandria (Court of Alessandria), Italy, record numbers 22/06 and 21/06, respectively.

24.     These bankruptcy filings led to a government investigation and criminal charges against Mr. Cantamessa.  In 2009, Mr. Cantamessa was convicted for criminal fraud in connection with his management of Cantamessa s.r.l. and sentenced to 20 months in prison.

25.     At the beginning of 2007, the court-appointed bankruptcy trustee put up for public auction and sale all tangible and intangible property belonging to Cantamessa s.r.l. and Res Nova.  Among other things, the trustee offered for sale the existing inventory of Cantamessa jewelry, jewelry designs, moldings, and other manufacturing equipment owned by Res Nova (together, the "Cantamessa Jewelry Assets").

26.     A company called PAMI s.r.l. ("PAMI") purchased the Cantamessa Jewelry Assets from the bankruptcy trustee in or about July 2007.

### *Idea Purchases And Revives The Cantamessa Jewelry Line*

27.     Idea purchased the Cantamessa Jewelry Assets from PAMI for a purchase price of $414,940,[1] pursuant to a Purchase and Sale Agreement dated as of July 20, 2007 (the "Idea Purchase Agreement").  A copy of the Idea Purchase Agreement is attached as Exhibit A.  Idea is

---

[1] As calculated using an exchange rate of 1.3831 (the Euro-to-Dollar exchange rate of July 20, 2007).

therefore the lawful owner of the Cantamessa Jewelry Assets, including the inventory of jewelry

and copyrights in the jewelry designs.

28.     After purchasing Cantamessa's Assets, Idea revived the defunct Cantamessa

jewelry line.  Among other things, Idea designed new jewelry molds for a new Cantamessa

collection.  Idea produced, marketed and sold jewelry using the new designs, together with

designs purchased from PAMI, under the "Cantamessa" name.

### *Idea's Copyright Registration Of Its Jewelry Designs*

29.     Idea's jewelry designs, including those it purchased as Cantamessa Assets and

those it created itself, are copyrighted works.  Each of such jewelry designs is an original,

expressive work of art with substantial commercial value.  Idea applied for and obtained

Certificates of Copyright Registration issued by the Register of Copyright for the jewelry designs

listed on Exhibit B (the "Copyrighted Jewelry Designs").  Under the U.S. Copyright Act, Idea

has the exclusive right, *inter alia*, to reproduce the Copyrighted Jewelry Designs, to prepare

derivative works based upon the Copyrighted Designs, and to distribute copies of the

Copyrighted Jewelry Designs to the public.  17 U.S.C. §§ 106(1)-(3).

### *Idea's Commercial Use of the Cantamessa Name and Crown Logo*

30.     As part of its purchase of the Cantamessa Jewelry Assets, Idea acquired the right

to use the Cantamessa name and a distinctive "crown" logo (the "Crown Logo") that had long

been used by Cantamessa s.r.l. to identify its jewelry.  The Cantamessa name and Crown Logo,

as used by Cantamessa s.r.l. and, subsequently, Idea, is depicted below:



CANTAMESSA

31.     In or about September 30, 2009, Idea also created a distinctive, artistic jewelry design based on the "Crown Logo.  A sample of Idea's Crown Logo jewelry with the Cantamessa name is depicted below:



32.     Since July 2007, Idea and its distributors and agents have used the Crown Logo and Cantamessa name in commerce throughout Europe and in the United States, Japan, China, Russia, Qatar, United Arab Emirates, and Dubai to identify and brand its Cantamessa line of jewelry.  Since that time, Cantamessa jewelry has been sold with a brochure prominently featuring the Crown Logo and Cantamessa name.  A sample of this brochure is attached as Exhibit C.   The Crown Logo has also adorned Cantamessa gift wrap, a depiction of which is attached as Exhibit D, and accessories, a depiction of which is attached as Exhibit E.  The Crown Logo and Cantamessa name have also been prominently featured in print and web-based advertisements, promotional literature, and on public displays of Cantamessa jewelry.  Attached as Exhibit F is a copy of the customer warranty cards, first used by Idea's former distributor in 2007, prominently depicting the Crown Logo and Cantamessa name.

33.    Since 2007, Idea has sold approximately 1,400 pieces of Cantamessa jewelry, for an aggregate price of about $6,500,000.00, bearing the distinctive Crown Logo and Cantamessa name.  Idea and its distributors have spent millions of dollars on advertising and promotional materials featuring the Crown Logo and Cantamessa name.  As a result of this extensive advertising campaign and sales of Cantamessa jewelry, the Crown Logo and Cantamessa name have become instantly recognizable by consumers as symbolizing Idea's Cantamessa line of jewelry.

### *Idea's Distribution Agreement With IGJ*

34.    In 2007, Idea entered into a non-exclusive distribution agreement for its Cantamessa jewelry line with International Group of Jewelers ("IGJ"), which was headquartered in Dubai, U.A.E.  Under the terms of the distribution agreement, IGJ purchased Cantamessa jewelry from Idea and resold it throughout the world.  Under the agreement, IGJ was licensed to use the Crown Logo and Cantamessa name solely for purposes of marketing and selling Idea's Cantamessa jewelry.  However, Idea retained exclusive worldwide ownership of the Crown Logo and Cantamessa name, as well as the Cantamessa jewelry designs.

35.    IGJ employed Mr. Cantamessa and his wife, Paola Brussino ("Ms. Brussino"), as its general agents to handle its marketing and sales of Idea's Cantamessa jewelry.  Mr. Cantamessa also engaged Mr. Kheit as IGJ's sales agent. IGJ dissolved in 2009.

### *Idea's and Helios's Exclusive Distributorship Agreement*

36.    In December 2009, Helios purchased from IGJ all its existing European inventory of Cantamessa jewelry for a purchase price of about $620,000.00.

37.    At about the same time, Helios entered into an exclusive distributorship agreement with Idea to buy, distribute, and sell Idea's Cantamessa jewelry.   Under Helios's agreement with Idea, Idea agreed to continue to produce jewelry with the original and new

Cantamessa designs for purchase and resale by Helios.  Idea licensed Helios to use the Crown

Logo and Cantamessa for purposes of marketing and selling the Cantamessa jewelry.

38.     Helios marketed and sold jewelry produced by Idea throughout the world under

the Crown Logo and Cantamessa brand name.  Since March 2010, Helios has sold about 125

pieces of Idea's Cantamessa jewelry, for an aggregate sale price of approximately

$1,783,439.49.[2]

### *Helios's Agency Agreement with Mr. Cantamessa*

39.     Because of Mr. Cantamessa's prior relationship with the Cantamessa brand,

Helios engaged him as its general agent for the marketing and resale of Idea's Cantamessa

jewelry.  Helios and Mr. Cantamessa entered into an agency agreement in or about December

2009 (the "Agency Agreement").  Under the Agency Agreement, Mr. Cantamessa was

authorized to market and sell Cantamessa jewelry for Helios throughout the world, in exchange

for a commission of five-to-fifteen percent (5-15%) of the sale price of any jewelry he sold.

40.     Under the Agency Agreement, Mr. Cantamessa was required to account, fully and

accurately, for each of his sales of Plaintiffs' jewelry, deduct the appropriate amount for his

commission, and then remit the remainder to Helios.

41.     Under the Agency Agreement, Mr. Cantamessa was authorized to use the Crown

Logo and Cantamessa name to market and sell Idea's Cantamessa jewelry (which Helios had

licensed from Idea), solely in his capacity as Helios's agent and for Helios's benefit.  Mr.

---

[2] As calculated using the average exchange rate for 2010, *see*
  http://www.irs.gov/Individuals/International-Taxpayers/Yearly-Average-Currency-Exchange-
  Rates.

Cantamessa was not authorized to use the Crown Logo and Cantamessa name for any other purpose.  At no time did Mr. Cantamessa acquire any rights in the Crown Logo or Cantamessa name.  Mr. Cantamessa was also not authorized to use Idea's jewelry designs for any purpose, including making any replicas of those designs.

42.     Mr. Cantamessa used the Crown Logo and Cantamessa name extensively in commerce to identify Idea's Cantamessa jewelry sold by Helios.  From the beginning of 2010 through April 2011, at Mr. Cantamessa's request, Helios paid several hundred thousand dollars to promote the Cantamessa jewelry line.

43.     Defendants' uses of the Crown Logo and Cantamessa name in commerce, including uses both authorized and unauthorized by Plaintiffs, were exclusively for the benefit of Plaintiffs.  Defendants did not acquire any rights in the Crown Logo or Cantamessa name as a result of such uses.  Rather, the enhanced consumer identification and geographical reach of the Crown Logo and Cantamessa name, including within New York and elsewhere in the United States, redounded exclusively to the benefit of Plaintiffs.

### *Mr. Cantamessa Engages Mr. Kheit As An Additional Agent Of Helios*

44.     Sometime in 2010, Mr. Cantamessa engaged a long-time friend who was also experienced in the jewelry business, Mr. Kheit, to act as an additional agent for Helios.  Messrs. Cantamessa and Kheit had previously acted as IGJ's agents for the marketing and sale of Idea's Cantamessa jewelry.

45.     Purportedly on Helios's behalf, Mr. Cantamessa engaged Mr. Kheit to market and sell Helios's Cantamessa jewelry in Russia in exchange for commissions of twelve percent (12%).  On information and belief, Mr. Kheit also requested authority to market and sell Helios's Cantamessa jewelry in the United States, and Mr. Cantamessa agreed that Mr. Kheit would receive a twenty percent (20%) commission on any sales in the United States.

### *Defendants' Duties to Helios*

46.     As Helios's agents, Messrs. Cantamessa and Kheit owed to Helios unyielding fiduciary duties of good faith, loyalty, and due care, and were required to use their utmost skills to further Helios's interests.  The duty of good faith required Messrs. Cantamessa and Kheit to act in an informed, honest, and equitable manner.  The duty of loyalty required Messrs. Cantamessa and Kheit to act in the best interests of Helios, and not under the influence of personal or extraneous considerations.  The duty of care required Messrs. Cantamessa and Kheit to take an active, direct, and informed role in carrying on Helios's business and to take reasonable steps to preserve Helios's property and assets.

47.     In reliance on Messrs. Cantamessa's and Kheit's faithful performance of their fiduciary duties, Helios entrusted them with substantial autonomy in representing Helios's interests.  Among other things, Helios granted Mr. Cantamessa and his wife, Paola Brussino, unfettered access to Helios's inventory of jewelry, much of which was located in the warehouse owned by Helios's shipping and storage agent in Geneva, Switzerland, called Malca-Amit Ltd. ("Malca-Amit").  Mr. Cantamessa and his wife were given general authority to execute sales, including drawing upon the Malca-Amit warehouse for international freight to Cantamessa customers.  Messrs. Cantamessa and Kheit were expected to account for any sales expeditiously and remit the proceeds to Helios after deducting their commissions.

### *Defendants' Conspiracy To Reaquire The Cantamessa Brand Illegally*

48.     On information and belief, from the time of the Cantamessa s.r.l. and Res Nova bankruptcies and the sale of the Cantamessa Jewelry Assets to Idea, Mr. Cantamessa was infuriated and embittered by the loss of his family's jewelry business.  He secretly devised with Mr. Kheit (who was working for IGJ in Russia) a plan to steal back from Helios and Idea the

entire Cantamessa brand, including millions of dollars in inventory, jewelry designs, the Crown Logo and the Cantamessa name.

49.    On September 24, 2010, while still under contract as Helios's agents and fiduciaries, Messrs. Cantamessa and Kheit unlawfully incorporated "Cantamessa USA, Inc." in New York without Helios's or Idea's knowledge or approval.

### *Defendants Fail To Account Properly For Their Sales Of Plaintiffs' Jewelry*

50.    From March 2010 to the end of December 2010, Messrs. Cantamessa and Kheit sold and accounted to Helios for approximately 125 pieces of Cantamessa jewelry, having an aggregate sale price of about $1,757,484.00.[3]  Of that $1.76 million, Mr. Cantamessa and his agents, including Mr. Kheit, were entitled to retain $236,380.95 as commissions for these sales and transfer the balance $1,533,841.97 to Helios.  Instead, Mr. Cantamessa and his agents unlawfully retained approximately $1,138,787.26, remitting only $618,696.81 to Helios.  As described below, on information and belief, Messrs. Cantamessa and Kheit have also sold many additional pieces of Cantamessa jewelry stolen from Plaintiffs and have neither remitted the proceeds nor accounted for these sales to Plaintiffs.

