UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------X

HELIOS INTERNATIONAL S.A.R.L. and
IDEA ITALIANA s.r.l.,

                 Plaintiffs,            12 Civ. 8205

    -against-                         OPINION

CANTAMESSA USA, INC., FABRIZIO
CANTAMESSA, and ROBERT KHEIT,

                 Defendants.

------------------------------------X

A P P E A R A N C E S:

        Attorneys for Plaintiffs

        OBERDIER RESSMEYER LLP
        655 Third Avenue, 28th Floor
        New York, NY  10017
        By:  Carl W. Oberdier, Esq.
            Kellen G. Ressmeyer, Esq.

        Attorneys for Defendants

        COWAN, LIEBOWITZ & LATMAN, P.C.
        1133 Avenue of the Americas
        New York, NY  10036
        By:  J. Christopher Jensen, Esq.
            Scott P. Ceresia, Esq.

**Sweet, D.J.**

Defendants Cantamessa USA, Inc., ("CUSA"), Fabrizio Cantamessa and Robert Kheit (collectively, "Defendants") have moved under Fed. R. Civ. P. 12(b)(6) ("Rule 12(b)(6)") for partial dismissal of the complaint ("Complaint") filed by plaintiffs Helios International S.A.R.L. ("Helios") and Idea Italiana s.r.l. ("Idea" and collectively, "Plaintiffs").

In the Complaint, which was filed on November 9, 2012, Plaintiffs have asserted the following causes of action: violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962 (Counts 1-4); copyright infringement under the U.S. Copyright Act, 17 U.S.C. §§ 106(1)-(3) (Count 5); trademark infringement under the Lanham Act, 15 U.S.C. § 1125 (Count 6); trademark dilution under the Lanham Act (Count 7); false designation under the Lanham Act (Count 8); cancellation of federal registration under the Lanham Act (Count 9); state statutory and common law trademark infringement under the Trademark Act of New York, Gen. Bus. L. 360-1 and the common law of each of the fifty states (Count 10); conversion (Count 11); common law fraud (Count 12); trespass to chattels (Count 13); breach of fiduciary duty (Count 14); misappropriation of trade secrets (Count 15); unfair competition (Count 16); and

1

breach of the New York Consumer Protection Act ("NYCPA") § 349 (Count 17).

On January 18, 2013, Defendants submitted the instant motion for partial dismissal of the Complaint, which moved for dismissal of the following claims: (i) RICO (Counts 1-4); (ii) trademark dilution (Count 7); (iii) common law fraud (Count 12); (iv) breach of fiduciary duty (Count 14); (v) trade secret misappropriation (Count 15); and (vi) breach of the NYCPA § 349 (Count 17).  The motion was heard and marked fully submitted on March 13, 2013.

Based upon the conclusions set forth below, the Defendants' motion to dismiss is granted with respect to Counts 1-4, Count 7, Count 12, and Count 17, and denied with respect to the other counts.

**The Facts**

As required on a motion to dismiss pursuant to Rule 12(b)(6), the facts alleged in the Complaint, which are set forth in pertinent part below, are presumed to be true, and all factual inferences are drawn in the plaintiffs' favor. See Mills v. Polar Molecular Corp., 12 F.3d 1170, 1174 (2d Cir. 1993).

2

Plaintiffs are owners and distributors of the Cantamessa brand of jewelry.  Compl. ¶ 2.  The Cantamessa line of jewelry was founded in Valenza, Italy in 1939 by the Cantamessa family, and flourished for six decades under the family's leadership.  Id. ¶ 3.  However, in the early 2000s the business began to decline, and in 2004 the company ("Cantamessa s.r.l.") was forced to declare bankruptcy.  Id.

In 2007, Cantamessa s.r.l.'s assets, including its tangible assets, i.e., jewelry, and intangible assets, i.e., copyrighted jewelry designs, the Cantamessa name and the Cantamessa "Crown Logo" trademark (collectively, the "Intellectual Property"), were acquired by plaintiff Idea.  Id. ¶ 4.  In 2009, plaintiff Helios purchased Idea's entire inventory of Cantamessa brand jewelry and entered into an exclusive distributorship agreement with Idea.  Id. ¶ 5.

In December 2009, Helios entered into an agreement with defendant Fabrizio Cantamessa ("Cantamessa"), a grandson of the founder of Cantamessa s.r.l., in which Cantamessa agreed to act as Helios' global sales agent in connection with the marketing and sale of Cantamessa brand jewelry, and was authorized to use the Intellectual Property in that capacity.

3

Id. ¶¶ 39-41.  Cantamessa was granted "unrestricted,
unsupervised access" to a warehouse in Geneva, Switzerland
containing Cantamessa jewelry (the "Warehouse") and permission
to remove jewelry from the Warehouse, and also was given
"general authority to execute sales" of any Cantamessa jewelry
that he took from the Warehouse.  Id. ¶¶ 6, 47.  The agreement
granted the same rights to Cantamessa's wife, non-party Paola
Brussino ("Brussino").

In 2010, defendant Robert Kheit ("Kheit"), a business
associate of Cantamessa, entered into an agreement with Helios
similar to the agreement between Helios and Cantamessa.  Id. ¶¶
44-47.[1]  As with Cantamessa, Kheit was bestowed with
authorization to use the Intellectual Property in connection
with the marketing and sale of Cantamessa brand jewelry.  Id.