### *Defendants Steal Helios's Jewelry From Its Warehouse*

51.    Upon information and belief, sometime during their agency relationship with Helios, Defendants began stealing Helios's inventory of Cantamessa jewelry.

---

[3] As calculated using the average exchange rate for 2010, *see* http://www.irs.gov/Individuals/International-Taxpayers/Yearly-Average-Currency-Exchange-Rates.

52.     From the beginning of 2011 through November 2011, Defendants stole at least 185 pieces of Helios's Cantamessa jewelry, worth at least $7,757,202 in the aggregate, from the Malca-Amit warehouse.  A chart identifying the stolen jewelry is attached hereto as Exhibit G. Defendants intentionally concealed their removal of these pieces.  They removed the pieces surreptitiously, violated Helios's and Malca-Amit's required "sign-out" procedures, and did not disclose to Helios or Malca-Amit that they had removed the pieces.  Defendants were not authorized to take this jewelry for any purpose except to market and sell to Helios's customers, with prompt accounting and remittitur of the proceeds to Helios.

53.     Helios did not discover the theft of its jewelry from Malca-Amit's warehouse until October 2011, when an inventory check revealed the jewelry was missing.  Further investigation revealed that the jewelry had almost certainly been stolen by Messrs. Cantamessa and Kheit.

54.     On information and belief, Defendants have sold much of this stolen Cantamessa jewelry and have kept all sales proceeds.  Defendants have never reported any sales of the stolen jewelry listed on Exhibit G, nor remitted any of the proceeds to Helios.  Defendants have also copied the designs of the stolen jewelry, which belonged to Idea, in order to sell unlawful replications of the jewelry.

55.     From January 2011 forward, Mr. Cantamessa reported to Helios that he had made no sales of Cantamessa jewelry.  On information and belief, these statements were false: Defendants had, in fact, sold much of the jewelry stolen from the Malca-Amit warehouse, without accounting for such sales or remitting the proceeds to Helios.

### *Defendants Steal Helios's And Idea's*
### *Jewelry On Loan To Them For Display in New York*

56.     In early 2011, before Helios had discovered Defendants' theft of jewelry from the

Malca-Amit warehouse, Messrs. Cantamessa and Mr. Kheit conspired to trick Helios and Idea

into loaning them, purportedly for a temporary exhibition in New York, about 150 additional

pieces from their jewelry collections.  Defendants planned to steal the jewelry for sale by

Cantamessa USA and to replicate the jewelry designs, which Idea owned, for further unlawful

sales.

57.     Messrs. Cantamessa and Kheit persuaded Helios and Idea each to ship jewelry

from their respective collections to Defendants in New York, promising to use the jewelry solely

for a temporary exhibition at the Manhattan Motorcars event scheduled for April 28, 2011 (the

"April 28 Exhibition"), in order to publicize Helios's and Idea's Cantamessa jewelry line.

Defendants promised to return the jewelry to Helios and Idea promptly after the April 28

Exhibition.  Helios and Idea did not authorize Defendants to sell any portion of the collection on

temporary loan.

58.     In reliance on Defendants' promises, on March 15, 2011, Idea shipped fifteen

pieces from its collection worth about $603,846.86[4] to Mr. Kheit in New York.  Idea shipped the

merchandise *via* "ATA Carnet," certifying to United States and Italian customs authorities that

the jewelry was being imported temporarily and not permanently for commercial sale.[5]   A copy

of the ATA Carnet evidencing Idea's shipment to Mr. Kheit is attached hereto as Exhibit H.

_____

[4] As calculated using the Exchange rate as of March 15, 2011 (1.3999%).

[5] ATA Carnets enable the temporary importation of commercial samples (CS), professional
    equipment (PE), and goods for exhibitions and fairs (EF) for up to one year without payment of
    normally applicable duties and taxes, including value-added taxes.

59.     On April 4, 2011, acting under Mr. Cantamessa's instructions, Helios shipped 135 pieces of jewelry (97 pieces from its Cantamessa collection and 38 pieces from another collection) worth about $5,086,796.06[6] from the Malca-Amit warehouse to Mr. Kheit, as a temporary exportation.  A true and correct copy of Helios's Temporary Exportation on Consignment Proforma-Invoice N. 03 (31/03/2011), which contains an itemized list of the jewels (and their wholesale value) shipped from Helios to Mr. Kheit, and a chart of the jewels' market value, are attached hereto as Exhibit I.

60.     Had Helios and Idea intended to ship the jewelry to Defendants for sale inside the United States, they could not have shipped the jewelry via ATA Carnet or temporary exportation, but rather would have had to ship the jewelry using customs forms requiring the payment of customs fees.  Under the import laws governing ATA Carnets, Defendants were required to re-export the jewelry no later than December 20, 2011.

61.     On April 28, 2011, Defendants exhibited Helios's and Idea's jewelry at the Manhattan Motorcars Showroom in New York City.  The attendees included several A-List celebrities including Susan Sarandon, Rima Rakih ("Miss USA"), and Carol Alt, modeling a reported $5 million in jewelry, including 6,000 diamonds.

62.     In marketing materials publicizing the April 28 Exhibition, Mr. Cantamessa and Mr. Kheit advertised Helios's and Idea's Cantamessa jewelry as follows:

> The overall Cantamessa jewelry line . . . boasts over 100 intricate *and proprietary* designs that are inspired by some of the world's most exotic flora and fauna. . . . Starting at around $10,000 a piece, the collections include necklaces, earrings, brooches, rings and bracelets[.].

---

[6] As calculated using the Exchange rate as of April 4, 2011 (1.4219%).

*See* "Cantamessa Jewels Debuts In the U.S. High-End Italian Jewelry Line To Launch With The Opening of Exclusive Appointment-Only Boutique Showroom On Fifth Avenue," *available at* http://www.cantamessajewels.com/events/28-04-11.html (last visited May 20, 2012) (emphasis added).

63.     Following the April 28 Exhibition, Defendants refused to return the jewelry to Helios and Idea.  Instead, Defendants stole the jewelry and began selling it at their Cantamessa U.S.A. New York store, shipping it abroad for other promotional events, and copying the designs and selling the replicas along with the originals.

64.     Indeed, about 150 of the 163 jewelry pieces currently advertised on Cantamessa USA's website as part of the "Cantamessa" collection are property of the Plaintiffs.  128 pieces were stolen from the ATA Carnet (N. It. 67047/AL), Helios's Temporary Exportation on Consignment Proforma-Invoice N. 03 (31/03/2011) (Ex. I, *supra*), or the Malca-Amit site (Ex. G, *supra*).  The remaining 22 pieces are unauthorized copies of Idea's proprietary designs.

65.     On April 26, 2012, Defendants hosted the Grand Opening of Cantamessa Ukraine in Kiev, Ukraine (the "Kiev Launch").  To promote the Kiev Launch, Defendants sent at least twenty-five pieces from the Temporary Exportation and the Malca-Amit Freeport from Cantamessa USA's New York site to its Cantamessa Ukraine boutique in Kiev (the "Kiev Exhibition").  True and correct promotional photographs showing models wearing one or more pieces from the Kiev Exhibition are attached hereto as Exhibit J.

### *Helios Terminates The Agency Agreement*

66.     After discovering a portion of Defendants' theft, fraud, other unlawful conduct, and breaches of fiduciary duty described above, on October 5, 2011, Helios formally demanded an accounting by Mr. Cantamessa of all sales of Helios's jewelry and all inventory still in his

possession, a list of customers, and payment of the amounts still due for the completed sales, as previously accounted for by Mr. Cantamessa.  Mr. Cantamessa stalled for several months without responding at all to the request, and ultimately failed to produce any information to Helios about his clients.

67.     Helios therefore further investigated the matter and, only then, discovered that its entire inventory located at the Malca-Amit storage facility was missing.  Helios then immediately terminated the Agency Agreement and demanded that Mr. Cantamessa cease associating himself with Helios or the Cantamessa line of jewelry, including any use of the Crown Logo and Cantamessa name.

68.     On November 2, 2011, Helios wrote to Malca-Amit to inform them that the agency agreement with Mr. Cantamessa had been terminated and that he and his wife should not be given access to Helios's warehoused inventory or any information related to such inventory.

### *Plaintiffs' Demands On Defendants*

69.     On January 25, 2012, counsel for Idea sent Defendants Cantamessa USA and Kheit a written demand for the return of its Merchandise and reimbursement of all customs penalties.  Defendants' counsel responded in a letter dated January 31, 2012, refusing to return the Merchandise or to reimburse Idea for customs penalties incurred by virtue of Defendants' unlawful conduct.  Idea's counsel renewed its demand on March 7, 2012, but Defendants did not respond further.

70.     On February 12, 2012, Helios sent a written request to Mr. Cantamessa and his wife, Paola Brussino, seeking, *inter alia*, updated contact information for Plaintiffs' customers who purchased through Mr. Cantamessa and Ms. Brussino, unpaid sales proceeds (less commission due).  Mr. Cantamessa did not respond to Helios's request.

71.     In April 2012, counsel for Helios sent Defendants Cantamessa USA and Kheit a written demand for the return of its Merchandise and reimbursement of all customs penalties. Defendants did not respond to Helios's letter.

### Defendants Transport The Stolen
### Collection Across State And International Lines

72.     Defendants have shipped many of the jewelry pieces stolen from Plaintiffs across state and international lines.  For example:

a.     Defendants' Facebook page reveals that in June 2011, they "donated" a pair of earrings stolen from Plaintiffs, valued in excess of $10,000 each, to the Naked Heart Foundation for use at a charity ball in Paris, France.  Defendants transported the stolen earrings from their New York boutique to Paris.  Defendants publicized their donation to the ball, which was hosted by luxury designer Valentino Clemente Ludovico Garavani ("Valentino") and supermodel Natalia Vodianova ("Vodianova").  Defendants thus used Plaintiffs' stolen jewelry to reap favorable publicity, curry favor with the famous hosts of the event, and, most likely, claim a "charitable" tax deduction from their donation of stolen property.  A true and correct copy of Cantamessa USA's Facebook page is attached hereto as Exhibit K.

b.     In or about July 2011, Defendants sent several pieces stolen from Plaintiffs, each advertised by Defendants as worth in excess of $10,000 each, from New York to California for commercial use by Vanity Fair in a photo shoot of the actress Lindsay Lohan at her Venice Beach, California home.  A true and correct copy of Lindsay Lohan modeling the R0635W Ring Prince from the Temporary Exportation for *Vanity Fair* is attached hereto as Exhibit L.

c.      In or about September 2011, Defendants sent several pieces stolen from Plaintiffs, each advertised by Defendants as worth in excess of $10,000 each, from New York to Florida for commercial use by Elle Magazine in a photo shoot of supermodel Adriana Lima at a beach in Miami, Florida.

d.      In or about December 2011, Defendants sent several pieces stolen from Plaintiffs, each advertised by Defendants as worth in excess of $10,000 each, from New York to Pennsylvania for commercial use by Philadelphia Style in a photo shoot of Melania Trump at Philadelphia, Pennsylvania.  A true and correct copy of Melania Trump modeling three pieces from the Temporary Exportation (N0561W Necklace Premiere, R0835W Ring Cometa), and one piece from the Malca-Amit Freeport (R0835W Ring Cometa) for *Philadephia Style* is attached hereto as Exhibit M.

e.      In or about February 2012, Defendants shipped pieces of the stolen jewelry, each advertised by Defendants as worth in excess of $10,000 each, from Defendants' New York store to a manufacturing facility in Bangkok.

### ***Defendants Criminal Copyright Infringement***

73.      Defendants have made exact counterfeit replicas of Idea's and Helios's stolen jewelry, including Idea's Copyrighted Jewelry Designs, for further sales.  Defendants have solicited and obtained counterfeited replicas of Plaintiffs' Cantamessa Jewelry from the same jewelry manufacturer that Idea uses to manufacture its jewelry designs, Delora Co. Ltd. ("Delora") which is located in Thailand.  A true and correct copy of a commercial invoice from

Delora to Idea, dated March 18, 2008, is attached hereto as Exhibit N.[7]  Defendants have then

passed off and sold these counterfeited replicas as genuine Cantamessa Jewelry.