At some point in 2010, Cantamessa, who was "infuriated
and embittered by the loss of his family's jewelry business,"
secretly devised a plan with Kheit "to steal back from Helios

---

[1] It is unclear from the Complaint whether Kheit's agreement was
made directly with Helios, or with Cantamessa acting as an agent
for Helios.  Regardless, the Complaint has alleged that Kheit
possessed the same authority and agency powers as Cantamessa,
see Compl. ¶¶ 47-48, so for the purposes of the instant motion,
it will be assumed that the nature of the relationship between
Helios and Kheit is functionally identical to that between
Helios and Cantamessa.

4

and Idea the entire Cantamessa brand, including millions of
dollars of inventory, jewelry designs, the Crown Logo and the
Cantamessa name." Id. ¶ 48.


          In September 2010, the Defendants incorporated
defendant Cantamessa USA in New York and thereafter opened a
boutique located in New York City (the "New York Boutique") that
offered Cantamessa brand jewelry for sale.  Id. ¶¶ 49, 63.
Defendants used the Intellectual Property to market Cantamessa
jewelry in the United States, and Plaintiffs have alleged that
this included both authorized and unauthorized instances of
usage.  Id. ¶ 43.


          From March 2010 through December 2010, Cantamessa and
Kheit sold approximately 125 pieces of Cantamessa jewelry having
an approximate aggregate value of $1,757,484.00.  Id. ¶ 50.
Pursuant to their respective agreements with Plaintiffs,
Cantamessa and Kheit were entitled to retain a total of
$236,380.95 as commission, and were required to remit the
remainder to Helios.  Id.  However, Cantamessa and Kheit
retained $1,138,787.26, and remitted only $618,696.81 to Helios.
Id.

5

From the beginning of 2011 through November 2011, Defendants removed 185 pieces of Cantamessa jewelry from the Warehouse.  Id. ¶¶ 52-55.  Defendants subsequently sold many of these pieces and kept all of the sales proceeds for themselves. Id.

During the course of 2011, Defendants engaged in efforts to publicize the Cantamessa brand by sending pieces of Cantamessa jewelry around the United States and the world for use in high-profile and high-visibility events.  Id. ¶¶ 72.  In June 2011, Defendants donated a pair of Cantamessa earrings for use in a charity event held in Paris, France hosted by the fashion designer Valentino.  Id.  In July 2011, Defendants sent several pieces of Cantamessa jewelry to California for use in a photo shoot of actress Lindsay Lohan for Vanity Fair magazine. Id.  In September 2011, Defendants sent several pieces of Cantamessa jewelry to Florida for use in a photo shoot of supermodel Adriana Lima for Elle Magazine.  Id.  In December 2011, Defendants sent several pieces of Cantamessa jewelry to Philadelphia for use in a photo shoot of Melania Trump, wife of Donald Trump, for Philadelphia Style Magazine.  Id.

Also in 2011, Cantamessa and Kheit asked Helios and Idea to send approximately $5 million of jewelry to New York on

6

the premise that the jewelry was to be used in a temporary
exhibition (the "New York Exhibition") meant to publicize the
Cantamessa jewelry line to U.S. consumers.  Id. ¶ 57.  In
shipping the jewelry, Helios and Idea filed certain forms with
customs officials indicating that the items were being imported
temporarily and would later be returned, and therefore were not
subject to the usual taxes that would be due on items being
imported for commercial sale.  Id. ¶ 58.  During the exhibition,
Cantamessa and Kheit utilized the Intellectual Property,
including the Cantamessa name and the Cantamessa Crown Logo, on
the signage used to display the pieces.  Id. ¶79.  Following the
exhibition, Defendants began selling the jewelry in their New
York Boutique and via the internet.  Id. ¶ 63.  Idea has been
notified by the Italian Chamber of Commerce that failure to
produce proof of the jewelry's return to Italy will result in a
fine of $27,452.61.  Id. ¶ 97.


        In June 2011 and November 2011, Defendants submitted
trademark registration applications to the United States Patent
& Trademark Office ("USPTO") and the Trademark and Designs
Office of the European Union ("ETO") for the Crown Logo and
Cantamessa name.  Id. ¶¶ 80-85.  The application to the USPTO
claimed that CUSA was the owner of the Crown Logo and the
Cantamessa name, and the ETO application asserted ownership by

Cantamessa himself, whereas in actuality the Crown Logo and the
Cantamessa name belong to Idea.  Id.  In addition, the USPTO
application claimed that the Crown Logo and Cantamessa name were
first used in commerce on March 15, 2011, whereas in actuality
they had been used by Defendants prior to that date in their
marketing efforts on behalf of Helios.  Id.

Helios first became aware of Defendants' alleged
scheme in October 2011, when it performed an inventory check on
the contents of the Warehouse which revealed that jewelry was
missing.  Id. ¶ 53.  Further investigation revealed that the
jewelry had been taken by Cantamessa and Kheit.  Id.  On October
5, 2011, Helios demanded an accounting by Cantamessa of all
sales of Helios' jewelry and all pieces still in Cantamessa's
possession.  Id. ¶ 66.  When Cantamessa did not immediately
respond to the request, Helios investigated further and
discovered that its entire inventory that had been stored in the
Warehouse was missing.  Id. ¶ 67.

In early November 2011, Helios terminated its
agreement with Cantamessa, restricted Cantamessa from having any
access to its inventory, and demanded that Cantamessa cease
associating himself with Helios or the Cantamessa brand and/or
using the Cantamessa Intellectual Property.  Id. ¶¶ 67-68.