74.     Plaintiffs learned of Defendants' unauthorized counterfeiting only when Delora

accidentally sent to Idea a chain of electronic mails evidencing such counterfeiting, dating from

February 14, 2012 through March 6, 2012 (the "Valentine's Day Emails").  A copy of the

Valentine's Day Emails is attached as Exhibit O.  Given the improbably-accidental nature of this

discovery, it is nearly certain that Defendants' unauthorized counterfeiting of Idea's Copyrighted

Jewelry Designs greatly outnumbers the instances evidenced in these emails.

75.     The Valentine's Day Emails reveal the following:

a.      On February 14, 2012, Mr. Kheit asked Delora to make unauthorized

copies of three jewelry pieces, whose unique identifying numbers showed they were from

Idea's ATA Carnet loaned to Defendants for the April 28 Exhibition (R0838, R0838BL,

and R0838P).  On information and belief, Defendants transmitted drawings of these

designs to Delora by international wires.

b.      Mr. Kheit also asked Delora to produce replicas of Idea's Copyrighted

Jewelry Designs using molds for those designs already in Delora's possession.  These

pieces included:

i.      Earrings identified as "E0682;"

ii.     Rings identified as "R0031WY;"

iii.    Rings identified as "R0031WP;"

iv.     Rings identified as "R0022WV;"

---

[7] One of the items invoiced is R0211KW, a ring stolen by Mr. Cantamessa during his raid of the
 Malca-Amit Freeport.

   v.  Pendant identified as "PO584"; and

   vi.  Earrings identified as "E0674."

  c.  Mr. Kheit mailed a ring from Idea's collection, identified as "R0838,"[8]

from New York to Delora's Bangkok facility for copying.

  d.  Mr. Kheit arranged for a ring from Idea's collection, identified as

"R0703," to be sent from his Russian affiliate, "Botticelli," to Delora for copying.

  e.  Defendants induced Delora to assist in manufacturing counterfeited

replicas of Idea's Copyrighted Jewelry Designs by wiring $35,000 from the United States

to Delora's Thai bank account on February 16, 2012 (reflecting a cost of between $79.79

and $4997.09, per item).  Huber confirmed receipt of the $35,000 payment via email that

same day.

  f.  Mr. Kheit requested additional copies of Idea's designs on March 6, 2012:

   i.  Earrings (model EO682) with yellow sapphire and crystal bullets;

   ii.  Earrings (model EO682) with pink sapphire and crystal bullets;

   iii.  Small ring (size 50) in white and violet;

   iv.  Small ring (size 50) in yellow sapphire; and

   v.  Small ring (size 50) in pink sapphire.

  g.  Mr. Kheit directed Delora to export these infringing counterfeit replicas

into the United States by April 2, 2012, for sale at Cantamessa's New York boutique at

prices beginning at $10,000.

---

[8] The R0838 design is a copyrighted design registered to Idea, VA0001822468 / 2012-07-12.

76.     On information and belief, RICO Defendants continue to employ Delora or other jewelry manufacturers for the purposes of unlawfully counterfeiting Plaintiffs' proprietary designs.

77.     In July 2012, Idea discovered the following additional instances of unlawful copying of Plaintiffs' proprietary jewelry designs, as evidenced by Exhibit P:

      a.     An infringing copy of a ring from its Luna Collection (similar to R0641). On information and belief, Defendants were required to ship actual prototypes of the Luna ring to Delora's Thai manufacturing plant in order to facilitate its replication by Delora;

      b.     Any infringing copy of a ring from its Lizard collection (similar to Z0220); and

      c.     An infringing copy of a pair of earrings from its Central Park collection (E0580).

78.     On August 20, 2012, Idea discovered additional replicas of its proprietary ring design, entitled, Medusa Piccola (code R0022) advertised on Defendants' facebook website, a true and correct copy of which is attached hereto in relevant part at Exhibit Q.

### *Defendants' Trademark Infringement*

79.     Defendants also repeatedly have used the Crown Logo and Cantamessa name in commerce, without Plaintiffs' authorization, to identify and promote their own, illegitimate "Cantamessa" jewelry business.   For example, as depicted in the photograph below, Defendants prominently featured the Crown Logo and Cantamessa name at their April 2011 exhibition of Helios's and Idea's Cantamessa jewelry in New York City.  While Plaintiffs had authorized the temporary loan of their jewelry for this exhibit, Defendants obtained Plaintiffs' authorization under false and fraudulent pretenses.  Plaintiffs would have never authorized the exhibition had

they known that Defendants planned to steal the jewelry to launch their own, unlawful "Cantamessa" business.




80.     Defendants, also without Helios's or Idea's knowledge or approval, unlawfully and fraudulently registered the Crown Logo and "Cantamessa" name as a trademark with the United States Patent & Trademark Office ("PTO") and the Trademark and Designs Office of the European Union ("ETO").

81.     In June 2011, Defendants caused Cantamessa USA to submit a trademark registration application to the PTO, claiming to be the owner of Crown Logo and Cantamessa name.  A copy of Defendants' application is attached as Exhibit R.

82.     In November 2011, Mr. Cantamessa himself submitted a trademark registration application to the ETO, claiming to be the owner of Crown Logo and Cantamessa name.  A copy of Mr. Cantamessa's application is attached as Exhibit S.

83.     Defendants' PTO registration application was published in November 2011, and the registration issued in January 2012.  Defendants' ETO registration was published in February 2012.

84.     The trademark that Defendants registered with the PTO and ETO, as depicted

below, is identical to the Crown Logo and Cantamessa name designed by Idea.



# CANTAMESSA

85.     Defendants' registration application to the PTO was sworn under penalties of

perjury.  In the PTO application, Defendants' attorney and agent made several false statements,

which Defendants knew, based on first-hand knowledge, were false.  These false statements

included:

      a.     That the Crown Logo and Cantamessa name were first used in commerce

in or about March 15, 2011.  This statement was false because:

            i.     As Defendants knew, the Crown Logo and Cantamessa name had
been used in commerce at least as early as 2007.  Indeed, on
December 17, 2010, Defendants had launched a jewelry boutique
in Moscow, Russia.  Defendants' publicity and marketing materials
for the Moscow launch featured the Crown Logo and Cantamessa
name.  The walls of the boutique itself prominently displayed the
Crown Logo and Cantamessa name, as depicted below:



ii.    At the event, Mr. Kheit wore a replica of the Crown logo as a broach:



iii.    The Moscow launch culminated with ceremony in which Fabrizio Cantamessa crowned Miss Universe with a three-dimensional replica of the Crown logo. A video showing Fabrizio Cantamessa crowning Miss Universe with a three-dimensional replica of the Crown logo can be viewed here: http://youtu.be/2pcC2yjZ2e0.

b.    That the Crown Logo and Cantamessa name were first used in commerce inside the United States on or about March 15, 2011. As Defendants knew, they themselves had used the Crown Logo and Cantamessa name in commerce inside the United States, purportedly as agents of Helios, before that date.

c.    That Cantamessa USA (in the United States) and Mr. Cantamessa (in Europe) was the owner of the Crown Logo and Cantamessa name. As Defendants knew, Idea was the owner of the Crown Logo and Cantamessa name. Defendants were licensed to use the Crown Logo and Cantamessa name only as Helios's agents for Helios's

benefit, as Idea's exclusive licensee, in marketing and selling Helios's Cantamessa jewelry.

## PLAINTIFFS' ACTUAL DAMAGES

### *Plaintiffs' Stolen Inventory Of Jewelry*

86.    Defendants have stolen jewelry from Plaintiffs in an amount to be proved at trial, but estimated at no less than $12,868,653.50.   This amounts includes an estimated $7,757,202 worth of jewelry stolen from the Malca-Amit warehouse, $4,507,604.64 in jewelry that Helios loaned to Defendants for the April 28 Exhibition but was never returned, and $603,846.86 in jewelry that Idea loaned to Defendants for the April 28 Exhibition but was never returned.

### *Defendants' Theft of Idea's Jewelry Designs*

87.    Defendants have sold illegal counterfeit replicas of Idea's Copyrighted Jewelry Designs in an amount to be proved at trial.  At the least, Defendants are required to disgorge to Idea all their profits from the sales of replicas of Idea's jewelry designs.

### *Defendants' Unlawful Use Of The Crown Logo And Cantamessa Name*

88.    Defendants have unlawfully sold jewelry marketed and branded using the Crown Logo and Cantamessa name, thereby unlawfully representing to consumers that their jewelry is owned by, or affiliated with, Idea and/or Helios.  At the least, Defendants are required to disgorge to Idea all their profits from the sales of any jewelry that is marketed or branded using the Crown Logo and Cantamessa name.

### *Costs and Expenses Helios Advanced to Defendants*

89.    Helios has also suffered the loss of amounts no less than $397,918.87 that it paid upon Messrs. Cantamessa's and Kheit's request for the purpose of promoting and selling Helios's jewelry.  Helios paid these amounts in reliance on Mr. Cantamessa's and Mr. Kheit's faithful performance of their duties to Helios.   For example:

a.      Helios paid nearly $334,224.60[9] at Mr. Cantamessa's request for a booth

at the 2011 Baselworld trade fair in Switzerland, which took place in March, 2011.

Every year, Baselworld attracts up to 2000 luxury jewelry and watchmakers (*e.g.*, Rolex,

Corum, Swatch) to showcase their products to approximately 100,000 visitors.  In

addition to the costs of the exhibition (estimated at nearly 250,000 Euros, *supra*), Helios

shipped several million dollars in jewelry from the Collection for display.  Yet, Mr.

Cantamessa reported that he made zero sales at the event.

b.      Helios had also paid nearly $63,694.27[10] in occasion of the 2010

Baselworld trade fair.  In 2010, Helios had decided not to officially participate to the fair

but it organized, at Mr. Cantamessa's request, a private event at a hotel in Basel.

90.      Messrs. Cantamessa and Kheit were faithless agents, however, and

misappropriated and misused the funds that Helios advanced for their own, illegitimate scheme

to steal Helios's and Idea's Cantamessa business for themselves.  Helios is entitled to the return

of all amounts advanced to Messrs. Cantamessa and Kheit.

### *Commissions Paid To Messrs. Cantamessa And Kheit*

91.      As set forth supra, Mr. Cantamessa and his agents unlawfully withheld at least

several hundred thousand dollars in sales revenues due to Helios.  According to Mr.

Cantamessa's accounting charts, the difference was $902,406.31.  On information and belief,

Messrs. Cantamessa and Kheit have failed to disclose many additional pieces of Cantamessa

---

[9] As calculated using the average exchange rate for 2011, *see*
http://www.irs.gov/Individuals/International-Taxpayers/Yearly-Average-Currency-Exchange-Rates.

[10] As calculated using the average exchange rate for 2010, *see id*.

jewelry stolen from Plaintiffs and have neither remitted the proceeds nor accounted for these sales to Plaintiffs.

92.     Because of Messrs. Cantamessa's and Kheit's willful, flagrant breaches of their fiduciary duties to Helios, they are required to disgorge all amounts paid to them as commissions under the Agency Agreement.

### *Customs Duties And Fines*

93.     Defendants' theft of Plaintiffs' jewelry has caused Plaintiffs to incur substantial fees and penalties to United States and Italian custom authorities.  As set forth above, Plaintiffs sent jewelry to Defendants for temporary export and exhibition, in good faith reliance  on Defendants' promises to return the jewelry to Plaintiffs promptly thereafter.

94.     Pursuant to regulations that permit the temporary export of merchandise without payment of customs duties, Plaintiffs did not pay any customs duties to United States or Italian customs authorities.

95.     On April 20, 2012, the United States Customs authorities sent a written demand to Idea seeking proof of re-exportation of the goods.

96.     On May 9, 2012, the Italian Customs authority sent a written demand to Idea seeking proof of compliance with the terms of the ATA Carnet (*i.e.*, evidence that the jewelry was returned to its country of origin).

97.     The Italian Chamber of Commerce notified Idea that its failure to produce proof of the jewelry's return to Italy would be subject to a fine of customs duties and taxes in an amount of approximately 5% of the declared value of the ATA Carnet and Temporary Import

($5084.88), a 10% penalty ($508.48) on applicable taxes and duties, and Italian V.A.T. of 21%

($21,859.25) for a total fine of $27,452.61.[11]

98.     Plaintiffs are entitled to recover as damages all amounts they are required to pay

to customs officials in connection with the stolen jewelry.