8

On January 25, 2012, counsel for Idea sent CUSA and
Kheit a written demand for the return of its merchandise and a
reimbursement of all customs penalties incurred by virtue of
Defendants' conduct. Id. ¶ 69. The demand was refused by
letter from Defendants' counsel dated January 31, 2012. Id.
Idea renewed its demand via letters in March 2012, and April
2012, but received no response. Id. ¶¶ 69, 71.

On February 12, 2012, Helios sent a written request to
Cantamessa and his wife seeking updated contact information for
any of Plaintiffs' customers who purchased jewelry through
Cantamessa and his wife, as well as any unpaid sales proceeds,
less commission due. Id. ¶ 70. Cantamessa did not respond to
the request. Id.

In or about February 2012, Defendants shipped pieces
of Cantamessa jewelry to the same manufacturing facility in
Thailand (the "Delora factory") that Idea had previously used to
manufacture its jewelry, and requested that Delora produce
replicas of those pieces. Id. ¶¶ 73-78. In addition,
Defendants asked Delora to produce certain pieces of jewelry
using molds that Delora had previously used to produce pieces
for Idea. Id. Defendants directed Delora to send the new

9

pieces to the United States by April 2012.  Id.  In addition, in
July and August 2012, Idea discovered that Plaintiffs were
offering for sale additional pieces of Cantamessa jewelry that
had been produced by the Delora factory.  Id. ¶¶ 77-78.

**The Rule 12(b)(6) Standard**

On a motion to dismiss pursuant to Rule 12(b)(6), all
factual allegations in the complaint are accepted as true, and
all inferences are drawn in favor of the pleader.  Polar
Molecular Corp., 12 F.3d at 1174.  "The issue is not whether a
plaintiff will ultimately prevail but whether the claimant is
entitled to offer evidence to support the claims."  County of
Suffolk, New York v. First Am. Real Estate Solutions, 261 F.3d
179, 187 (2d Cir. 2001) (quoting Villager Pond, Inc. v. Town of
Darien, 56 F.3d 375, 378 (2d Cir. 1995), cert. denied, 519 U.S.
808 (1996)).

To survive a motion to dismiss pursuant to Rule
12(b)(6), "a complaint must contain sufficient factual matter,
accepted as true, to 'state a claim to relief that is plausible
on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)
(quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).

This is not intended to be an onerous burden, as plaintiffs need
only allege facts sufficient in order to "nudge[] their claims
across the line from conceivable to plausible."  Twombly, 550
U.S. at 570.


**The Complaint Fails To State A RICO Claim**


Section 1962 of Title 18 provides a private cause of
action for those injured by another's pattern of racketeering
activity.  It states, in relevant part:


> (a) It shall be unlawful for any person who
> has received any income derived, directly or
> indirectly, from a pattern of racketeering
> activity . . . to use or invest, directly or
> indirectly, any part of such income, or the
> proceeds of such income, in acquisition of
> any interest in, or the establishment or
> operation of, any enterprise which is
> engaged in, or the activities of which
> affect, interstate or foreign commerce . . .
> .
>
> [. . .]
>
> (c) It shall be unlawful for any person
> employed by or associated with any
> enterprise engaged in, or the activities of
> which affect, interstate or foreign
> commerce, to conduct or participate,
> directly or indirectly, in the conduct of
> such enterprise's affairs through a pattern
> of racketeering activity . . . .

11

> (d) It shall be unlawful for any person to
> conspire to violate any of the provisions of
> subsection (a), (b), or (c) of this section.

18 U.S.C. § 1962.

To state a claim for civil damages under Section 1962, a plaintiff has a twofold pleading burden. First, the plaintiff must allege that the defendant has violated the substantive RICO statute, 18 U.S.C. § 1962 ("§1962"). See Moss v. Morgan Stanley Inc., 719 F.2d 5, 17 (2d Cir. 1983).  Second, the plaintiff must allege that he or she was injured in his or her business or property by reason of the violation of Section 1962. See 18 U.S.C. § 1964(c); Moss, 719 F.2d at 17.

To plead a RICO violation, a plaintiff must allege: "(1) that the defendant (2) through the commission of two or more acts (3) constituting a 'pattern' (4) of 'racketeering activity' (5) directly or indirectly invests in, or maintains an interest in, or participates in (6) an 'enterprise' (7) the activities of which affect interstate or foreign commerce." Moss, 719 F.2d at 17 (citing 18 U.S.C. §§ 1962(a), 1962(b) and 1962(c)); The Jordan (Bermuda) Inv. Co., Ltd. v. Hunter Green Invs. Ltd., 154 F. Supp. 2d 682, 690 (S.D.N.Y. 2001).

12

In order to satisfy the "pattern of racketeering" requirement, a plaintiff must show (i) at least at least two predicate racketeering acts, (ii) that "the racketeering predicates are related, *and* (iii) that they amount to or pose a threat of continued criminal activity." H.J. Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229, 239.  Section 1961(1) of Title 18 sets forth the various criminal violations defined by state and federal law that can constitute predicate acts of racketeering activity upon which a §1962 RICO claim may be premised.  See 18 U.S.C. § 1961(1).