## AS AND FOR A FIRST CAUSE OF ACTION

### RICO, 18 U.S.C. § 1982(C)
### (AGAINST DEFENDANTS MESSRS. CANTAMESSA AND KHEIT)

99.     Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1-

98, *supra*, as though fully set forth herein.

100.    At all relevant times, both Helios and Idea have been "persons" within the

meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

101.    At all relevant times Messrs. Cantamessa and Kheit (together, the "RICO

Defendants") have been "person[s]" within the meaning of 18 U.S.C. § 1961(3), who conducted

the affairs of an enterprise as defined in 18 U.S.C. § 1961(4), whereby they engaged in a pattern

of racketeering activity for a common illegal purpose in violation of 18 U.S.C. § 1962(c).

### THE RICO ENTERPRISE

102.    The RICO Defendants are partners in the criminal enterprise, Cantamessa USA, a

corporation they created to be, and have used as, their tool to effectuate their pattern of

racketeering activity within the meaning of 18 U.S.C. § 1961(4).  The criminal enterprise,

Cantamessa USA (the "Enterprise"), is a separate and distinct entity from the RICO Defendants;

and both of the RICO Defendants together have owned, controlled, operated and managed it.

---

[11] As calculated using the exchange rate of May 9, 2012.

103.    The RICO Defendants have financed their Enterprise through breathtakingly unlawful and fraudulent means, including:

a.      Stealing and unlawfully importing into the United States merchandise valued no less than $12.85 million, comprising Helios's jewelry that Defendants looted from the Malca-Amit warehouse (about $7.75 million) and Helios's and Idea's jewelry loaned to Defendants for exhibition at the April 28 Exhibition (about $5.1million), which Defendants stole by refusing to return to Helios and Idea (together, the "Stolen Jewelry");

b.      Willfully and criminally infringing Idea's Copyrighted Jewelry Designs and selling illegal counterfeit replicas of those designs for amounts currently unknown but to be learned in discovery;

c.      Infringing Idea's Crown Logo and Cantamessa name to confuse unlawfully customers into believing Defendants' jewelry was authentic Cantamessa jewelry affiliated with Plaintiffs, in order to induce customers to purchase Defendants' jewelry in amounts currently unknown but to be learned in discovery;

d.      Transporting the Stolen Jewelry from Plaintiffs across state and international lines; and

e.      Laundering the proceeds from their unlawful activities to further their criminal Enterprise.

104.    The RICO Defendants have organized their Enterprise with a particular management and control structure, assigning each Defendant specific responsibilities, operating out of Cantamessa USA's New York office.  On information and belief:

a.      Both RICO Defendants have been responsible for overseeing the scheme to defraud and steal from Helios and Idea, and both have taken, and directed others to take, actions necessary to accomplish the overall objects of the criminal Enterprise.

b.      Both RICO Defendants participated in looting Helios's jewelry from the Malca-Amit warehouse.

c.      Mr. Cantamessa was principally responsible for tricking Helios and Idea into loaning their jewelry to Defendants for exhibition at the April 28 Exhibition.

d.      Both Defendants have directed the transportation of Plaintiffs' Stolen Jewelry across state and international lines.

e.      Mr. Cantamessa was principally responsible for unlawfully incorporating Cantamessa USA, and in applying for, and obtaining, fraudulent trademark registrations from the PTO and ETO for the Crown Logo and Cantamessa name.

f.      Mr. Kheit has been principally responsible for obtaining illegal, infringing counterfeit replicas of Idea's Copyrighted Jewelry Designs from Delora, and possibly other sources.

105.    At all relevant times, the Enterprise was engaged in, and its activities affected, interstate and foreign commerce within the meaning of 18 U.S.C. § 1962(c).

## PATTERN OF RACKETEERING ACTIVITY

106.    Each RICO Defendant conducted or participated, directly or indirectly, in the management, operation and conduct of the Enterprise through a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5) and in violation of 18 U.S.C. § 1962(c).

107.    The RICO Defendants, directly and/or through their agents, engaged in the pattern of racketeering activity alleged herein for the purpose of conducting the affairs of the Enterprise. Each such act of racketeering activity was related, having common (*a*) participants, (*b*) purposes,

(*c*) victims, (*d*) methods of commission, and (*e*) other interrelated characteristics with the shared result of benefitting the RICO Defendants and or their agents or co-conspirators at the expense of Plaintiffs.  The predicate acts of racketeering activity described below amount to a common, ongoing course of conduct resulting in the continued misappropriation of approximately $12.85 million of Plaintiffs' property.

108.    In particular, the RICO Defendants have committed the following criminal acts, each of which constitutes a "predicate act" under 18 U.S.C. § 1981, and which together constitutes a pattern of racketeering within the meaning of 18 U.S.C. § 1961(5):

### A.    Transportation Of Stolen Goods In Violation Of The National Stolen Property Act (18 U.S.C. § 2314)

109.    In violation of 18 U.S.C. § 2314, the RICO Defendants, each being associated with the criminal Enterprise, did unlawfully, knowingly, and intentionally transport, transmit, or transfer in interstate or foreign commerce goods, wares, merchandise, or money, of the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud, all with the intent and effect of causing actual economic loss to Plaintiffs.

110.    The RICO Defendants violated Section 2314 in at least each of the following instances, each in furtherance of their criminal scheme:

a.    From early 2011 through November 2011, on information and belief, the RICO Defendants looted Malca-Amit's Freeport in Geneva, Switzerland, stealing at least 185 pieces of Helios's jewelry worth at least $7.75 million in the aggregate, and each individually worth more than $5,000.  On information and belief, the RICO Defendants then imported this Stolen Jewelry into the United States for use in interstate and foreign commerce.

b. In early 2011, the RICO Defendants lied to Plaintiffs to induce them to export approximately 150 pieces of jewelry worth approximately $5.1 million in the aggregate, and each individually worth more than $5,000, from Italy and Switzerland to Defendants in the United States, using customs forms that materially misrepresented the nature of the import. The RICO Defendants falsely assured Plaintiffs that Defendants would exhibit such Jewelry at the April 28 Exhibition and then promptly return it to Plaintiffs. In fact, the RICO Defendants never intended on returning the Stolen Jewelry to Plaintiffs, instead intending to steal and resell the Stolen Jewelry for their own commercial gain. The RICO Defendants themselves took unlawful possession of the Stolen Jewelry in Switzerland, arranging for its transport to their store in New York.

c. The RICO Defendants caused numerous pieces of Stolen Jewelry, each worth more than $5,000, to be placed in postal offices or authorized depositories, or deposited or caused to be deposited with a private or commercial interstate carrier, and transported in interstate or international commerce for exhibitions, photoshoots, and charity events.

**B. Sale Of Stolen Goods In Violation Of The National Stolen Property Act (18 U.S.C. § 2315)**

111. In violation of 18 U.S.C. § 2315, the RICO Defendants, each being associated with the criminal Enterprise, did unlawfully, knowingly, and intentionally possess, conceal, store, barter, sell, or dispose of goods, wares, merchandise, or money of the value of $5,000 or more, which had crossed a State or United States boundary after being stolen, unlawfully converted, or taken, knowing the same to have been stolen, unlawfully converted, or taken, all with the intent and effect of causing actual economic loss to Plaintiffs.

112.     The RICO Defendants violated Section 2315 in at least each of the following instances, each in furtherance of their criminal scheme:

a.     From early 2011through November 2011, the RICO Defendants looted Malca-Amit's Freeport in Geneva, Switzerland, stealing approximately 185 pieces of Helios's jewelry worth at least $7.75 million in the aggregate, and each individually worth more than $5,000.  On information and belief, the RICO Defendants then imported this Stolen Jewelry into the United States for use in interstate and foreign commerce.

b.     In early 2011, the RICO Defendants lied to Plaintiffs to induce them to export approximately 150 pieces of jewelry worth approximately $5.1 million in the aggregate, and each individually worth more than $5,000, from Italy and Switzerland to Defendants in the United States, using customs forms that materially misrepresented the nature of the import.  The RICO Defendants falsely assured Plaintiffs that Defendants would exhibit such Jewelry at the April 28 Exhibition and then promptly return it to Plaintiffs.  In fact, the RICO Defendants never intended on returning the Stolen Jewelry to Plaintiffs, instead intending to steal and resell the Stolen Jewelry for their own commercial gain.  The RICO Defendants themselves took unlawful possession of the Stolen Jewelry in Switzerland, arranging for its transport to their store in New York.

c.     The RICO Defendants stored the Stolen Jewelry, in whole and in part, at their New York store.  *Compare* Exhibits T (photos of Cantamessa USA's online catalogue, as of May 2012) *with* Exhibits H & I (Idea & Helios's temporary importation forms).

d.     On information and belief, the RICO Defendants have sold numerous pieces of the Stolen Jewelry.  Among other things, between March 15, 2011 and February

14, 2012, the RICO Defendants sold approximately twenty-seven pieces of Plaintiffs'
jewelry, including one or more of the pieces identified as R0838, R0838BL, R0838P,
R0703, CM003, BROM0005B, BROM008bl, BROM008RY, BROM008, BROM008,
BROM008T, BROM5252, BROM5250, BROM007B, BROM007R, BROM070R,
ROM5236, POM321B, GO2713, GO2711, CW001, CM003, POM271, POM2713,
POM2712, POM2710, POM2710T, ROM001, ROM0010R, ROM0010B, ROM0012,
BRM004R, RO838P, ROO22W, ROO22V, PO584, EO684 from their New York store.

     e.     The RICO Defendants caused numerous pieces of Stolen Jewelry, each
worth more than $5,000, to be placed in postal offices or authorized depositories, or
deposited or caused to be deposited with a private or commercial interstate carrier, and
transported in interstate or international commerce for exhibitions, photoshoots, and
charity events.

## C.    Laundering of Money Instruments In Violation Of 18 U.S.C. § 1956(a)(2)

113.    In violation of 18 U.S.C. § 1956(a)(2), the RICO Defendants, each being
associated with the criminal Enterprise, and with the intent and effect of causing actual economic
loss to Plaintiffs, unlawfully, knowingly, and intentionally attempted to—and actually did—
transport, transmit, or transfer a monetary instrument or funds from a place in the United States
to or through a place outside the United States or to a place in the United States from or through
a place outside the United States—

     a.     with the intent to promote the carrying on of specified unlawful activity,
and/or

     b.     knowing that the monetary instrument or funds involved in the
transportation, transmission, or transfer represent the proceeds of some form of unlawful

activity and knowing that such transportation, transmission, or transfer is designed in whole or in part—

    i.    to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; or

    ii.    to avoid a transaction reporting requirement under State or Federal law.

114.    The RICO Defendants violated Section 1956(a)(2) in at least each of the following instances, each in furtherance of their criminal scheme:

    a.    The RICO Defendants transferred at least $35,000 (and, on information and belief, much more) from New York to Delora in Thailand in payment for illegal replicas of Idea's Cantamessa jewelry designs. Such transfer was both to promote the carrying on of criminal copyright infringement in violation of U.S.C. §§ 106, 501, which is a specified unlawful activity as defined by Section 1956(c)(7) and thus in violation of Section 1956(a)(2)(A), and also to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of their criminal copyright infringement, in violation of Section 1956(a)(2)(B)(i).

    b.    On information and belief, the RICO Defendants transferred in excess of $10,000 from New York to Switzerland to facilitate their theft of Helios's jewelry from the Malca-Amit Freeport. Such funds were used for, *inter alia*, freight charges, import fees, duties, and storage costs. The RICO Defendants' misappropriation of the Stolen Jewelry from the Malca-Amit Freeport constituted a specified unlawful activity as defined by Section 1956(c)(7), and was thus in violation of Section 1956(a)(2)(A), in that it constituted criminal offenses under, *inter alia*, Arts. 137 (unlawful appropriation), 138 (embezzlement), 139(1) (theft), and 139(16) (handling stolen goods) of the Swiss Penal

Law—all extraditable offenses under the Extradition Treaty between the United States and Switzerland of May 14, 1900 (TS 354), as amended by the Supplementary Treaty of January 10, 1935 (TS 889) and the Supplementary Treaty of January 31, 1940 (TS 969).