"Because the mere assertion of a RICO claim . . . has an almost inevitable stigmatizing effect on those named as defendants, . . . courts should strive to flush out frivolous RICO allegations at an early stage of the litigation." Kirk v. Heppt, 423 F. Supp. 2d 147, 150 (S.D.N.Y. 2006) (citations and internal quotations omitted).  Such frivolous RICO allegations are often manifested in the form of "garden variety fraud or breach of contract cases that some Plaintiff has attempted to transform into a vehicle for treble damages by resort to what [. . .] [has been] referred to as 'the litigation equivalent of a thermonuclear device.'" Goldfine v. Sichenza, 118 F. Supp. 2d 392, 394 (S.D.N.Y. 2000) (quoting Schmidt v. Fleet Bank, 16 F. Supp. 2d 340, 346 (S.D.N.Y. 1998)).  This Court has previously

13

counseled that courts "must be wary of putative civil RICO
claims that are nothing more than sheep masquerading in wolves'
clothing." Kirk, 423 F. Supp. 2d at 149 (quoting W. 79th St.
Corp. v. Congregation Kahl Minchas Chinuch, No. 03 Civ. 8606
(RWS), 2004 WL 2187069, at *5 (S.D.N.Y. Sept. 29, 2004)). The
instant case presents just such a situation.

      In an effort to satisfy RICO's pleading requirements,
Plaintiffs have alleged the commission of a formidable array of
predicate acts: (a) transportation of stolen goods in violation
of the National Stolen Property Act ("NSPA"), 18 U.S.C. § 2314;
(b) sale of stolen goods in violation of the NSPA, 18 U.S.C. §
2315; (c) laundering of money instruments in violation of 18
U.S.C. § 1956(a)(2); interstate and foreign travel or
transportation in aid of racketeering enterprises in violation
of 18 U.S.C. § 1952; (e) criminal copyright infringement in
violation of 18 U.S.C. § 2319; (f) deprivation of honest
services by mail and wire fraud in violation of 18 U.S.C. §§
1341, 1343 & 1346; and (g) mail and wire fraud in violation of
18 U.S.C. §§ 1341 & 1343. Compl. ¶¶ 106-35.

      However, "Plaintiffs cannot turn this case into a RICO
case simply by recasting breach of contract [and common business
torts] as conspiracies of deception and fraud." Bachewicz v.

14

Preferred Dev., Inc., No. 10 C 3875, 2011 WL 2560218, at *5
(N.D. Ill. June 28, 2011).  As set forth below, an examination
of the allegations offered in support of these putative
predicate racketeering acts reveals that this case is nothing
more than a commonplace business dispute involving what are, at
essence, "garden variety" commercial claims such as breach of
contract, breach of fiduciary duty and infringement of
intellectual property rights.

## A. Transportation of Stolen Goods

Plaintiffs' allegations that Cantamessa and Kheit
engaged in transportation of stolen goods in violation of 18
U.S.C. § 2314 are premised upon the contention that the
following conduct constituted such a violation: (i) Defendants'
removal of jewelry from the Warehouse, (ii) Defendants'
retention of jewelry sent for use at the New York Exhibition,
and (iii) Defendants' shipment of jewelry to various parts of
the United States for use in photo shoots, and shipment of
jewelry to Paris for use in a charity auction.  See Compl. ¶¶
72, 110.  However, that contention is belied by the allegations

15

in the Complaint describing the contractual relationships

between Helios, Cantamessa and Kheit[2], under which:

- Defendants were "given unrestricted, unsupervised access to Plaintiffs' multi-million dollar inventory warehouse," Compl. ¶ 6;

- Defendants were "allowed to take jewelry from the warehouse unmonitored for sale, display or marketing," and to "serve as cashier on all . . . jewelry sales," Compl. ¶ 6;

- Defendants were given "general authority to execute sales," and to "draw[] upon the warehouse for international freight to Cantamessa customers,"  Compl. ¶ 47;

- Defendants were authorized to "market and sell . . . Cantamessa jewelry" and "to use the Crown Logo and Cantamessa name" to engage in such marketing and sales efforts, Compl. ¶ 41; and

- Defendants "were required to use their utmost skills to further Helios' interests."  Compl. ¶ 46.

With respect to the allegations regarding Defendants'

removal of jewelry from the Warehouse, given Defendants' express

authority to effect such removal, these allegations merely raise

a contract dispute regarding the extent of the authority and

autonomy granted to Defendants over the Warehouse merchandise.

---

[2] Although these allegations are largely stated with respect to only defendant Cantamessa, they are assumed to be equally applicable to Kheit, since as noted above,the Complaint has characterized Cantamessa and Kheit as possessing commensurate powers and duties with respect to Helios.  See Compl. ¶¶ 46-47.

16

With respect to the allegations concerning Defendants' retention of the jewelry sent for the New York Exhibition, given Defendants' express authority to engage in the marketing and sale of Cantamessa jewelry, these allegations merely indicate a contract dispute regarding the extent of the authority and autonomy granted to Defendants over marketing and sales.  The same goes for the allegations concerning Defendants' shipment of the jewelry to domestic and international locations for use in photo shoots and other promotional events – such allegations evidence a contract dispute as to the extent of the autonomy afforded to Defendants in fulfilling their contractual duty to market the Cantamessa brand and further Helios' interests.

B.  Sale of Stolen Goods

Plaintiffs' allegations in support of the putative predicate act of selling stolen goods mirror those asserted in support of the putative predicate act of transportation of stolen goods.  See Compl. ¶¶ 110, 112.  Accordingly, for substantially the same reasons stated above, see supra § A, Plaintiffs' allegations purporting to establish that Defendants sold stolen goods in violation of 18 U.S.C. § 2315 actually sound in breach of contract.