> c.       The RICO Defendants transferred in excess of $1.5 million from New York to Moscow, Russia, and elsewhere in foreign countries for the purpose of advertising, marketing, exhibiting and selling Plaintiffs' Stolen Jewelry, which constituted further specified unlawful activities as defined under Section 1956(c)(7).  On information and belief, the RICO Defendants used these funds to finance:

>> i.        A photo shoot in Moscow featuring Plaintiffs' Stolen Jewelry;

>> ii.       Ten separate international trips for Mr. Kheit to Italy and Moscow, Russia; and

>> iii.      The placement of new orders with international suppliers.

## D.   Interstate And Foreign Travel Or Transportation In Aid Of Racketeering Enterprises In Violation Of 18 U.S.C. § 1952

115.    In violation of 18 U.S.C. § 1952, the RICO Defendants, each being associated with the criminal Enterprise, did unlawfully, knowingly, and intentionally travel in interstate or foreign commerce, and/or use the mail or any facility in interstate or foreign commerce, with intent to distribute the proceeds of any unlawful activity, and/or otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity, all with the intent and effect of causing actual economic loss to Plaintiffs.

116.    The RICO Defendants violated Section 1952 in at least each of the following instances, each in furtherance of their criminal scheme:

> a.       The RICO Defendants repeatedly traveled to other states and foreign countries, including at least ten international trips by Mr. Kheit, to advertise, market, exhibit and sell Plaintiffs' Stolen Jewelry.

b.      The RICO Defendants used facilities in interstate or foreign commerce to transfer at least $35,000 (and, on information and belief, much more) to Delora in Thailand as payment for illegal, counterfeit replicas of Idea's copyrighted Cantamessa Jewelry Designs.  On information and belief, these funds were themselves the proceeds of unlawful activity in that they were obtained through Defendants' illegal sales of Plaintiffs' Stolen Jewelry.

c.      The RICO Defendants used a facility of interstate or foreign commerce on or about February 15, 2012, to send an unauthorized copy, by electronic mail, of Idea's copyrighted Cantamessa jewelry designs to Delora in Thailand.

d.      The RICO Defendants used facilities of interstate or foreign commerce to wire funds, and send information, to promote, manage, and establish their illegal Enterprise trafficking in Plaintiffs' Stolen Jewelry.  Among other things, the RICO Defendants wired or transported such funds to finance:

      i.      A photo shoot in Moscow featuring Plaintiffs' Stolen Jewelry;

      ii.     Ten separate international trips for Mr. Kheit to Italy and Moscow, Russia; and

      iii.    The placement of new orders with international suppliers.

**E.      Criminal Copyright Infringement In Violation Of 17 U.S.C. § 506(a) & 18 U.S.C. § 2319**

117.    In violation of 17 U.S.C. § 506(a) & 18 U.S.C. § 2319, the RICO Defendants, each being associated with the criminal Enterprise, did unlawfully, knowingly, and willfully infringe Idea's copyright in its Copyrighted Jewelry Designs—

a.      for purposes of commercial advantage or private financial gain; and/or

b. by the reproduction or distribution during any 180-day period, of one or more copies of one or more of Idea's Copyrighted Jewelry Designs, which have a total retail value of more than $1,000.

118. As of November 2011, the RICO Defendants were on notice that their authority as Helios's sales agents had been withdrawn by Helios. Moreover, even while they were Helios's agents, they were never authorized to solicit the manufacture of replicas of Idea's Copyrighted Jewelry Designs.

119. The RICO Defendants violated 17 U.S.C. § 506(a) & 18 U.S.C. § 2319 by virtue of the following conduct, in furtherance of their criminal scheme:

a. The RICO Defendants solicited Delora to manufacture unauthorized, counterfeit replicas of Idea's Copyrighted Jewelry Designs on at least two separate occasions.

b. On these occasions, the RICO Defendants solicited and obtained unauthorized counterfeit replicas of at least twenty-seven of Idea's Copyrighted Jewelry Designs, including pieces from its Anturium Collection, Registration No. VA0001822468.

c. These counterfeited replicas had a wholesale price of at least $35,000, which the RICO Defendants paid to Delora, and a fair market resale value of at least $10,000 per copy.

d. The RICO Defendants reproduced and distributed these twenty-seven counterfeited replicas all within forty-seven days (*i.e.*, the period of time between February 14, 2012, when the RICO Defendants first solicited these particular

counterfeited replicas, and April 2, 2012, when the Defendants took delivery of the replicas from Delora).

120.     On information and belief, the particular infringing conduct alleged herein, which Plaintiffs discovered entirely by accident, is only a small portion of Defendants' ongoing willful and criminal infringement of Idea's Copyrighted Jewelry Designs.

### F.     Deprivation Of Honest Services By Mail And Wire Fraud In Violation Of 18 U.S.C. §§ 1341, 1343 & 1346

121.     In violation of 18 U.S.C. §§ 1341, 1343 & 1346, the RICO Defendants, each being associated with the criminal Enterprise, did unlawfully, knowingly, and intentionally devise a scheme to deprive Helios of the intangible right of honest services, and, for the purpose of executing such scheme or artifice or attempting so to do, made use of the United States Postal Service, and wires in interstate or foreign commerce, all with the intent and effect of causing actual economic loss to Plaintiffs.

122.     More specifically, as Helios's agents for the marketing and sales of the Cantamessa line of jewelry worldwide, the RICO Defendants owed Plaintiffs fiduciary duties. The RICO Defendants unlawfully, knowingly, intentionally and fraudulently breached their fiduciary duties to Helios and used the mails and wires in furtherance of their breaches of duty.

123.     The RICO Defendants violated Sections 1341, 1343 & 1346 in at least each of the following instances, each in furtherance of their criminal scheme:

a.     On information and belief, the RICO Defendants used the international mails and wires to loot Helios's jewelry from the Malca-Amit's Freeport in Geneva, Switzerland, in flagrant violation of their fiduciary duties to Helios.  The RICO Defendants used international wires to transfer funds used to facilitate their theft, and they used international mails to transport the Stolen Jewelry.

b.      The RICO Defendants used the international mails and wires in their

scheme to steal further pieces of Helios's jewelry by fraudulently inducing it to loan

jewelry to Defendants for the April 28 Exhibition, in flagrant violation of their fiduciary

duties to Helios.  The RICO Defendants used international wires to communicate with

Helios and convince it to loan the jewelry, and they used international mails to transport

the Stolen Jewelry.

c.      The RICO Defendants used the international mails and wires in their

scheme to misappropriate and counterfeit Idea's jewelry designs, in flagrant violation of

their fiduciary duties to Helios.  The RICO Defendants used the international wires to (*i*)

solicit and instruct Delora to manufacture the counterfeited jewelry, (*ii*) transmit

drawings and designs to Delora, and (*iii*) wire payment to Delora, and they used the

international mails to send Plaintiffs' Stolen Jewelry to Delora for copying.  Particular

examples of such criminal wire and mail communications are attached as Exhibit O.

124.    RICO Defendants participated in the scheme or artifice knowingly, willfully and

with specific intent to deceive and/or defraud Plaintiffs into paying or transferring to the RICO

Defendants money or property that was not owed.

125.    Plaintiffs reasonably relied on the RICO Defendants' fraudulent

misrepresentations and suffered direct injury to their business and property.  Indeed, as a direct

and proximate result of Messrs. Cantamessa's and Kheit's conduct and participation in the affairs

of the Enterprise through the racketeering conspiracy, Plaintiffs suffered injury, including:

a.      The loss of approximately $5.1 million in Stolen Jewelry representing the

March 2011 imports;

43

b.     The loss of at least $7.75 million in Stolen Jewelry that was stolen from Plaintiffs' storage facility at Malca-Amit;

c.     Lost sales of $902,406.30;

d.     Diminished value of Plaintiffs' proprietary interests in their Cantamessa Jewelry collections;

e.     Financial penalties on their imports, which have exceeded the lawful terms allotted for ATA Carnets;

f.     Professional expenses incurred in investigating and obtaining redress for the RICO Defendants' misappropriations and malfeasances.

126.   The interference with Plaintiffs' businesses, along with the predicate violations, had effects on interstate commerce.

127.   In addition to harm to Plaintiffs, RICO Defendants' commission of mail and wire fraud has actually harmed innocent third-parties, such as United States customs officials, Italian customs officials, Magazine editors, and innocent purchasers customers of Defendants' "Cantamessa" jewelry within the United States and abroad.

### G.     Mail And Wire Fraud, In Violation Of 18 U.S.C. §§ 1341 & 1343

128.   In violation of 18 U.S.C. §§ 1341 & 1343, the RICO Defendants, each being associated with the criminal Enterprise, did unlawfully, knowingly, and intentionally devise a scheme or artifice, and, for the purpose of executing such scheme or artifice or attempting so to do, made use of the United States Postal Service, and wires in interstate or foreign commerce, all with the intent and effect of causing actual economic loss to Plaintiffs.

129.   The RICO Defendants violated Sections 1341 & 1343 in at least each of the following instances, each in furtherance of their criminal scheme:

44

a.      Since the launch of their Twitter site (@Cantamessaworld) on February 29, 2012, the RICO Defendants have used their Twitter site to market, advertise, and sell Plaintiffs' Stolen Jewelry.  For example, on March 1, 2012, Defendants advertised Idea's Anturium Ring (identified in Idea's Carnet as R0838W), a copy of which is attached hereto as Exhibit U.

b.      Since their website launch on March 8, 2012, the RICO Defendants have used their domain name to market, advertise, and sell Plaintiffs' Stolen Jewelry. Currently, Defendants' website advertises ninety-four pieces from Idea's ATA Carnet, Helios's Temporary Export, and Plaintiffs' Malca-Amit storage site. *See* Exhibit T.

c.      On information and belief, the RICO Defendants used the international mails and wires to loot Helios's jewelry from the Malca-Amit's Freeport in Geneva, Switzerland.  The RICO Defendants used international wires to transfer funds used to facilitate their theft, and they used international mails to transport the Stolen Jewelry.

d.      The RICO Defendants used the international mails and wires in their scheme to steal further pieces of Plaintiffs' jewelry by fraudulently inducing them to loan jewelry to Defendants for the April 28 Exhibition.  The RICO Defendants used international wires to communicate with Plaintiffs and convince them to loan the jewelry, and they used international mails to transport the Stolen Jewelry.

e.      The RICO Defendants used the international mails and wires in their scheme to misappropriate and counterfeit Idea's jewelry designs.  The RICO Defendants used the international wires to (i) solicit and instruct Delora to manufacture the counterfeited jewelry, (ii) transmit drawings and designs to Delora, and (iii) wire

payment to Delora, and they used the international mails to send Plaintiffs' Stolen

Jewelry to Delora for copying.

130.    The use of interstate mail and wire to connect this international racketeering

conspiracy was foreseeable.

131.    Plaintiffs incorporate by reference the attached Exhibit O, which sets forth

particular examples of wire and mail communications in furtherance of the RICO Defendants'

scheme or artifice to defraud that constitute violations of 18 U.S.C. §§ 1341 & 1343, including

which individual Defendant caused the communication to be mailed or wired, when the

communication was made, and how it furthered the fraudulent scheme.

132.    RICO Defendants participated in the scheme or artifice knowingly, willfully and

with specific intent to deceive and/or defraud Plaintiffs into paying RICO Defendants.

133.    Plaintiffs reasonably relied on RICO Defendants' fraudulent misrepresentations

and suffered direct injury to their business and property.  Indeed, as a direct and proximate result

of Messrs. Cantamessa's and Kheit's conduct and participation in the affairs of the enterprise

through the racketeering conspiracy, Plaintiffs suffered injury, including:

        a.      The loss of approximately $5.1 million in Stolen Jewelry representing the

March 2011 imports;

        b.      The loss of at least $7.75 million in Stolen Jewelry that was stolen from

Plaintiffs' storage facility at Malca-Amit;

        c.      Lost sales of $902,406.30;

        d.      Diminished value of Plaintiffs' proprietary interests in their Cantamessa

Jewelry collections;

e.      Financial penalties on their imports, which have exceeded the lawful terms allotted for ATA Carnets;

f.      Professional expenses incurred in investigating and obtaining redress for the RICO Defendants' misappropriations and malfeasances.

134.    The interference with Plaintiffs' businesses, along with the predicate violations, had effects on interstate commerce.

135.    In addition to harm to Plaintiffs, RICO Defendants' commission of mail and wire fraud has actually harmed innocent third-parties, such as United States customs officials, Italian customs officials, Magazine editors, and innocent purchasers customers of Defendants' "Cantamessa" jewelry within the United States and abroad.