17

C.  Laundering of Money Instruments

        Plaintiffs' allegations that Defendants engaged in
money laundering in violation of 18 U.S.C. § 1956(a)(2) are
premised upon the contention that the following conduct
constituted money laundering: (i) Defendants' transfer of
$35,000 to the Delora factory in payment for the production of
Cantamessa jewelry; (ii) Defendants' payment of shipping and
storage costs associated with the shipment of jewelry from the
Warehouse to Switzerland[3]; and (iii) Defendants' transfer of at
least $1.5 million for the purpose of "advertising, marketing,
exhibiting and selling" Cantamessa brand jewelry.  Compl. ¶ 114.

        This contention is belied by the substantial authority
and powers that were vested in Defendants by virtue of their
contractual agreements with Plaintiffs.  Since Defendants were
"allowed to take jewelry from the warehouse unmonitored for
sale, display or marketing," Compl. ¶ 6, Defendants' arrangement
for the shipment of jewelry from the Warehouse to New York
merely raises a contractual issue regarding the parameters of
the autonomy afforded to Defendants as to the transportation of
the jewelry.  Likewise, since Defendants were contractually

_____

[3] The jewelry was subsequently transported to New York.  See
Compl. ¶ 112.

authorized to "market and sell Cantamessa jewelry," Compl. ¶ 39,
Plaintiffs' allegation that Defendants' expended funds for the
purpose of "advertising, marketing, exhibiting and selling"
Cantamessa jewelry merely implies a contractual dispute
regarding the parameters of the autonomy afforded to Defendants
to fulfill their contractual obligations.  Finally, Plaintiffs'
allegation that Defendants paid for the production of Cantamessa
jewelry with the intention of selling it gives rise to either a
contractual dispute or perhaps a cause of action for breach of
fiduciary duty.[4]


D.  Interstate and Foreign Travel or Transportation in Aid of
Racketeering Enterprises


        Plaintiffs' allegations with respect to this putative
predicate act are premised upon the contention that the
following conduct by Defendants constituted interstate and

---

[4] That the complained-of conduct occurred after Helios is alleged
to have terminated its agreement with Defendants is of no
consequence, as Defendants' conduct nonetheless evidences a
commercial dispute regarding the contracting parties' rights to
unilaterally terminate the agreement, or perhaps the nature and
substance of the parties' rights in the wake of a termination of
the agreement.  Indeed, the Complaint has alleged that
Defendants' arrangement of the production of Cantamessa pieces
by the Delora factory constituted a breach of Defendants'
fiduciary duties to Plaintiffs, see Compl. ¶¶ 122-23, thereby
implying that the contractual relationship between Plaintiffs
and Defendants persisted in some form even at that point in
time.

foreign travel or transportation in aid of racketeering
enterprises: (i) Defendants' travel, both in the U.S. and
internationally, and Defendants' use of facilities in interstate
or foreign commerce,  for the purpose of "advertis[ing],
market[ing], exhibit[ing] and sell[ing]" Cantamessa jewelry; and
(ii) Defendants' use of facilities of interstate or foreign
commerce to send the design of a piece of Cantamessa jewelry to
the Delora factory and to transfer funds to the Delora factory
in payment for production of Cantamessa jewelry.  Compl. ¶ 116.
However, as set forth above, see supra § C, due to the
contractual nature of the parties' relationship, Plaintiffs'
allegations sound in breach of contract or other common law
causes of action, rather than criminal violations sufficient to
form the basis for a RICO claim.


E.  Criminal Copyright Infringement


        Plaintiffs have alleged that Defendants committed
criminal copyright infringement by arranging for the Delora
factory to produce 27 pieces of Cantamessa jewelry by the Delora
factory in February 2012, and taking delivery of those pieces in
April 2012.  However, as noted above, see supra § D, Defendants'
contract with Plaintiffs granted them authority to "market and
sell Cantamessa jewelry," Compl. ¶ 39, so Defendants' alleged

conduct falls more into the realm of breach of contract or breach of fiduciary duty.

Moreover, as noted in Professor David Nimmer's treatise <u>Nimmer on Copyright</u>, which has been characterized as the "leading copyright treatise," <u>New York Mercantile Exchange, Inc. v. Intercontinental Exchange, Inc.</u>, 497 F.3d 109, 114 (2d Cir. 2007), and "the bedrock authority on all copyright matters," <u>Sparaco v. Lawler, Matusky, Skelly Engineers LLP</u>, 313 F. Supp. 2d 247, 253 (S.D.N.Y. 2004), "[o]nly the *most egregious instances* of criminal copyright infringement have ever been upheld as predicate offenses to racketeering charges under RICO."  Melville B. Nimmer & David Nimmer, 1 <u>Nimmer on Copyright</u> § 3.04[B][3] (2013) (emphasis added).  This is in keeping with general adage that courts "must be wary of putative civil RICO claims that are nothing more than sheep masquerading in wolves' clothing," <u>Kirk</u>, 423 F. Supp. 2d at 149, and of plaintiffs attempting to "appl[y] [RICO] to commonplace commercial controversies."  <u>Baker v. Sturdy Built Mfg., Inc.</u>, No. 3:07CV212-HEH, 2007 3124881, at *4 (E.D. Va. Oct. 23, 2007).