### *Plaintiffs' Damages Resulting From Defendants' RICO Violations*

136.    As a direct and proximate result of Messrs. Cantamessa's and Kheit's conduct and participation in the affairs of the Enterprise through the racketeering conspiracy, Plaintiffs suffered injury, including:

a.      The loss of approximately $5.1 million in Stolen Jewelry representing the March 2011 imports;

b.      The loss of at least $7.75 million in Stolen Jewelry that was stolen from Plaintiffs' storage facility at Malca-Amit;

c.      Lost sales of $902,406.30;

d.      Diminished value of Plaintiffs' proprietary interests in their Cantamessa Jewelry collections;

e.      Financial penalties on their imports, which have exceeded the lawful terms allotted for ATA Carnets;

f.     Professional expenses incurred in investigating and obtaining redress for the RICO Defendants' misappropriations and malfeasances.

137.   The interference with Plaintiffs' businesses, along with the predicate violations, had effects on interstate commerce.

138.   On information and belief, the RICO Defendants have derived substantial income from their unlawful activities, which has facilitated the expansion of their unlawful activities worldwide.  Indeed, Defendants' illegal Cantamessa Enterprise is growing: on May 1, 2012, the RICO Defendants advertised the opening of a new store in Ukraine.

139.   By virtue of these violations of 18 U.S.C. § 1962(c), Plaintiffs are entitled to recover treble damages costs and attorneys' fees from the RICO Defendants and such other relief as may be appropriate, pursuant to 18 U.S.C. § 1964(c).

## AS AND FOR A SECOND CAUSE OF ACTION

### CONSPIRACY TO VIOLATE RICO, 18 U.S.C. § 1962(D)
### (AGAINST MESSRS. CANTAMESSA AND KHEIT)

140.   Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1-139, *supra*, as though fully set forth herein.

141.   The RICO Defendants have unlawfully, knowingly and willfully combined, conspired, confederated and agreed together and with others to violate 18 U.S.C. § 1962(c) as described above, in violation of 18 U.S.C. § 1962(d).

142.   Upon information and belief, the RICO Defendants knew they were engaged in a conspiracy to commit the predicate acts, and they knew that the predicate acts were part of such racketeering activity, and the participation and agreement of each of them was necessary to allow the commission of this pattern of racketeering activity.  This conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c), as described above, in violation of 18 U.S.C. § 1962(d).

143.    Upon information and belief, the RICO Defendants agreed to conduct or participate, directly or indirectly, in the conduct, management or operation of the enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

144.    Upon information and belief, each RICO Defendant knew about and agreed to facilitate the Enterprise's scheme to steal Plaintiffs' Cantamessa jewelry, misappropriate and counterfeit Idea's Copyrighted Jewelry designs, and infringe Idea's trademarked Crown Logo and Cantamessa name.  It was part of the conspiracy that RICO Defendants would commit a pattern of racketeering activity in the conduct of the affairs of the enterprise, including the acts of racketeering set forth in paragraphs 106-135, *supra*.

145.    As a direct and proximate result of the RICO Defendants' conspiracy, the acts of racketeering activity of the Enterprise, the overt acts taken in furtherance of that conspiracy and the violations of 18 U.S.C. § 1962(d), Plaintiffs have been injured in their business and property, including damage to Plaintiffs' reputation and goodwill; the impairment of Plaintiffs' interests in executed contracts; and the attorneys' fees and costs to prosecute this action.

146.    By virtue of these violations of 18 U.S.C. § 1962(d), Plaintiffs are entitled to recover treble damages, costs and attorneys' fees from the RICO Defendants, together with such other relief as may be appropriate, pursuant to 18 U.S.C. § 1964(d).

### AS AND FOR A THIRD CAUSE OF ACTION

#### VIOLATION OF RICO, 18 U.S.C. § 1962(A)
#### (AGAINST MESSRS. CANTAMESSA AND KHEIT)

147.    Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1-146, *supra*, as though fully set forth herein.

148.    Each of the RICO Defendants is a person who received income from a pattern of racketeering activity in which the RICO Defendants participated as a principal, as that term is used in 18 U.S.C. § 2.

149.    On information and belief, the RICO Defendants have reinvested the income derived from their racketeering activity into Cantamessa USA in furtherance of the criminal purposes of the Enterprise, including:

    a.    Financing and maintaining Cantamessa USA's New York boutique, including, *inter alia*:

            i.    Developing Cantamessa USA's internet presence through domain names (Cantamessajewels.com and Cantamessaworld.com);

            ii.   Leasing Cantamessa USA's Fifth Avenue boutique, which unlawfully houses Plaintiffs' stolen jewelry;

            iii.  Executing supply contracts to furnish their New York boutique.

    b.    Financing the freight of Plaintiffs' Stolen Jewelry in interstate and foreign commerce for use in advertising campaigns promoting the Cantamessa USA brand;

    c.    Financing the criminal copyright infringement of Idea's Copyrighted Jewelry Designs;

    d.    Financing the RICO Defendants' exhibition of their counterfeit Cantamessa collection at industry fairs worldwide;

    e.    Financing the RICO Defendants' commercial travel expenses incurred in the promotion of their counterfeit Cantamessa collection worldwide; and

    f.    Funding legal actions designed to forestall Plaintiffs' efforts to obtain redress for the RICO Defendant's criminal theft and misappropriation of Plaintiff's jewelry and intellectual property.

50

150.     The Enterprise was engaged in, or the activities of the Enterprise affected, interstate and foreign commerce.

151.     Plaintiffs' business or property was injured by reason of the RICO Defendants' use of or investment of the income in the Enterprise.

152.     By virtue of this pattern of racketeering, the RICO Defendants have received income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt to acquire an interest in, or to establish or operate any enterprise that is engaged in or affects interstate or foreign commerce.

153.     By virtue of these violations of 18 U.S.C. § 1962(a), Plaintiffs are entitled to recover treble damages, costs and attorneys' fees from the RICO Defendants, together with such other relief as may be appropriate, pursuant to 18 U.S.C. § 1964(d).

## AS AND FOR A FOURTH CAUSE OF ACTION

### VIOLATION OF RICO, 18 U.S.C. § 1962(B)
### (AGAINST MESSRS. CANTAMESSA AND KHEIT)

154.     Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1-153, *supra*, as though fully set forth herein.

155.     The RICO Defendants are persons who through a pattern of racketeering activity acquired or maintain an interest in or control of the criminal Enterprise, Cantamessa USA.

156.     The RICO Defendants' interest or control in the Enterprise was associated with or connected to the pattern of racketeering activity.

157.     The Enterprise was engaged in, or the activities of the Enterprise affected, interstate and foreign commerce.

158.     Plaintiffs' business and property was injured by reason of RICO Defendants' acquisition or maintenance of the interest in, or control over, the enterprise.

159.    By virtue of their pattern of racketeering, RICO Defendants have acquired or maintained, directly or indirectly, an interest in or control of an enterprise that is engaged in or affects interstate or foreign commerce.

160.    By virtue of these violations of 18 U.S.C. § 1962(b), Plaintiffs are entitled to recover treble damages, costs and attorneys' fees from the RICO Defendants, together with such other relief as may be appropriate pursuant to 18 U.S.C. § 1964(d).

## AS AND FOR A FIFTH CAUSE OF ACTION

### COPYRIGHT INFRINGEMENT UNDER THE U.S. COPYRIGHT ACT (AGAINST ALL DEFENDANTS)

161.    Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1-160, *supra*, as though fully set forth herein.

162.    Idea's Copyrighted Jewelry Designs and the various versions thereof are copyrighted works.  Idea has applied for and obtained Certificates of Copyright Registration duly issued by the Register of Copyright for the Copyrighted Works.  *See* Exhibit B ("Anturium Collection," VA0001822468, "Prince Collection," VA0001824288, and "Teddy Bear Collection," VA0001825182).  Under the U.S. Copyright Act, Idea has the exclusive rights, *inter alia*, to reproduce the Copyrighted Jewelry Designs, to prepare derivative works based upon the Copyrighted Jewelry Designs, and to distribute copies of the Copyrighted Jewelry Designs to the public.  *See* 17 U.S.C. §§ 106(1), (2), (3).

163.    Through their conduct alleged herein, Defendants have directly infringed Idea's copyrights in the Copyrighted Jewelry Designs by reproducing, adapting, and/or distributing works embodying the Copyrighted Jewelry Designs without authorization in violation of the Copyright Act.  *See* 17 U.S.C. §§ 106, 501.  Defendants have caused counterfeit replicas of Idea's Copyrighted Jewelry Designs to be distributed within the United States.

164.    Defendants have the right and ability to supervise and control ongoing infringements by third parties, including infringements by those who—with Defendants' authorization, approval, and consent—distribute and cause copies to be made of Idea's Copyrighted Jewelry Designs in the United States and elsewhere.  Defendants have refused and failed to exercise supervision and control over such third parties, including Delora, and Defendants also reap a direct pecuniary benefit from the infringement.  As a direct and proximate result of Defendants' actions, third parties, including Delora, have infringed Idea's copyrights in the Copyrighted Jewelry Designs, including by reproducing, counterfeiting, adapting, distributing, selling and publicly displaying the Copyrighted Jewelry Designs.

165.    In addition, Defendants have knowingly facilitated the unauthorized copying and dissemination of Idea's Copyrighted Jewelry Designs.  Defendants have materially contributed to the infringing conduct of third parties, *inter alia*, because Defendants have knowingly authorized, approved of, and consented to third party distribution and copying of Idea's Copyrighted Jewelry Designs in the United States and elsewhere, and Defendants each possessed actual or constructive knowledge of the violations at issue.

166.    The aforementioned infringing acts occurred in whole or in part within the territorial boundaries of the United States and/or its territories.

167.    Each infringement by Defendants in and to Idea's Copyrighted Jewelry Designs constitutes a separate and distinct act of infringement.

168.    Defendants' acts of infringement were knowing, willful, negligent, in disregard of, and with indifference to, the rights of Idea.

169.    As a direct and proximate result of the infringements by Defendants, Idea is entitled to its damages and Defendants' profits, each in amounts to be proven at trial.

170.    Alternatively, Idea is entitled to the maximum statutory damages in the amount of $150,000 with respect to each work infringed, or for such other amounts as may be proper. *See* 17 U.S.C. § 504(c).

171.    Idea is further entitled to its attorneys' fees and costs pursuant to 17 U.S.C. § 505.

172.    As a direct and proximate result of the foregoing acts and conduct, Idea has sustained and will continue to sustain substantial, immediate, and irreparable injury, for which there is no adequate remedy at law.  On information and belief, unless enjoined and restrained by this Court, Defendants will continue to infringe Idea's rights in Idea's Copyrighted Jewelry Designs.  Idea is entitled to preliminary and permanent injunctive relief.

### AS AND FOR A SIXTH CAUSE OF ACTION

### TRADEMARK INFRINGEMENT UNDER THE LANHAM ACT, 15 U.S.C. § 1125(A) (AGAINST ALL DEFENDANTS)

173.    Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1-172, *supra*, as though fully set forth herein.

174.    The Crown Logo and Cantamessa name are, individually and as used together, famous and distinctive trademarks used in commerce by Plaintiffs.  Among other things: (*a*) the Crown Logo and Cantamessa name have acquired a high degree of distinctiveness; (*b*) the Cantamessa name has been used on hundreds of thousands of pieces of Cantamessa jewelry sold around the world since the 1930s; (*c*) the Crown Logo and Cantamessa name together have been used on innumerable pieces of Cantamessa jewelry throughout the United States and around the world since 2007; (*d*) Plaintiffs and their predecessors have spent several million dollars in advertising and marketing the Crown Logo and Cantamessa name; and (*d*) the Crown Logo and Cantamessa name have an extremely high degree of recognition among consumers of luxury jewelry.

54

175.     As Helios's agents and fiduciaries, Defendants used the Crown Logo and Cantamessa name, including inside the United States, to advertise, market and sell Plaintiffs' Cantamessa jewelry.  Among other things, Defendants used the Crown Logo and Cantamessa name at the April 28 Exhibition to advertise and exhibit Plaintiffs' Cantamessa jewelry. The added goodwill, distinctiveness, and identification with Plaintiffs' jewelry that resulted from Defendants' use of the Crown Logo and Cantamessa name belongs to Plaintiffs.