An example of an instance of copyright infringement that was deemed sufficiently "egregious" so as to constitute a predicate act for RICO purposes is found in <u>Bryant v. Mattell,</u>

Inc., 573 F. Supp. 2d 1254 (C.D. Cal. 2007), where the court upheld a RICO claim based upon a predicate act of criminal copyright infringement of a line of dolls that was bringing in an annual revenue of $500 million to the alleged infringer.  See id. at 1257.  Here, Plaintiffs have alleged that the infringing jewelry produced by Defendants has an aggregate retail value of merely $270,000.  Compl. ¶ 119; Pl. Opp. at 13.  The relatively minor value of the allegedly infringing items, coupled with the overall "run-of-the-mill commercial dispute" tenor of the case, see supra §§ A-D, indicates that even if Plaintiffs have adequately alleged the requisite elements of criminal copyright infringement, it would nonetheless be inappropriate for such infringement to constitute a predicate act for RICO purposes. Cf. Stewart v. Wachowski, No. CV 03-2873 MMM (VBKx), 2005 WL 6184235, at *4 (C.D. Cal. June 14, 2005) (noting that the legislative history of the Anticounterfeiting Consumer Protection Act of 1996, Pub. L. No. 104-153, § 3, 110 Stat. 1386 ("ACPA"), which added §2319 to the list of crimes that can serve as a predicate act for RICO purposes, indicates that "Congress intended that the ACPA would provide necessary sanctions against large-scale organized counterfeiting schemes") (emphasis added).

F.  Mail and Wire Fraud & Deprivation of Honest Services by Mail
and Wire Fraud

          Plaintiffs' allegations with respect to the putative

predicate acts of mail fraud and deprivation of honest services

by mail and wire fraud are premised upon the contention that the

following conduct by Defendants constituted criminal fraud: (i)

use of the internet and social media to "market, advertise and

sell" Cantamessa jewelry; (ii) use of the international mails

and wires to obtain jewelry from the Warehouse; (iii) use of the

international mails and wires to convince Plaintiffs to send

jewelry for use in the New York Exhibition; (iv) use of the

international mails and wires to arrange for the Delora

factory's production of pieces of Cantamessa jewelry.  Compl. ¶¶

122-23, 129.  This contention is contravened by the allegations

in the Complaint that describe Defendants' "unfettered" access

the jewelry in the Warehouse, Compl. ¶ 9, and contractual

authorization to "market and sell Cantamessa jewelry," Compl. ¶

39, which indicate that the complained-of conduct supports

causes of action for breach of contract and/or fiduciary duty,

rather than federal criminal fraud that was committed as part of

a "broad-based" criminal racketeering scheme.  See Allen ex rel.

Allen v. Devine, 726 F. Supp. 2d 240, 248 (E.D.N.Y.

2010)(citation omitted) ("the [RICO] statute was intended to

23

bring only *the most serious, broad-based frauds* into the federal
courts") (emphasis added).

*        *        *

As set forth above, the allegations in the Complaint
that purport to plead predicate criminal acts sufficient to
establish a cause of action under RICO "amount merely to a
breach of contract claim [and common business torts], which
cannot be transmogrified into a RICO claim by the facile device
of charging that the breach was fraudulent, indeed criminal."
Carr v. Tillery, 591 F.3d 909, 918 (7th Cir. 2010).  This case
is yet another instance of "civil RICO plaintiffs [who] persist
in trying to fit a square peg in a round hole by squeezing
garden-variety business disputes into civil RICO actions."
Midwest Grinding Co. v. Spitz, 976 F.2d 1016, 1025 (7th Cir.
1992).  While "[Plaintiffs] may very well have a case against
[Defendants] for breach of duty, [breach of contract, or other
business torts,] [Plaintiffs] have absolutely no case against
[Defendants] for a civil RICO violation."  Id. at 1025-26.

Given the absence of viable predicate acts,
Plaintiffs' have failed to plead the "pattern of racketeering"
that is a necessary and core element of substantive RICO claims

24

under 18 U.S.C. §§ 1962(a),(b) & (c) (asserted here as Counts 3,
4 and 1, respectively), thereby necessitating dismissal of those
causes of action.  In addition, in the absence of a validly pled
substantive RICO claim, Plaintiffs' claim under 18 U.S.C. §
1962(d) for RICO conspiracy fails as well.  <u>Jordan (Bermuda)
Inv. Co.</u>, 154 F. Supp. 2d at 695.


**The Complaint Fails To State A Claim For Trademark Dilution**


In order to plead trademark dilution under the
Trademark Dilution Revision Act ("TDRA"), 15 U.S.C.§ 1125(c), a
trademark owner must allege four elements: (1) that the mark is
famous; (2) that the defendant is making use of the mark in
commerce; (3) that such use began after the mark became famous;
and (4) that there is a likelihood of dilution as a result of
the defendant's use.  <u>Heller Inc. v. Design Within Reach, Inc.</u>,
No. 09 Civ. 1909 (JGK), 2009 WL 2486054, at *3 (S.D.N.Y. Aug.
15, 2009).


In order for a given mark to be considered "famous"
under the TDRA, it must be "widely recognized by the general
consuming public of the United States as a designation
indicating a single source of good or services."  <u>Id.</u> (quoting
15 U.S.C. § 1125(c)) (internal quotation marks omitted).

"[C]ourts generally have limited famous marks to those that receive multi-million dollar advertising budgets, generate hundreds of millions of dollars in sales annually, and are almost universally recognized by the general public." Id. (collecting cases that have found "fame" with respect to marks such as DuPont, Buick, Kodak and Budweiser).  In addition, the statute's caveat that the mark be widely recognized "*by the general consuming public of the United States*" is intended to exclude "dilution claims based on 'niche' fame, i.e., fame limited to a particular channel of trade, segment of industry or service, or geographic region."  Dan-Foam A/S v. Brand Named Beds, LLC, 500 F. Supp. 2d 296, 307 n. 90 (S.D.N.Y. 2007).