176.     Defendants' unauthorized use of the Crown Logo and Cantamessa name has caused, and is likely to cause, confusion and mistake and to deceive potential consumers and the public as to the source, origin or sponsorship of Defendants' jewelry.  Consumers exposed to Defendants' unauthorized use of the Crown Logo and Cantamessa name will falsely believe they are dealing with Plaintiffs—the owners of the famed Cantamessa brand—not their faithless former sales agents, and that Defendants continue to be associated with, sponsored by, or endorsed by Plaintiffs.

177.     Plaintiffs have no control over the quality of jewelry now sold by Defendants. The valuable goodwill in their Cantamessa brand is therefore at substantial risk of being diminished or tarnished by consumers' false identification of Defendants' products with Plaintiffs' brand.

178.     Defendants' unauthorized use of the Crown Logo and Cantamessa name has caused and, unless restrained, will continue to cause great and irreparable injury to Plaintiffs, the Cantamessa jewelry brand, and the distinctiveness of the Crown Logo and Cantamessa name themselves, and to the business and goodwill represented thereby, in an amount that cannot be presently ascertained, leaving Plaintiffs with no adequate remedy at law.  Plaintiffs are therefore entitled to injunctive relief under 15 U.S.C. § 1114.

179.    Defendants' actions demonstrate a willful intent to trade on the reputation and goodwill associated with the Crown Logo and Cantamessa name, thereby entitling Plaintiffs' to recover Defendants' profits, treble damages, costs, and reasonable attorneys' fees under 15 U.S.C. §§ 1114, 1116 and 1117.

## AS AND FOR A SEVENTH CAUSE OF ACTION

### Trademark Dilution under the Federal Trademark Dilution Act – 15 U.S.C. § 1125(c) (Against All Defendants)

180.    Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1-179, *supra*, as though fully set forth herein.

181.    The Crown Logo and Cantamessa name are, individually and as used together, famous and distinctive trademarks used in commerce by Plaintiffs.  Among other things: (*a*) the Crown Logo and Cantamessa name have acquired a high degree of distinctiveness; (*b*) the Cantamessa name has been used on hundreds of thousands of pieces of Cantamessa jewelry sold around the world since the 1930s; (*c*) the Crown Logo and Cantamessa name together have been used on innumerable of pieces of Cantamessa jewelry throughout the United States and around the world since 2007; (*d*) Plaintiffs and their predecessors have spent several million dollars in advertising and marketing the Crown Logo and Cantamessa name; and (*d*) the Crown Logo and Cantamessa name have an extremely high degree of recognition among consumers of luxury jewelry.

182.    As Helios's agents and fiduciaries, Defendants used the Crown Logo and Cantamessa name, including inside the United States, to advertise, market and sell Plaintiffs' Cantamessa jewelry.  Among other things, Defendants used the Crown Logo and Cantamessa name at the April 28 Exhibition to advertise and exhibit Plaintiffs' Cantamessa jewelry. The

added goodwill, distinctiveness, and identification with Plaintiffs' jewelry that resulted from Defendants' use of the Crown Logo and Cantamessa name belongs to Plaintiffs.

183.   Defendants' unauthorized use of the Crown Logo and Cantamessa name dilutes and detracts from the distinctiveness of the Crown Logo and Cantamessa name by eroding the public's exclusive identification of this famous mark with Plaintiffs' brand and the Cantamessa line of jewelry, resulting in damage to Plaintiffs and the substantial business and goodwill symbolized by the Crown Logo and Cantamessa name, in violation of the Federal Trademark Dilution Act, 15 U.S.C. § 1125(c).

184.   Defendants' acts of trademark dilution name has caused and, unless restrained, will continue to cause great and irreparable injury to Plaintiffs, the Cantamessa jewelry brand, and the distinctiveness of the Crown Logo and Cantamessa name themselves, and to the business and goodwill represented thereby, in an amount that cannot be presently ascertained, leaving Plaintiffs with no adequate remedy at law.  Plaintiffs are therefore entitled to injunctive relief under 15 U.S.C. § 1125(c).

185.   Defendants' conduct has been undertaken with a willful intent to trade on the reputation and heritage of Plaintiffs' Cantamessa brand and to cause dilution of the famous Crown Logo and Cantamessa name, thereby entitling Plaintiffs to damages and the other remedies available under 15 U.S.C. §§ 1116, 1117 and 1125(c)(5).

## AS AND FOR AN EIGHTH CAUSE OF ACTION

### FALSE DESIGNATION OF ORIGIN UNDER SECTION 43(A) OF THE FEDERAL LANHAM ACT – 15 U.S.C. § 1125(A) (AGAINST ALL DEFENDANTS)

186.   Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1-185, *supra*, as though fully set forth herein.

187.    The Crown Logo and Cantamessa name are, individually and as used together, famous and distinctive trademarks used in commerce by Plaintiffs.  Among other things: (*a*) the Crown Logo and Cantamessa name have acquired a high degree of distinctiveness; (*b*) the Cantamessa name has been used on hundreds of thousands of pieces of Cantamessa jewelry sold around the world since the 1930s; (*c*) the Crown Logo and Cantamessa name together have been used on innumerable pieces of Cantamessa jewelry throughout the United States and around the world since at least 2007;  (*d*) Plaintiffs and their predecessors have spent several million dollars in advertising and marketing the Crown Logo and Cantamessa name; and (*d*) the Crown Logo and Cantamessa name have an extremely high degree of recognition among consumers of luxury jewelry.

188.    As Helios's agents and fiduciaries, Defendants used the Crown Logo and Cantamessa name, including inside the United States, to advertise, market and sell Plaintiffs' Cantamessa jewelry.  Among other things, Defendants used the Crown Logo and Cantamessa name at the April 28 Exhibition to advertise and exhibit Plaintiffs' Cantamessa jewelry. The added goodwill, distinctiveness, and identification with Plaintiffs' jewelry that resulted from Defendants' use of the Crown Logo and Cantamessa name belongs to Plaintiffs.

189.    Defendants' unauthorized use of the Crown Logo and Cantamessa name is a false designation of origin and has caused, and is likely to continue to cause, confusion and mistake and to deceive potential consumers and the public as to the source, origin or sponsorship of Defendants' jewelry.  Consumers exposed to Defendants' unauthorized use of the Crown Logo and Cantamessa name will falsely believe they are dealing with Plaintiffs—the owners of the famed Cantamessa brand—not their faithless former sales agents, and that Defendants continue to be associated with, sponsored by, or endorsed by Plaintiffs.

190.    Plaintiffs have no control over the quality of jewelry now sold by Defendants. The valuable goodwill in their Cantamessa brand is therefore at substantial risk of being diminished or tarnished by consumers' false identification of Defendants' products with Plaintiffs' brand.

191.    Defendants' unauthorized use of the Crown Logo and Cantamessa name has caused and, unless restrained, will continue to cause great and irreparable injury to Plaintiffs, the Cantamessa jewelry brand, and the distinctiveness of the Crown Logo and Cantamessa name themselves, and to the business and goodwill represented thereby, in an amount that cannot be presently ascertained, leaving Plaintiffs with no adequate remedy at law.  Plaintiffs are therefore entitled to injunctive relief under 15 U.S.C. § 1125(a).

192.    Defendants' actions demonstrate a willful intent to trade on the reputation and goodwill associated with the Crown Logo and Cantamessa name, thereby entitling Plaintiffs' to recover Defendants' profits, treble damages, costs, and reasonable attorneys' fees under 15 U.S.C. §§ 1114, 1116 and 1117.

## AS AND FOR A NINTH CAUSE OF ACTION

### CANCELLATION OF FEDERAL REGISTRATION PURSUANT TO SECTION 37 OF THE FEDERAL LANHAM ACT —15 U.S.C. § 1119 (AGAINST DEFENDANTS CANTAMESSA USA AND MR. CANTAMESSA)

193.    Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1-192, *supra*, as though fully set forth herein.

194.    The Crown Logo and Cantamessa name depicted in Defendants' Trademark Registration No. 85355051 (the "Registration") is identical to Plaintiffs' Crown Logo and Cantamessa name.  When used in connection with jewelry, Defendants' registered Crown Logo and Cantamessa name is likely to cause confusion and mistake and to deceive potential consumers and the public as to the source, origin or sponsorship of the jewelry on which it is

used.  Defendants are using the registered mark "so as to misrepresent the source of the goods or services on or in connection with which the mark is used."  The Registration is therefore subject to cancellation, under Sections 2(d), 14(3) and 37 of the Lanham Act, 15 U.S.C. §§ 1052(d), 1064(3) and 1119.

195.    The Crown Logo and Cantamessa name depicted in Defendants' Trademark Registration No. 85355051, when used in connection with jewelry, dilute Plaintiffs' famous and distinctive Crown Logo and Cantamessa name by eroding the public's exclusive identification of this famous mark with Plaintiffs' brand and Cantamessa line of jewelry.  The Registration is therefore subject cancellation under Sections 14, 37 and 43(c) of the federal Lanham Act, 15 U.S.C. §§ 1052(e), 1064 and 1125(c).

196.    Defendants have no cognizable right in the Registration.  Moreover, Idea's common law and trademark rights in the Crown Logo and Cantamessa name, preceding the incorporation of Cantamessa USA by one year, are superior in time to any rights Defendants have in the Registration.

197.    Defendant's registration of the Crown Logo and Cantamessa name has caused and will continue to cause, great and irreparable harm to Plaintiffs, the Cantamessa jewelry brand, and the distinctiveness of the Crown Logo and Cantamessa name themselves, and to the business and goodwill represented thereby.  Accordingly, the Registration should be cancelled by this Court under Section 37 of the Lanham Act, 15 U.S.C. § 1119.

## AS AND FOR A TENTH CAUSE OF ACTION

### STATE STATUTORY AND COMMON LAW TRADEMARK INFRINGEMENT
### (AGAINST ALL DEFENDANTS)

198.    Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1-197, *supra*, as though fully set forth herein.

199.     Defendants' use of the Crown Logo and Cantamessa name constitutes trademark infringement actionable under the Trademark Act of New York, Gen. Bus. L. 360-1, and the statutory and/or common law of each of the fifty states.

200.     Defendants' acts of trademark infringement have caused and, unless restrained, will continue to cause, great and irreparable harm to Plaintiffs, the Cantamessa jewelry brand, and the distinctiveness of the Crown Logo and Cantamessa name themselves, and to the business and goodwill represented thereby, in an amount that cannot be presently ascertained.  Plaintiffs are therefore entitled to injunctive and monetary relief.

## AS AND FOR AN ELEVENTH CAUSE OF ACTION

### CONVERSION
### (AGAINST ALL DEFENDANTS)

201.     Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1-200, *supra*, as though fully set forth herein.

202.     Plaintiffs are the lawful owners of the actual jewelry pieces, designs, molds, and intellectual property that comprise the jewelry line that Defendants now advertise as the "Cantamessa USA" jewelry line.

203.     One or before March 2011, and without consent of the Plaintiffs, Defendants stole at least $7.75 million of Plaintiffs' jewelry for their own, unauthorized commercial use from Plaintiffs' Malca-Amit warehouse.

204.     In March 2011, Defendants' converted an additional $5.1 million in Stolen Jewelry that they had fraudulently induced Plaintiffs to import to them for temporary display.

205.     As a direct and proximate result of Defendants' conversion, Plaintiffs suffered injury, including:

      a.      The loss of approximately $5.1 million in Stolen Jewelry representing the March 2011 imports;

      b.      The loss of at least $7.75 million in Stolen Jewelry that was stolen from Plaintiffs' storage facility at Malca-Amit;

      c.      Financial penalties on their imports, which have exceeded the lawful terms allotted for ATA Carnets;

      d.      Professional expenses incurred in investigating and obtaining redress for the Defendants' misappropriations and malfeasances.

### AS AND FOR A TWELFTH CAUSE OF ACTION

#### FRAUD
#### (AGAINST ALL DEFENDANTS)

206.    Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1-205, *supra*, as though fully set forth herein.

207.    Defendants knowingly made materially false statements to Plaintiffs, as described in detail above, regarding their intent to display Plaintiffs' jewelry in the April 28 Exhibition and return it to Plaintiffs immediately thereafter.

208.    In reasonable reliance on these representations, Plaintiffs shipped approximately $5.1 million in jewelry to the Defendants for display at the April 28 Exhibition.

209.    Defendants' representations were knowingly false or made in reckless disregard of their falsity.   Such representations were intended to induce, and did induce, Plaintiffs to import their jewelry to Defendants.