A claim for trademark dilution under the TDRA will survive a motion to dismiss only when the plaintiff has "ple[d] enough facts to show that its dilution claim is facially plausible."  Heller, 2009 WL 2486054, at *4.  While Plaintiffs have made a conclusory allegation that the Crown Logo and the Cantamessa name are "famous," Compl. ¶ 181, they do not allege that these marks are "widely recognized by the general consuming public of the United States"; rather, Plaintiffs allege that the marks "have an extremely high degree of recognition *among consumers of luxury jewelry*."  Compl. ¶ 181 (emphasis added). This is the very definition of the type of "niche" fame that is

insufficient to support a finding of fame for TDRA purposes.

See Luv N' Care, Ltd. v. Regent Baby Prods. Corp., 841 F. Supp.

2d 753, 758-59 (S.D.N.Y. 2012) (dismissing dilution claim where

"plaintiffs in this case have not alleged facts indicating that

the . . . trademarks [at issue] are recognized beyond a niche

market, i.e., the baby product market").


        Since Plaintiffs have alleged that the marks in

question enjoy fame only within the narrow niche of the American

public that comprises the consumer market for "luxury jewelry,"[5]

their dilution claim fails because they have not pled "enough

facts to show that the dilution claim is facially plausible."

Heller, 2009 WL 2486054, at *4.


**The Complaint Fails To State A Claim For Common Law Fraud**


        Under New York law, a plaintiff asserting fraud must

establish that "(1) the defendant made a material false

representation, (2) the defendant intended to defraud the

plaintiff thereby, (3) the plaintiff reasonably relied upon the

representation, and (4) the plaintiff suffered damage as a

_____

[5] Based on the allegations in the Complaint, it appears that the
average piece of Cantamessa jewelry retails for at least $5,000.
See, e.g., Compl. ¶¶ 112, 119.

result of such reliance." Bridgestone/Firestone v. Recovery
Credit Servs., Inc., 98 F.3d 13, 19 (2d Cir. 1996).

Plaintiffs have alleged that Defendants perpetrated
common law fraud by convincing Plaintiffs to ship jewelry to New
York for display at the New York Exhibition, and then failing to
return the jewelry to Defendants immediately thereafter. Compl.
¶¶ 56-65. However, at the time of the allegedly fraudulent
representation, Plaintiffs and Defendants were engaged in a
contractual relationship that specifically granted authority to
Defendants to "market and sell Cantamessa jewelry," Compl. ¶ 39.
Accordingly, Defendants' eventual failure to return the jewelry
to Plaintiffs is at best a breach of their contract with
Plaintiffs, as evidenced by Plaintiffs' allegation that the
failure to the return the jewelry was a breach of Defendants'
fiduciary duties to Plaintiffs, see Compl. ¶ 123(b).

Regarding such situations, New York courts have long
held that "a cause of action for fraud does not arise when the
only fraud charged relates to a breach of contract." Non-Linear
Trading Co. v. Braddis Assoc., 243 A.D.2d 107, 118 (N.Y. App.
Div. 1998) (quoting Tesoro Petroleum Corp. v. Holborn Oil Co.,
108 A.D.2d 607 (N.Y. App. Div. 1985)). Accordingly, here, where
"the cause of action at issue . . . does not allege the breach

of a duty extraneous to, or distinct from the contract between
the parties," Courageous Syndicate v. People-to-People Sports
Comm., 141 A.D.2d 599, 600 (N.Y. App. Div. 1988) (quoting Edwil
Indus. v. Stroba Instruments Corp., 131 A.D.3d 425 (N.Y. App.
Div. 1987)), and "plaintiff[s'] theory of recovery is
necessarily limited to a breach of contract." Wegman v.
Dairylea Coop., 50 A.D.2d 108, 113 (N.Y. App. Div. 1975).


    Moreover, while Plaintiffs have alleged that
Defendants "tricked" Plaintiffs into shipping the jewelry
because Defendants never intended to return the pieces, they do
not provide any factual basis for their assertion regarding
Defendants' state of mind at the time of exchange. See Compl.
¶¶ 56-65.  Under New York law, "if a promise was actually made
with a preconceived and undisclosed intention of not performing
it, it constitutes a misrepresentation of material existing
fact" giving rise to a fraud claim. Sabo v. Delman, 164 N.Y.S.2d
714, 716 (N.Y. 1957).  However, "[t]he mere conclusory
allegation that a party never intended to perform . . . is
insufficient" to state a cause of action in fraud. Grossberg v.
Lasermedics, Inc., No. 95 Civ. 1122 (DC), 1996 WL 153701, at *2
(S.D.N.Y. Apr. 3, 1996).  "Instead, a plaintiff must set forth
specific facts indicating that the promisor never intended to
honor his or her obligations at the time the promise was made."

Id.  Accordingly, Plaintiffs' conclusory allegation that
Defendants did not intend to return the jewelry at the time that
they persuaded Plaintiffs to send it is insufficient to state a
claim for common law fraud.

**The Complaint Has Stated A Claim For Breach Of Fiduciary Duty**

To state a claim for breach of fiduciary duty under
New York law, a plaintiff must plead "breach by a fiduciary of a
duty owed to plaintiff; defendant's knowing participation in
that breach; and damages." SCS Commc'ns, Inc., v. Herrick
Co., 360 F.3d 329, 342 (2d Cir. 2004).  Defendants contend that
Plaintiffs' claim for breach of fiduciary duty fails because the
relationship between Plaintiffs and Defendants was not fiduciary
in nature, but rather was an "arms' length" business
relationship that does not give rise to a fiduciary
relationship.  Def. Mem. at 30-31.  However, Plaintiffs have
alleged that pursuant to their agency relationship with
Defendants, Plaintiffs entrusted Defendants with broad authority
and discretion over Plaintiffs' business, including "unfettered"
authority to draw inventory from Plaintiffs' warehouse.  See
Compl. ¶¶ 4-6, 9, 41, 44, 46-47, 52.  An agency relationship of
such an extensive nature creates a fiduciary bond between the
involved parties.  See, e.g., St. John's Univ. v. Bolton, 757 F.