210.    As a direct and proximate result of Defendants' fraud, Plaintiffs suffered injury, including:

a.      The loss of approximately $5.1 million in Stolen Jewelry representing the March 2011 imports;

b.      Financial penalties on their imports, which have exceeded the lawful terms allotted for ATA Carnets;

c.      Professional expenses incurred in investigating and obtaining redress for the Defendants' misappropriations and malfeasances.

211.    Defendants' have engaged in the malicious, willful, and fraudulent commission of wrongful acts and, because of the reprehensible and outrageous nature of these acts, Plaintiffs are entitled to, and should be, awarded punitive damages against Defendants.

## AS AND FOR A THIRTEENTH CAUSE OF ACTION

### TRESPASS TO CHATTELS
### (AGAINST ALL DEFENDANTS)

212.    Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1-211, *supra*, as though fully set forth herein.

213.    Defendants have intentionally, and without Plaintiffs' justification or consent, physically interfered with the use and enjoyment of approximately $12.85 million of Plaintiffs' Stolen Jewelry.  On information and belief, Defendants' knowing interference with Plaintiffs' Jewelry has included: (*a*) selling the Jewelry in interstate commerce, (*b*) copying the Jewelry designs, (*c*) transporting the Jewelry in interstate and foreign commerce, (*d*) publicly displaying and advertising the Jewelry as belonging to Defendants, and (*e*) donating the Jewelry to charities.

214.    Defendants' interference with Plaintiffs' property has damaged Plaintiffs by:

a.      Depriving Plaintiffs of the use of their property;

b.      Depriving Plaintiffs of income from the use of their property;

      c.      Depriving Plaintiffs of sales that are rightfully theirs from replicas of Idea's jewelry designs;

      d.      Devaluing and diluting the value of Idea's Crown Logo and Cantamessa name by causing consumers falsely to associate such marks with Defendants' business and products, rather than Plaintiffs' business and products;

      e.      Depriving Plaintiffs of sales that are rightfully theirs of jewelry bearing the Crown Logo and Cantamessa name;

      f.      Damaging Plaintiffs' reputation and goodwill, including their relationships with the governments of the United States, Italy and Switzerland, their relationships with their suppliers, such as Delora, and their customers.

215.    The harms suffered by Plaintiffs are the direct, proximate, and reasonably foreseeable results of the Defendants' acts of intentional interference with Plaintiffs' business and property interests.

216.    Defendants have engaged in the malicious, willful, and fraudulent commission of wrongful acts and, because of the reprehensible and outrageous nature of these acts, Plaintiffs are entitled to, and should be, awarded punitive damages against each of the Defendants.

## AS AND FOR A FOURTEENTH CAUSE OF ACTION

### BREACH OF FIDUCIARY DUTY
### (AGAINST MESSRS. CANTAMESSA AND KHEIT)

217.    Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1-216, *supra*, as though fully set forth herein.

218.    A fiduciary relationship existed at all material times between Messrs. Cantamessa and Kheit and Helios, whereby such Defendants owed Helios fiduciary duties, including duties of care and loyalty.  As Helios's global sales agents, these Defendants knew that they owed such

fiduciary duties to Helios.  These Defendants further knew that, through their pattern of wrongful and unlawful activity, they were in willful, flagrant breach of their fiduciary duties to Helios.

219.    Messrs. Cantamessa and Kheit breached their fiduciary duties to Helios by:

a.      Stealing Helios's jewelry from the Malca-Amit Freeport;

b.      Fraudulently inducing Plaintiffs to loan jewelry to Defendants for exhibition at the April 28 Exhibition, with intent to steal such jewelry once it was in their possession;

c.      Lying to Helios about their sales of Helios's jewelry, so they could keep the entire sales proceeds for themselves;

d.      Soliciting, obtaining, and selling counterfeited replicas of Idea's Cantamessa Jewelry designs, which Helios had the exclusive right to purchase and sell;

e.      Using the Crown Logo and Cantamessa name in commerce for their own benefit to identify their own business, in violation of Helios's exclusive license to use such marks;

f.       Actively concealing their faithless conduct from Helios.

220.    As a direct and proximate result of Messrs. Cantamessa's and Kheit's breaches of fiduciary duties, Helios suffered injury, including:

a.      The loss of approximately $5.1 million in Stolen Jewelry representing the March 2011 imports;

b.      The loss of at least $7.75 million in Stolen Jewelry that was stolen from Plaintiffs' storage facility at Malca-Amit;

c.      Lost sales of $902,406.30;

d.      Diminished value of Plaintiffs' proprietary interests in their Cantamessa

Jewelry collections;

e.      Financial penalties on their imports, which have exceeded the lawful terms

allotted for ATA Carnets;

f.      Professional expenses incurred in investigating and obtaining redress for

the Defendants' misappropriations and malfeasances.

### AS AND FOR A FIFTEENTH CAUSE OF ACTION

#### MISAPPROPRIATION OF TRADE SECRETS
#### (AGAINST ALL DEFENDANTS)

221.    Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1-

220, *supra*, as though fully set forth herein.

222.    As set forth herein, a fiduciary relationship existed at all material times between

Messrs. Cantamessa and Kheit and Helios, whereby these Defendants owed Helios fiduciary

duties, including duties of care and loyalty.

223.    As Helios's global sales agents, Messrs. Cantamessa and Kheit had access to

Plaintiffs' confidential and proprietary business information, including, *inter alia*: proprietary

jewelry designs, molds, products, formulations, industrial processes, internal corporate

documents, planning and strategy documentation, financial and accounting information,

customer contact lists and information, supplier contact lists and information.  In breach of their

fiduciary relationship with Helios, Defendants wrongfully misappropriated Plaintiffs'

confidential and proprietary business information to obtain a commercial advantage and personal

gain.

224.    Plaintiffs' proprietary designs and molds held independent economic value to

third-parties, particularly industry competitors, such as Defendants.

225.   Plaintiffs took reasonable steps to maintain the confidentiality of their proprietary information, including storing the drawings of the designs in the company safe, restricting access to such drawings only to a few employees and reaching non-disclosure agreements with its suppliers for the protection of its proprietary information.

226.   Nevertheless, in furtherance of their scheme to defraud Plaintiffs and misappropriate Plaintiffs' trade secrets, Defendants stole and misappropriated Plaintiffs' trade secrets, and conveyed such information to and directed their unauthorized duplication by third parties, and continued in possession of such information knowing that such information had been stolen, misappropriated, obtained or converted without authorization.

227.   Defendants' unauthorized misappropriation of Plaintiffs' trade secrets has caused and, unless restrained, will continue to cause great and irreparable injury to Plaintiffs, the Cantamessa jewelry brand, the business and goodwill represented thereby, and Plaintiffs' ability to compete, in an amount that cannot be presently ascertained, leaving Plaintiffs with no adequate remedy at law.  Plaintiffs are therefore entitled to injunctive relief.

228.   As a direct and proximate result of Defendants' misappropriation of Plaintiffs' trade secrets, Plaintiffs suffered injury, including:

a.   Loss of revenue from sales that would have accrued to Plaintiffs but for Defendants' acts of unfair competition;

b.   Loss of goodwill from customers, suppliers, and contractors worldwide;

c.   Plaintiffs' proprietary interests in their Collections have been diminished in value;

d.   Plaintiffs have incurred financial penalties on their imports, which have exceeded the lawful terms allotted for ATA Carnets;

e.     Plaintiffs have incurred professional expenses in investigating and obtaining redress for Defendants' misappropriations and malfeasances.

## AS AND FOR A SIXTEENTH CAUSE OF ACTION

### UNFAIR COMPETITION
### (AGAINST ALL DEFENDANTS)

229.    Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1-228, *supra*, as though fully set forth herein.

230.    Defendants acted knowingly, intentionally and in bad faith by devising, implementing and carrying out a scheme designed to misappropriate Plaintiffs' Stolen Jewelry, proprietary business information, and business relationships in order to realize a commercial advantage.  Defendants' conduct was intended to harm Plaintiffs' business and property.

231.    Defendants have knowingly and intentionally profited from their copying and counterfeiting of Plaintiffs' Stolen Jewelry and have sold, and continue to sell, products in direct competition with Plaintiffs' business using Defendants' misappropriated property and information, thereby realizing the commercial advantage from their acts of unfair competition.

232.    As a direct and proximate result of Defendants' violation, Plaintiffs suffered injury, including:

a.     The loss of approximately $5.1 million in Stolen Jewelry representing the March  2011 imports;

b.     The loss of at least $7.75 million in Stolen Jewelry that was stolen from Plaintiffs' storage facility at Malca-Amit;

c.     Loss of revenue from sales that would have accrued to Plaintiffs but for Defendants' acts of unfair competition;

d.     Loss of goodwill from customers, suppliers, and contractors worldwide;

e.      Diminished value of Plaintiffs' proprietary interests in their Cantamessa

Jewelry collections;

f.      Financial penalties on their imports, which have exceeded the lawful terms

allotted for ATA Carnets;

g.      Professional expenses incurred in investigating and obtaining redress for

the Defendants' misappropriations and malfeasances.

### AS AND FOR AN SEVENTEENTH CAUSE OF ACTION

### BREACH OF NEW YORK CONSUMER PROTECTION ACT § 349
### (AGAINST ALL DEFENDANTS)

233.    Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1-

232, *supra*, as though fully set forth herein.

234.    Defendants' efforts to produce, market, advertise and sell the Cantamessa jewelry

line at their Fifth Avenue boutique in New York, New York constitutes are consumer-oriented

transactions.

235.    Defendants have engaged in deceptive acts in connection with those consumer-

oriented transactions.

236.    As a direct and proximate result of Defendants' violation, Plaintiffs suffered

injury, including:

a.      The loss of approximately $5.1 million in Stolen Jewelry representing the

March 2011 imports;

b.      The loss of at least $7.75 million in Stolen Jewelry that was stolen from

Plaintiffs' storage facility at Malca-Amit;

c.      Lost sales of $902,406.30;

      d.      Loss of revenue from sales that would have accrued to Plaintiffs but for Defendants' deceptive acts;

      e.      Diminished value of Plaintiffs' proprietary interests in their Cantamessa Jewelry collections;

      f.      Financial penalties on their imports, which have exceeded the lawful terms allotted for ATA Carnets;

      g.      Professional expenses incurred in investigating and obtaining redress for the Defendants' misappropriations and malfeasances.

## JURY DEMAND

237.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs hereby demand a trial by jury as to all triable issues in the above-styled action.

**WHEREFORE**, Plaintiffs pray for judgment:

      a.      Awarding judgment over and against each of the Defendants, jointly and severally;

      b.      Awarding judgment over and against each of the Defendants, jointly and severally, for Plaintiffs' general damages according to proof at trial;

      c.      Awarding judgment over and against each of the Defendants, jointly and severally, requiring the return of Plaintiffs' Stolen Jewelry or the fair market value thereof;

      d.      Awarding judgment over and against each of the RICO Defendants for trebled damages according to statute, 18 U.S.C. § 1964(c);

      e.      Awarding judgment over and against each of the Defendants, jointly and severally, for prejudgment interest on all these amounts;

     f.     Awarding judgment over and against each of the Defendants, jointly and severally, for punitive damages;

     g.     Awarding judgment over and against each of the RICO Defendants, jointly and severally, for Plaintiff's costs and expenses of this litigation, including reasonable attorneys' fees according to statute, 18 U.S.C. § 1964(c);

     h.     Enjoining each of the Defendants, their agents, and all persons acting on their behalf, from any further infringement of Idea's Copyrighted Jewelry Designs;

     i.     Enjoining each of the Defendants, their agents, and all persons acting on their behalf, from any further infringement of Idea's trademarked Crown Logo and Cantamessa name;

     j.     Ordering the United States Patent and Trademark Office to remove Defendants' Registration (Serial Number 85355051) from the Principal Register;

     k.     Enjoining each of the Defendants, their agents, and all persons acting on their behalf, from any further misappropriation or use of Plaintiffs' trade secrets; and

     l.     Awarding such other and further relief as the Court may deem just.

Dated: November 9, 2012
New York, New York

          OBERDIER RESSMEYER LLP

          By:_____
            Carl W. Oberdier
            Kellen G. Ressmeyer
          655 Third Avenue, 28th Floor
          New York, New York 10017
          (212) 659-5141

          *Counsel for Plaintiffs*