Supp. 2d 144, 168 (E.D.N.Y. 2010) (finding a fiduciary
relationship where the defendants "were entrusted with
[plaintiff's] resources and the autonomy and discretion to use
those resources" because the defendants possessed the special
knowledge and expertise required to exploit those resources, and
therefore "[the plaintiff] was vulnerable to [the defendants']
abuse of their positions of trust . . ."); Pensee Assocs., Ltd.
v. Quon Indus., Ltd., 241 A.D.2d 354, 359 (N.Y. App. Div. 1997)
("Agency is a fiduciary relationship created as a result of
conduct by parties manifesting that the principal party is
willing to allow the other party, upon such other party's
consent, to act for it subject to the principal's control and
within the limits of the authority thus conferred.  This
includes the relationship between a commission agent and a
principal for the sale of goods, in which title remains in the
principal.") (internal citations omitted).  Accordingly, the
allegations in the Complaint are sufficient to plead the
existence of a fiduciary relationship between Plaintiffs and
Defendants which can serve as a basis for Plaintiffs' breach of
fiduciary duty claim.

**The Complaint Has Stated A Claim For Trade Secret
Misappropriation**

To plead a claim for trade secret misappropriation

under New York law, a plaintiff must allege: "(1) that it

possessed a trade secret, and (2) that defendants used that

trade secret in breach of an agreement, confidential

relationship or duty, or as a result of discovery by improper

means." Linkco, Inc. v. Fujitsu Ltd., 230 F. Supp. 2d 492, 497-

98 (S.D.N.Y. 2002).

Defendants have contended that Plaintiffs failed to

state a claim for trade secret misappropriation because it is

based upon jewelry designs that have been made public through

sales and display of those pieces, as well as through

registration of the designs with the U.S. Copyright Office..

Def. Mem. at 32-33.  However, the Complaint has alleged that

Defendants misappropriated Plaintiffs "propriety business

information," which included not only "proprietary jewelry

designs [and] molds," but also proprietary "products,

formulations, industrial processes, internal corporate

documents, planning and strategy documentation, financial and

accounting information, customer contact lists and information,

[and] supplier contact lists and information."  Compl. ¶ 223.

Plaintiffs further alleged that they "took reasonable steps to

32

maintain the confidentiality of their proprietary information."
Compl. ¶ 224.  Defendants' allegations with respect to the
latter items are sufficient to state a claim for trade secret
misappropriation with respect to those items.  See Medtech
Prods. Inc. v. Ranir, LLC, 596 F. Supp. 2d 778 (S.D.N.Y. 2008)
(holding that generally allegations regarding manufacturing cost
details, drawings, test data, and other information about the
design and manufacturing process were sufficient to state a
claim for trade secret misappropriation).

        With respect to the jewelry designs, however, the fact
that the design drawings were available to the public and that
pieces constructed from such designs were sold to the public
does preclude the designs themselves from qualifying as trade
secrets for the purposes of a misappropriation cause of action.
See, e.g., Phillips v. Avis Inc., 1996 U.S. Dist. LEXIS 7342, at
*7 (N.D. Ill. May 28, 1996) (holding that a copyrighted work was
not a trade secret because "it was readily available through the
Copyright Office").  Accordingly, Plaintiffs' claim fails
insofar as it is asserted with respect to the physical jewelry
designs that were publicly disclosed via sales of the pieces and
registration of the designs with the Copyright Office.

33

**The Complaint Has Stated A Claim Under The NYCPA**

New York General Obligations Law § 349 (the "NYCPA")
is modeled after the Federal Trade Commission Act, and "federal
courts have interpreted the statute's scope as limited to the
types of offenses to the public interest that would trigger
Federal Trade Commission intervention under 15 U.S.C. § 45, such
as potential danger to the public health or safety." Do Denim
LLC v. Fried Denim, Inc., 634 F. Supp. 2d 403, 409 (S.D.N.Y.
2009). "It is well settled . . . that trademark or trade dress
infringement claims are not cognizable under [the NYCPA] unless
there is a specific and substantial injury to the public
interest *over and above ordinary trademark infringement or
dilution*." Nat'l Distillers Prods. Co., LLC v. Refreshment
Brands, Inc., 198 F. Supp. 2d 474, 486-87 (S.D.N.Y. 2002)
(emphasis added).

Here, Plaintiffs' NYCPA claim is premised upon
allegations that Defendants conspired to deceive American
consumers with counterfeit goods. Compl. ¶¶ 233-35. Such
allegations are sufficient to state a claim under the NYCPA. In
re Houbigant Inc., 914 F. Supp. 964, 984 (S.D.N.Y. 1995)
(holding that allegations of false advertising of a plaintiff's
goods and the importing of counterfeit goods with the intent to

34

deceive customers as to the source and origin of the products were sufficient to state a claim under §349 because such conduct would involve a public harm if proved).

**Conclusion**

Upon the conclusions set forth above, the Defendants' partial motion to dismiss is granted in part and denied in part, and leave is given to replead within 20 days.

New York, NY
July 27, 2013

ROBERT W. SWEET
U.S.D.J.

35