UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------X

HELIOS INTERNATIONAL S.A.R.L. and
IDEA ITALIANA s.r.l.,

                    Plaintiffs,              12 Civ. 8205

     -against-                               OPINION

CANTAMESSA USA, INC., FABRIZIO
CANTAMESSA, and ROBERT KHEIT,

                    Defendants.

------------------------------------X

A P P E A R A N C E S:

          Attorneys for Plaintiffs

          OBERDIER RESSMEYER LLP
          655 Third Avenue, 28th Floor
          New York, NY  10017
          By:  Carl W. Oberdier, Esq.
               Kellen G. Ressmeyer, Esq.


          Attorneys for Defendants

          COWAN, LIEBOWITZ & LATMAN, P.C.
          1133 Avenue of the Americas
          New York, NY  10036
          By:  J. Christopher Jensen, Esq.
               Scott P. Ceresia, Esq.

**Sweet, D.J.**

Plaintiffs Idea Italiana s.r.l. ("Idea" or "Idea
Italiana) and Helios International S.A.R.L. ("Helios")
(collectively, "Plaintiffs") have moved pursuant to Rule 56 of
the Federal Rules of Civil Procedure and Local Rule 56.1 for
partial summary judgment on their claims of conversion of 112
pieces of Cantamessa jewelry (the "Jewelry") by Defendants
Cantamessa USA, Inc. ("Cantamessa USA"), Fabrizio Cantamessa
("Fabrizio") and Robert Kheit ("Kheit") (collectively,
"Defendants"). The Defendants have moved pursuant to Rule
12(b)(6) for partial dismissal of the Plaintiffs' Amended
Complaint ("AC") and for sanctions pursuant to Rule 11. Based
upon the conclusions set forth below, the Plaintiffs' motion for
partial summary judgment is denied, the Defendants' motion to
dismiss the Racketeering Influenced and Corrupt Organizations
Act, 18 U.S.C. § 1962 ("RICO") and common-law fraud claims of
the AC are granted, and the motion for sanctions is denied with
leave granted to renew upon a resolution of the action.

This action involved the understandings and
misunderstandings between the parties concerning the promotion
and sale of jewelry in an industry which is characterized by

1

trust and recognized practices. It is a demonstration of the difficulties presented when that trust is destroyed.

## **Prior Proceedings**

The Plaintiffs' initial complaint was filed on November 9, 2012 (the "Complaint"), asserting RICO, 18 U.S.C. § 1962 (Counts 1-4); copyright infringement under the U.S. Copyright Act, 17 U.S.C. §§ 106(1)-(3) (Count 5); trademark infringement under the Lanham Act, 15 U.S.C. § 1125 (Count 6); trademark dilution under the Lanham Act, 15 U.S.C. § 1125 (Count 7); false designation under the Lanham Act, 15 U.S.C. § 1125(a) (Count 8); cancellation of federal registration under the Lanham Act, 15 U.S.C. § 1119 (Count 9); state statutory and common law trademark infringement under the Trademark Act of New York, Gen. Bus. L. 360-1 and the common law of each of the fifty states (Count 10); conversion (Count 11); common law fraud (Count 12); trespass to chattels (Count 13); breach of fiduciary duty (Count 14); misappropriation of trade secrets (Count 15); unfair competition (Count 16); and breach of the New York Consumer Protection Act ("NYCPA") § 349 (Count 17). On January 18, 2013, the Defendants moved for partial dismissal; on July 31, 2013, Defendants' motion to dismiss was granted and Counts 1-4, 7, 12,

2

and 17 were dismissed. *See Helios Intern. S.A.R.L. v. Cantamessa USA, Inc.*, 2013 WL 3943267 (S.D.N.Y. July 31, 2013) (the "July 31 Opinion").

The Plaintiffs filed the AC on September 3, 2013, and the instant motions followed. They were heard and marked fully submitted on January 15, 2014.

**The AC**

As in the initial Complaint, all six putative RICO predicate acts in the AC arise from the same business transactions underlying Plaintiffs' separately pled claims for copyright and trademark infringement, breach of fiduciary duty, conversion, and trespass to chattel. AC ¶¶ 201-272.

The AC includes a repetition of the operative facts initially alleged in the original Complaint. The principal changes in the AC include a revision to the number of "stolen" jewelry pieces. Initially, it was alleged that Defendants had physically "stolen" 185 pieces of jewelry from the Malca-Amit Geneva warehouse in 2011. The AC reduced the number of allegedly "stolen" pieces to 49, and alleged that this "theft" at the

3

warehouse was accomplished through third-party "agents" under Defendants' control. AC ¶¶ 20, 74.

The AC reduced the amount of proceeds allegedly due from the sale of 124 jewelry pieces during the period of March 2010 through December 2010 from $902,406.30 to $834,706.82, due from the disposition of 94 pieces of jewelry that were sent by Defendants to customers in the year 2010. 78 of these pieces were allegedly given by Defendants to their Russian customer Botticelli Jewelry House ("Botticelli") which thereafter remitted a payment to Helios of $611,464.96. The AC also alleges that Defendants did not maintain proper recordkeeping with respect to the jewelry pieces removed from the warehouse.

In connection with their allegation of "criminal" copyright infringement under § 2319, Plaintiffs increased the number of allegedly infringing jewelry pieces from 27 to 120, with a corresponding increase in their total net value from $270,000 to $1.5 million.

It is also alleged that Kheit committed customs violations involving declarations as to the jewelry's place of

manufacture, the alleged importation of rubies, and the fair market value of imported jewelry.

The RICO claims plead the same six "predicate" acts that were alleged in their original Complaint regarding the alleged "theft" of jewelry, marketing and sale of allegedly "stolen" jewelry, and/or infringement allegations, namely: (1) "Transportation of Stolen Goods"; (2) "Sale of Stolen Goods"; (3) "Laundering of Money Instruments"; (4) "Interstate and Foreign Travel or Transportation in Aid of Racketeering Enterprises"; (5) "Criminal Copyright Infringement"; and (6) "Mail and Wire Fraud."

## The Facts

The facts have been set forth in the Plaintiffs' Local Rule 56.1 Statement of Material Facts, the Defendants' Rule 56.1 Counter-Statement of Disputed Material Facts and Statement of Additional Disputed Material Facts, and the Plaintiffs' Reply to Defendants' Rule 56.1 Counter-Statement. Any disputes between parties are noted.

Idea and Helios manufacture, sell and distribute jewelry bearing the trademark Cantamessa, but Fabrizio is the owner of the Cantamessa trademark, which is his family name under Italian law. Cantamessa USA is the record owner of the Cantamessa trademark in the United States. Fabrizio is one of the designers of the Cantamessa jewelry designs subject to Idea Italiana's copyright registrations and therefore may use, and authorize others to use, jewelry pieces embodying those proprietary designs.

Helios is a limited liability company organized under the laws of Tunisia, with its principal office located at Immueble La Coupole—Rue Du Lac Windermere—Les Berges Du Lac, 1053 Tunis, Tunisia.

Idea is a limited liability company organized under the laws of Italy, with its principal office currently located at Via Gillio 18, Valenza (AL), Italy 15048.

The Defendants Fabrizio and Kheit were engaged by Helios to market and sell Plaintiffs' Cantamessa Jewelry. Defendants allege that an oral contract was entered into in 2010 with Giuseppe Giachino ("Giachino"), who controlled and managed

the Plaintiffs, to provide the funding for marketing and development expenses involved in the Cantamessa brand expansion and to regularly produce the jewelry in response to customer orders procured by Kheit (the "Cantamessa Contract").

According to the Plaintiffs, in September 2010, Fabrizio and Kheit incorporated Cantamessa USA, a New York corporation. Defendants submit that Plaintiffs had contemporaneous knowledge of the establishment of Cantamessa. Kheit's incorporation of Cantamessa USA was meant to serve as the U.S. arm of the expanded Cantamessa business with the consent of Fabrizio.

According to the Plaintiff, since incorporating Cantamessa USA, Defendants have admitted that Cantamessa Jewelry is "unique," and the product of "proprietary" jewelry designs, "never-seen-before techniques" and "one of a kind" jewels. According to the Defendants, Fabrizio and Kheit are authorized to sell, and have sold, jewelry bearing the trademark Cantamessa, but denied having sold their own "Cantamessa" jewelry through Cantamessa USA to the extent that it implies that the Cantamessa jewelry sold by Cantamessa USA was counterfeit or otherwise non-genuine. Defendants allege that

7

Fabrizio and Cantamessa USA are the record owners of trademark registrations for the Cantamessa trademark in Italy and the United States, respectively and that Fabrizio is one of the designers of the Cantamessa jewelry designs subject to Idea Italiana's fraudulently obtained copyright registrations and therefore may use, and authorize others to use, jewelry pieces embodying those proprietary designs. Defendants deny that Plaintiffs own all of the subject jewelry pieces and allege that a significant number of the 112 jewelry pieces that are the subject of this motion were part of the inventory of Cantamessa jewelry owned by the International Group of Jewelers ("IGJ") and sent to Helios in 2009, and/or were manufactured by Delora Co., Ltd. ("Delora"), Plaintiff Idea Italiana's jewelry manufacturer based in Thailand, in 2008-2009; that Giachino, on behalf of Plaintiffs, failed to remit full payment for the merchandise; and that the invoices from IGJ to Helios indicate that IGJ did not transfer title and ownership of the jewelry pieces until payment. Defendants also deny that they have ever claimed that the individual Cantamessa jewelry pieces are "unique" or otherwise incapable of being reproduced through manufacturing and allege that more than one jewelry piece can be made and has been made from the same "unique" proprietary Cantamessa design. Defendants allege that the Plaintiffs manufactured multiple

8

copies of the same design (or model number) for a great number of the Cantamessa jewelry pieces.

Cantamessa USA leases and operates a showroom located at 589 Fifth Avenue, Ste. 813, New York, New York 10017 to serve as the New York City office and showroom for the expanded Cantamessa enterprise. According to the Defendants, Kheit's leasing of the office located at 589 Fifth Avenue, Suite 813, New York, New York, was done with the consent of Fabrizio and Giachino (on behalf of Plaintiffs) pursuant to the Cantamessa Contract.

According to Plaintiffs, in March or April 2011, Defendants borrowed 112 pieces of Cantamessa Jewelry that was owned by Helios. The Defendants admit that they received 112 pieces of Cantamessa jewelry contained in the ATA Carnet and Temporary Export shipments, but deny that Helios owns all of the subject jewelry pieces and allege that a significant number of the 112 jewelry pieces that are the subject of this motion were part of the inventory of Cantamessa jewelry owned by IGJ and sent to Helios in 2009, and/or were manufactured by Delora in 2008-2009, for which Giachino, on behalf of Plaintiffs, failed to remit full payment for the merchandise, and that the invoices

from IGJ to Helios indicate that IGJ did not transfer title and ownership of the jewelry pieces until payment.

According to Plaintiffs, at the time Defendants borrowed the Jewelry, 97 of the pieces were stored by Helios at the Malca-Amit warehouse in Geneva, Switzerland (the "Helios Jewelry").

According to Plaintiffs, at the time Defendants borrowed the Jewelry, the remaining 15 pieces were in Idea's possession at its headquarters in Valenza, Italy (the "Idea Jewelry").

According to the Plaintiffs, Helios had shipped the Idea Jewelry to Idea in Italy via a temporary export designation that required Idea to return the Jewelry to Helios by May 14, 2011, to avoid customs penalties.

According to the Plaintiffs, Defendants told Giachino, that their purpose in borrowing the Jewelry was to display it at an exhibition at the Manhattan Motorcars Showroom in New York City scheduled for April 28, 2011 (the "April 28 Exhibition"). Defendants admit that, pursuant to the Cantamessa Contract,

10

Giachino agreed on behalf of Plaintiffs to ship the Helios and
Idea Jewelry to the offices of Cantamessa USA so that the
jewelry could be displayed at the Cantamessa New York City
launch event held on April 28, 2011 (the "April 28 Exhibition")
and allege that the purpose of exhibiting these jewelry pieces
at the Cantamessa New York City launch event, as agreed to by
Giachino, was to promote the Cantamessa brand expansion and
development in the United States.

According to Plaintiffs, Defendants' representative,
Massimiliano Piumetto ("Piumetto") told Idea's representative,
Franco Piazza ("Piazza") that Defendants' purpose in borrowing
the Jewelry was to display it at the April 28 Exhibition.
Defendants admit that pursuant to the Cantamessa Contract, Kheit
and Fabrizio requested that Giachino ship the Helios and Idea
Jewelry to the offices of Cantamessa USA so that the jewelry
could be used at the April 28 Exhibition for the purpose of
promoting the Cantamessa brand expansion and development in the
United States.

According to the Plaintiffs, on or about March 31,
2011, Defendants shipped the Helios Jewelry from Switzerland to
their showroom in New York via a special U.S. customs

11

designation called "Temporary Export" (the "Temporary Export shipment"). Defendants admit that Cantamessa USA received the Temporary Export shipment in early April 2011 and allege that it was Helios, not Defendants, who arranged for the shipment and delivery of the Temporary Export shipment to the United States.

According to the Plaintiffs, on or about March 15, 2011, Defendants shipped the Idea Jewelry from Italy to their showroom in New York via ATA Carnet N. IT67047/AL (the "ATA Carnet shipment"). Defendants admit that Cantamessa USA received the ATA Carnet shipment in mid to late March 2011 and allege that it was Idea Italiana, not Defendants, who arranged for the shipment and delivery of the ATA Carnet shipment to the United States.

According to the Plaintiffs, the terms of the ATA Carnet shipment required that the Jewelry be re-exported from the United States no later than December 20, 2011. Defendants deny this allegation and allege that under the U.S. customs laws, the ATA Carnet jewelry pieces were allowed to remain within the United States for a period of up to one year after their importation in March 2011.

12

According to the Plaintiffs, both the Temporary Export and ATA Carnet shipments required the Jewelry to be re-exported within a certain time and prohibited its commercial sale in the United States. Defendants allege that once Cantamessa USA paid the U.S. customs duties for the Temporary Export shipment, the jewelry within that shipment could lawfully be sold within the United States under U.S. customs laws.

Kheit issued a letter dated April 4, 2011, to the U.S. Customs Service certifying with respect to the Helios Jewelry that:

> [T]he Merchandise ... is being imported for repair and alteration. The merchandise is not intended for sale or sale upon approval and will be exported within the bonded period or any lawful extension thereof.

The Defendants admit that Kheit signed the customs declaration Bates-stamped as CMESSA 3929. Defendants deny the materiality of this statement on the ground that once Cantamessa USA paid the U.S. customs duty for the Temporary Export shipment, that declaration was void and the jewelry within that shipment could lawfully be sold within the United States under U.S. customs law.

13

On April 28, 2011, Defendants exhibited Plaintiffs'
Jewelry at the April 28 Exhibition. Following the April 28
Exhibition, Defendants did not return the Jewelry to Helios and
Idea. Defendants retained the Jewelry and began selling,
gifting, and consigning it. According to the Plaintiffs, the
Defendants never accounted to Plaintiffs for their disposition
of this Jewelry nor remitted any payment for the Jewelry to
Plaintiffs. The Defendants admit that they have not remitted
payment for the 30 jewelry pieces from the ATA Carnet and
Temporary Export shipments that have been sold but deny that
Defendants have "never accounted" to Plaintiffs for the
jewelry's disposition since and allege that they have produced
documents in their possession showing the disposition of the 112
jewelry pieces, to the extent any particular pieces have been
sold or transferred, including a summary chart and have also
confirmed in their interrogatory responses that all of the
pieces of jewelry which have not been sold and/or consigned
remain in the possession of Cantamessa USA at its offices
located at 589 Fifth Avenue, New York, New York.

In May 2011, Idea was forced to purchase the Idea
Jewelry from Helios in order to avoid Italian custom penalties
for a violation of the terms of the Italian temporary export.

Plaintiffs orally demanded from Defendants the return of the Jewelry promptly after the April 28 Exhibition. The Defendants deny that such oral demand was made "promptly" after the April 28 Exhibition. Plaintiffs and their attorneys demanded from Defendants the return of the Jewelry in emails or letters dated December 12, 2011; January 25, 2012; March 7, 2012; April 12, 2012; and July 15, 2013. Defendants failed to respond to most of these demands. When they did respond, they explicitly refused to return the Jewelry, and continue their refusal to this day. According to the Defendants, they refused to return the Helios and Idea Jewelry pending the resolution of damages due to Plaintiffs' breach of the Cantamessa Contract.

Defendants have produced records in discovery purporting to show their disposition of each of Plaintiffs' 112 pieces of Jewelry. According to Defendants' records:

a.   Defendants have sold at least 30 pieces for an aggregate sale price to their customers of $305,176.19.

b.   Defendants have gifted, donated, or consigned 7 pieces with an aggregate list price of $381,786.52

15

($348,107.93 plus $33,678.56), for which Defendants

declared a customs value of $62,358.56.

c.   Defendants still possess the remaining 75 pieces

in their New York City salesroom, with an aggregate

list price of $3,153,950, for which Defendants

declared a customs value of $736,480.50.

Defendants admit the sale of 30 pieces of jewelry from

the ATA Carnet and Temporary Export shipments for an aggregate

sales price of approximately $305,176.19, but allege Kheit is

entitled to 20% commission and that Plaintiffs admit Kheit was

owed for any sales of the jewelry. Defendants further allege the

"list" (or "tag") price of the jewelry does not accurately

reflect the fair market value of the jewelry and that it was

Plaintiffs who declared the alleged value of the jewelry to U.S.

customs authorities when arranging for the delivery of those

shipments to the United States.

According to the Plaintiffs, Idea was required by the

U.S. Customs Service to pay customs penalties of 5,275.84 £

($6,902.83) for Defendants' failure to re-export the Idea

Jewelry within the time required by the ATA Carnet. According to

16

Plaintiffs' moving papers, Idea Italiana paid penalties to Italian customs authorities with respect to the ATA Carnet.

The Defendants knew that under the terms upon which the Jewelry was imported, customs penalties would be levied if Defendants failed to export the Jewelry within the requisite period. The Defendants admit this statement and allege that Kheit, on behalf of Cantamessa USA, personally paid for the U.S. customs duties on the Temporary Export shipment and is not in violation of any U.S. Customs laws or regulations.

According to the Plaintiffs, the Defendants have never denied that they appropriated Plaintiffs' Jewelry without authorization. Defendants deny this statement.

According to the Plaintiffs, the Defendants have never offered any explicit excuse for their appropriation of Plaintiffs' Jewelry. Defendants deny this statement.

According to the Plaintiffs, in a letter dated July 26, 2011, from Kheit's attorney to Giachino, Kheit's attorney asserted that Giachino's "company" owed Kheit about $1.5 million as reimbursement of expenses incurred in "the development of the

17

Cantamessa brand in the United States and Moscow." Kheit's
attorney made the same demand on Helios in a letter dated
October 24, 2011. Defendants admit the letters and allege that
$1.5 million in damages incurred as a result of Giachino's
breach of the Cantamessa Contract, which included Kheit's
payment of out-of-pocket expenses that were supposed to have
been paid by Plaintiffs under the contract.

The July 26, 2011 and October 24, 2011 letters did not
provide receipts or other documentation supporting Kheit's
claimed expenses of $1.5 million. Defendants admit this
statement but contend there is no requirement that a contract be
in writing and allege the existence of the oral Cantamessa
Contract entered into between Kheit and Giachino on behalf of
Plaintiffs regarding the marketing, sale, and distribution of
the Cantamessa jewelry.

In an email dated July 24, 2011, Kheit rejected
Plaintiffs' demand for return of certain other jewelry also in
Defendants' possession advising Fabrizio not to "write [him]
anything more" regarding Plaintiffs' demands until his expenses
were paid.

18

According to the Plaintiffs, and Defendants' responses to interrogatories and documents, the Defendants have sold at least 30 pieces of Plaintiffs' Jewelry for an aggregate sales price of $305,176.19, and gifted, donated or consigned 7 others, as follows:

| Model No. | Status | Sale Price | Date |
|---|---|---|---|
| R0525VP | Sold | $10,530.00 | 7/12/12 |
| R0780 and $0784 | Sold | $20,000.00 | 3/1/12 |
| R0839KWY | Sold | $8,951.00 | Undated |
| P0592, R0582, E0592 | Sold | $8,712.00 | 1/3/12 |
| R0839NKW | Sold | $9,504.00 | 5/10/12 |
| R0795 | Sold | $8,006.00 | 5/10/12 |
| E0760Y | Sold | $9,504.00 | 1/3/12 |
| E0760B | Sold | $10,929.60 | 1/3/12 |
| E0670W | Sold | $26,664.00 | 12/24/11 |
| E0844WK | Sold | $10,348.00 | 9/18/12 |
| R0051WV | Sold | $8,001.00 | 12/24/11 |
| R0836W | Sold | $21,060.00 | 12/24/11 |
| R0842TZ | Sold | $3,380.00 | 12/14/11 |
| R0843WA | Sold | $7,128.99 | 1/3/12 |
| R0847K | Sold | $7,101.60 | 1/3/12 |

| | | | |
|---|---|---|---|
| R0847WY | Sold | $6,784.00 | 1/3/12 |
| R0848K | Sold | $4,493.00 | 7/12/12 |
| R0848R | Sold | $4,710.00 | 1/3/12 |
| R0848Y | Sold | $3,828.00 | 12/24/11 |
| E0849W | Sold | $7,228.00 | 12/24/11 |
| R0031W | Sold | $33,800.00 | No date |
| R0635W | Sold | $27,370.00 | 2/11/12 |
| R0636 | Sold | $17,091.00 | 12/24/11 |
| E0844B | Sold | $6,045.00 | 4/03/11 |
| R0843WB | Sold | $3,380.81 (declared value) | 4/03/11 |
| R0843WP | Sold | $3,380.81 (declared value) | 4/03/11 |
| R0848B | Sold | $1,910.15 (declared value) | 4/03/11 |
| E056WB | Sold | $20,860.87 (declar4d value) | 4/03/11 |
| N0560WB | Sold | $26,075.03 (declared value) | 4/03/11 |

Idea's Jewelry ($23,907.00)

| Model No. | Status | Sale Price | Date |
|---|---|---|---|
| R0839BWY | Sold | $7,839.00 | 12/24/11 |
| R0211VW | Sold | $13,068.00 | 10/11/11 |
| R0005R | Sold | $3,000.00 | 11/2/11 |
| E0091W | Donated | $4,041.50 (declared value) | 3/17/11 |

| R0833P | Gift | $2,786.95 (declared value) | 3/17/11 |
| --- | --- | --- | --- |

Defendants admit that they sold 30 pieces of jewelry from the ATA Carnet and Temporary Export shipment for an aggregate sale price of approximately $305,176.19 and allege that Kheit is entitled to a 20% commission. Defendants further contend that Plaintiffs do not own all of the 112 jewelry pieces, as a significant number were part of the inventory of Cantamessa jewelry owned by IGJ and sent to Helios in 2009 and/or were manufactured by Delora in 2008-2009, for which Giachino, on behalf of Plaintiffs, failed to remit full payment.

According to the Plaintiffs, in their customs forms importing the Helios and Idea Jewelry into the United States, Defendants declared the value of such jewelry to the U.S. Customs authorities. The Defendants deny this statement and allege that the Plaintiffs' representatives declared the alleged value of the jewelry to U.S. customs authorities. Defendants further allege that the invoices from IGJ to Helios indicate that IGJ did not transfer title and ownership of the jewelry pieces until payment.

21

According to the Plaintiffs, the values declared by Defendants for the Jewelry to the customs authorities reflected the Jewelry's approximate cost of production. The Defendants deny this statement and allege that Plaintiffs' declared value for the subject jewelry pieces do not reflect the jewelry's production cost.

Generally, the retail or "Tag" price of the Jewelry is several multiples of the cost of production.

According to the Plaintiffs, for the Jewelry that Defendants have not identified as "sold" in the table above, the aggregate value declared to customs authorities was $736,480.50. Defendants admit that according to the customs invoices prepared by Plaintiffs the total declared value of the jewelry pieces in the ATA Carnet and Temporary Export shipments not sold by Defendants is approximately $736,480.50, but allege it was Plaintiffs, not Defendants, who declared the value of these jewelry pieces in connection with their shipment of this jewelry to the United States.

According to the Plaintiffs, the Jewelry, which has been in Defendants' possession for over two years, has

depreciated in value during that time, both because the designs
are now dated and because of likely natural deterioration in the
quality of the Jewelry. The Defendants deny this statement and
alleged that the 112 jewelry pieces and the continued goodwill
in the Cantamessa brand resulting from Kheit and Fabrizio's
substantial marketing and advertising efforts in the United
States has maintained market value.

The Defendants' version of the facts set forth below
is denied in its totality by the Plaintiffs.

In 2009, pursuant to an agreement between IGJ and
Giachino, Giachino agreed to purchase IGJ's inventories of
Cantamessa jewelry located in Valenza and Dubai, respectively,
through Helios. Under the 2009 agreement between IGJ and
Giachino, the shares of Idea Italiana were sold for the nominal
fee of 1£ to Italian investors as arranged by Giachino.
Beginning as of late 2009, Giachino exercised control over the
business and financial management of the Plaintiffs. Idea
Italiana's administrator, Piazza, required Giachino's permission
before taking any financial or business actions concerning the
jewelry business. Idea Italiana's corporate registry records

listed Giachino's son, Marco Carlo Giachino ("Marco") as one of
the owners of the company.

Helios' corporate records listed Prestige 2002 s.r.l.,
P.R.F. Industriali s.r.l., and Centro 2000 s.r.l., companies
administered by Giachino or his son Marco, as the owners of
Helios.

In connection with their participation in the
Cantamessa jewelry business, Defendants had contact with and
dealt with only Idea Italiana employees and never dealt with any
Helios employees.

Plaintiffs listed Giachino as a representative for
both Idea Italiana and Helios in Plaintiffs' Initial Disclosures
served in this action.

In early 2010, the parties orally entered into the
Cantamessa Contract in which:

- Giachino agreed on behalf of Plaintiffs to
  provide the funding for marketing and development
  expenses involved in the Cantamessa brand

24

expansion in Europe and the United States and to
regularly produce the jewelry in response to
customer orders procured by Kheit;

- Kheit agreed to provide his time and utilize his
  client contacts and business expertise in the
  high-end jewelry industry to promote the brand;
  and

- Fabrizio agreed to provide his trademarked family
  name, proprietary jewelry designs, and other
  creative talents.

In reliance on Giachino's promises under the
Cantamessa Contract, Kheit and Fabrizio started rebuilding and
expanding the Cantamessa brand.

In 2010 and 2011, Kheit took trips to Italy and Moscow
to meet with prospective customers in order to lay the
groundwork for the expansion of the Cantamessa brand abroad.

In the spring of 2010, Kheit contacted one of his
longstanding clients based in Russia, Botticelli, in order to

25

convince them to open a Cantamessa boutique in Moscow.
Botticelli had previously purchased Cantamessa jewelry from
Kheit, and was thus a known customer to Giachino. After
reviewing the existing Cantamessa price catalog, Botticelli
agreed to purchase jewelry pieces and invest in the opening of
the Cantamessa Moscow boutique. Kheit's leasing of the
Cantamessa U.S. office and showroom located at 589 Fifth Avenue,
Suite 813, New York, New York, in late April 2010 was done with
the consent of Fabrizio and Giachino pursuant to the Cantamessa
Contract.

Plaintiffs had contemporaneous knowledge of Kheit's
leasing of the Cantamessa U.S. office and showroom located at
589 Fifth Avenue, Ste. 813, New York, New York. Before entering
into the Cantamessa Contract, Kheit had planned to leave the
office located at 589 Fifth Avenue, Ste. 813, New York, New
York, as he had not previously been in need of a large showroom.

In 2010, Giachino engaged Gianluca Calderoni
("Calderoni"), and Italian architect, to design the showroom for
the Cantamessa Moscow boutique and the New York City showroom.

In September 2010, Kheit, Fabrizio, and Giachino met in Torino, Italy to discuss the terms of their Cantamessa Contract regarding the marketing, distribution and sale of the Cantamessa jewelry (the "September 2010 Meeting"). Giachino agreed he would make the necessary monetary investments by:

(1)   Establishing a Cantamessa boutique in Milan in three to six months, and establishing a Cantamessa boutique in Paris the following year;

(2)   Paying all costs and expenses for a booth at the 2011 international Baselworld trade show;

(3)   Paying all costs and expenses relating to a Cantamessa launch event in New York City, along with subsequent brand promotion, marketing, advertising, and product packaging;

(4)   Paying all costs and expenses relating to the Cantamessa New York City showroom, including payments for the furniture and reimbursing Kheit for all rental payments for the space;

27

(5)   Reimbursing Kheit for his travel, lodging, and
      expenses relating to site establishment and brand
      development in Italy and Russia; and

(6)   Regularly supplying jewelry merchandise on both sale
      and consignment to fill the jewelry orders Kheit
      obtained.

Kheit agreed he would undertake the client and brand
development by:

(1)   coordinating with his contacts in Russia to set up a
      Cantamessa boutique in Moscow;

(2)   arranging for photo shoots of the jewelry in Europe
      and the United States;

(3)   arranging for the promotion and advertising relating
      to the Cantamessa New York City brand launch event and
      the opening of a Cantamessa New York City showroom;

(4)   continuing the lease for the Cantamessa New York City
      office and showroom;

(5)   making several trips to Italy and Russia to promote
      the enterprise; and

(6)   procuring sales of Cantamessa jewelry in exchange for
      a 20% commission.

Fabrizio agreed he would undertake the creative and
business development by:

(1)   reporting sales of the Cantamessa jewelry made by
      Kheit and other distributors to Giachino;

(2)   acting as the creative consultant of the enterprise
      including creating new jewelry designs that would be
      used in connection with the newly manufactured
      merchandise; and

(3)   consenting to Kheit and Giachino's use of the
      Cantamessa trademark and the proprietary jewelry
      designs in connection with this enterprise.

Kheit physically met with Giachino on two occasions: (1) the September 2010 Meeting; and (2) the 2011 Baselworld fair held in March 2011.

Kheit's incorporation of Cantamessa USA in September 2010 was done with the consent of Fabrizio and Giachino on behalf of Plaintiffs pursuant to the Cantamessa Contract. Plaintiffs had contemporaneous knowledge of the establishment of Cantamessa USA in the United States.

Botticelli purchased 78 pieces of the Cantamessa jewelry in 2010 to stock the Cantamessa Moscow boutique by making two trips to the Geneva Malca-Amit warehouse which stored the jewelry. Giachino knew of and consented to Botticelli's purchase of these 78 jewelry pieces in 2010.

In December 2010, Idea Italiana issued an invoice reflecting Botticelli's then-recent purchase of 63 jewelry pieces made on the second visit to the warehouse (the "2010 Botticelli Invoice"). Giachino had revised the 2010 Botticelli Invoice by raising the purchase prices an additional 25% from the previously agreed-upon prices.

With the assistance of Kheit and Fabrizio, Botticelli opened the Cantamessa Moscow boutique on December 22, 2010. Giachino knew and approved of the opening of the Cantamessa Moscow boutique in December 2010.

In January and February 2011, Botticelli sent payments to Helios of approximately $650,000 for the Cantamessa jewelry they had purchased in 2010. Kheit was never paid his contractually guaranteed 20% commission for Botticelli's purchase of the 78 jewelry pieces in 2010.

To prepare for opening of the Cantamessa New York City showroom and the April 28 Exhibition, Kheit arranged for celebrities such as Susan Sarandon and the reigning Miss Universe to attend the opening; arranged for the public relations firm, DKC Publication Relations, to handle the promotion, marketing, and advertising of the opening; and further arranged for a photo shoot of the jewelry to create advertising displays for the event. Because these services for the Cantamessa New York City Opening required immediate payment, Kheit advanced the payment of these expenses out of his own pocket. Pursuant to the Cantamessa Contract, Giachino was obligated to reimburse Kheit for these expenses. Giachino never

31

responded to Calderoni's request for payment for the design and supply of furniture for the New York City showroom and, as a consequence, Calderoni's supplier refused to deliver the furniture.

Because Giachino failed to pay Calderoni for the showroom furniture, Kheit personally had to pay for replacement furniture and other accessories for the showroom to ensure that the showroom was ready for the April 28 Exhibition.

Many of Kheit's customers, including Botticelli, came to the 2011 Baselworld trade fair to view Cantamessa merchandise. Kheit made in excess of 1,500,000 € in jewelry sales at the 2011 Baselworld trade fair (the "2011 Baselworld Orders"). Kheit showed Giachino the 2011 Baselworld Orders while the two were at the 2011 Baselworld trade fair. When Kheit confronted Giachino at the 2011 Baselworld fair about his concerns about the business, Giachino told Kheit that they would resolve everything and memorialize the agreement in a written contract at the following month's Cantamessa New York City opening.

Fabrizio emailed Kheit's 2011 Baselworld Orders to Giachino and his employees so that they could fill the customers' orders. One of Giachino's employees, Patrizia Scapitta ("Scapitta") responded that Giachino had failed to give them approval to produce the jewelry to fill Kheit's 2011 Baselworld Orders.

Fabrizio emailed Giachino directly on May 6, 2011, again seeking information as to the status of the 2011 Baselworld Orders, but Giachino refused to give him any clear answers. Giachino refused to fill the 2011 Baselworld Orders despite his obligation to do so pursuant to the Cantamessa Contract.

As a result of Giachino's failure to fill the 2011 Baselworld Orders, Kheit lost all of his valuable, long-standing relationships with his clients who had submitted orders at the trade fair, including Botticelli, which Kheit had developed through hard work over the decades. Additionally, Kheit lost substantial sales commission from the unfilled 2011 Baselworld Orders, which totaled in excess of 300,000 €.

33

Pursuant to the Cantamessa Contract, Giachino agreed in early 2011 to send Cantamessa USA approximately 150 jewelry pieces in the ATA Carnet and Temporary Export shipments.

Although there were 150 pieces total in these two shipments, Kheit personally paid for the manufacture and design of 38 pieces from the Temporary Export shipment that were part of the Men's Collection.

The jewelry pieces in the ATA Carnet and Temporary Export shipments were not "loaned" to Defendants for the purpose of displaying them at the April 28 Exhibition, but instead, as agreed to by Giachino, they were sent for the purpose of promoting the Cantamessa brand expansion in the United States. The parties did not agree that Defendants would ship back the jewelry pieces from the ATA Carnet and Temporary Export shipments "promptly following" the April 28 launch event.

Under the U.S. customs laws, the jewelry pieces in the ATA Carnet and Temporary Export shipments were allowed to remain within the United States for a period of up to one year after their importation in early 2011. Cantamessa USA, as the principal on the customs bond, was responsible to pay any

34

applicable U.S. customs duties or penalties in the event the pieces were sold in the United States. Kheit, on behalf of Cantamessa USA, Inc., personally paid for the duties on the Temporary Export shipment.

Plaintiffs arranged for the shipment and delivery of the Temporary Export and ATA Carnet shipments to the United States, and declared the alleged value of the jewelry to U.S. customs authorities in connection with those shipments.

The customs invoices submitted in connection with the ATA Carnet shipment declaring the alleged value of the jewelry state "IDEA ITALIANA S.R.L." at the top. The customs invoice submitted in connection with the Temporary Export shipment declaring the alleged value of the jewelry states "HELIOS INTERNATIONAL TRADING SARL" at the top. The "declared values" of the jewelry listed in the customs invoices for the ATA Carnet and Temporary Export shipments do not represent the production cost of the jewelry pieces. The "list" (or "tag") price of the jewelry does not accurately reflect the fair market value of the jewelry pieces.

35

The Cantamessa jewelry pieces are never sold for the tag price but in fact typically sell for 40% or less of the tag price. Defendants contend that any determination with respect to the any of the Helios and Idea Jewelry sold by Cantamessa USA would necessarily have to deduct Kheit's contractually guaranteed 20% commission from the sale price of the jewelry.

In early 2011, Kheit prepared an updated costs estimate for Giachino for the Cantamessa brand expansion, which included costs and expenses Kheit had advanced for the upcoming Cantamessa New York City Opening.

On April 14, 2011, Fabrizio emailed this updated costs estimate to Giachino and informed him that Kheit had paid invoices for 100,000 € in relation to the Cantamessa New York City Opening.

In early May 2011, Fabrizio forwarded to Giachino a "media recap" and a "Public Relations Report" for the Cantamessa brand, which showed that the brand's profile was escalating quickly in the media in the United States.

On July 26, 2011, Kheit's attorney sent Giachino a letter stating that Giachino had breached the contract by, *inter alia*, failing to fill jewelry orders and refusing to pay the Cantamessa marketing and development expenses he agreed to pay under the Cantamessa Contract, which Kheit wound up having to pay.

The July 26, 2011 Letter was the first correspondence between the parties concerning their contractual dispute and stated that Kheit suffered approximately $1.5 million in damages as a result of the breach of contract, which included Kheit's payment of out-of-pocket expenses that were supposed to have been paid by Giachino on behalf of Plaintiffs under the contract.

In a response letter dated August 9, 2011, Giachino stated that he "[was] not a party to any venture with Cantamessa USA or Robert Kheit" and "[had] no business relation whatsoever with your client."

In subsequent letters from Giachino's attorneys, Giachino pretended that Idea Italiana and Helios were entirely

37

unaffiliated and even stated that "Idea is not aware of the details of [Defendants'] dispute with Helios."

One of the letters from Giachino's attorneys threatened Kheit with "criminal legal proceedings," even though this was a business dispute. In none of the pre-litigation letters sent in early 2012 did Plaintiffs claim they owned the trademark rights to Fabrizio's family name or the jewelry designs that he created, nor did such letters claim that Defendants had "looted" the Malca-Amit warehouse and "stolen" Plaintiffs' inventory of jewelry.

In approximately February 2009, Giachino was convicted in Italy of criminal business fraud and embezzlement. If Giachino's criminal sentence is affirmed on appeal, Giachino will be barred from managing any companies in Italy for a period of ten years.

Giachino, on behalf of Helios, failed to pay IGJ the full amount of the purchase price for the European inventory of Cantamessa jewelry that was sent to Helios in 2009. Helios owed IGJ an outstanding debt of over $267,000 for this jewelry. Giachino, on behalf of Idea Italiana, failed to pay Delora for

Delora's manufacture of jewelry in 2008-2009. Idea Italiana owes Delora an outstanding debt of over $54,000 for this jewelry. Giachino, on behalf of Idea Italiana, failed to pay S. Vinodkumar (Europe) Sales B.V.B.A. ("SV"), Idea Italiana's jewel supplier, money owed for the supply of diamonds and other gem stones. Idea Italiana owes SV an outstanding debt of over $213.00.

A significant number of the 112 jewelry pieces that are the subject of Plaintiffs' motion were part of IGJ's inventory of Cantamessa jewelry sent to Helios in 2009 and/or were manufactured by Delora in 2008-2009, for which Giachino, on behalf of Plaintiffs, failed to remit full payment for the merchandise. The invoices from IGJ to Helios indicate that IGJ did not transfer title and ownership of the jewelry pieces until payment.

Franz Huber, principal of Delora ("Huber") repeatedly told Giachino that Delora was entitled to the immediate repossession of the unpaid jewelry pieces because Delora remained the legal owner of that merchandise.

Giachino, on behalf of Plaintiffs, refused to fill the 2011 Baselworld Orders because he was unable to manufacture jewelry resulting from his problems with unpaid creditors. In this action, Defendants produced documentation supporting their counterclaim for money damages resulting from Plaintiffs' breach of the Cantamessa Contract.

Defendants have never claimed that the individual Cantamessa jewelry pieces are incapable of being reproduced through manufacturing. More than one jewelry piece can be made, and has been made, from the same "unique" proprietary Cantamessa design. Plaintiffs manufactured multiple copies of the same design (or model number) for a great number of the Cantamessa jewelry pieces.

**The Applicable Standards**

On a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), all factual allegations in the complaint are accepted as true, and all inferences are drawn in favor of the pleader. *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1174 (2d Cir. 1993). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence

40

to support the claims." *County of Suffolk, N.Y. v. First Am.*
*Real Estate Solutions*, 261 F.3d 179, 187 (2d Cir. 2001) (quoting
*Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir.
1995), *cert. denied*, 519 U.S. 808, 117 S. Ct. 50, 136 L. Ed. 2d
14 (1996)).

        To survive a motion to dismiss pursuant to Rule
12(b)(6), "a complaint must contain sufficient factual matter,
accepted as true, to 'state a claim to relief that is plausible
on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 663, 129 S. Ct.
1937, 1940, 173 L. Ed. 2d 868 (2009) (quoting *Bell Atl. Corp. v.*
*Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929
(2007)). This is not intended to be an onerous burden, as
plaintiffs need only allege facts sufficient in order to
"nudge[] their claims across the line from conceivable to
plausible." *Twombly*, 550 U.S. at 570.

        Summary judgment is appropriate only where "there is
no genuine issue as to any material fact and . . . the moving
party is entitled to a judgment as a matter of law." Fed. R.
Civ. P. 56(c). A dispute is "genuine" if "the evidence is such
that a reasonable jury could return a verdict for the nonmoving
party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

(1986). The relevant inquiry on application for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52. A court is not charged with weighing the evidence and determining its truth, but with determining whether there is a genuine issue for trial. *Westinghouse Elec. Corp. v. N.Y. City Transit Auth.,* 735 F. Supp. 1205, 1212 (S.D.N.Y. 1990) (quoting *Anderson*, 477 U.S. at 249. Moreover, if the evidence for the nonmoving party is a mere scintilla or "not significantly probative," the court may grant summary judgment. *Anderson*, 477 U.S. at 249-50. A fact is "material" only if it will affect the outcome of the suit under applicable law, and such facts "properly preclude the entry of summary judgment." *Id.* at 248. Disputes over irrelevant facts will not preclude summary judgment. *Id.* The goal is to "isolate and dispose of factually unsupported claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).

While the moving party bears the initial burden of showing that no genuine issue of material fact exists, *Atl. Mut. Ins. Co. v. CSX Lines, L.L.C.*, 432 F.3d 428, 433 (2d Cir. 2005), in cases where the non-moving party bears the burden of persuasion at trial, "the burden on the moving party may be

discharged by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. "It is ordinarily sufficient for the movant to point to a lack of evidence . . . on an essential element of the non-movant's claim . . . . [T]he nonmoving party must [then] come forward with admissible evidence sufficient to raise a genuine issue of fact for trial . . . ." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008) (internal citations omitted); *see also Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) ("Once the moving party has made a properly supported showing sufficient to suggest the absence of any genuine issue as to a material fact, the nonmoving party . . . must come forward with evidence that would be sufficient to support a jury verdict in his favor.").

## The Motion For Summary Judgment Is Denied

The Plaintiffs seek by way of summary judgment the determination that the Defendants have converted the 112 pieces of Jewelry of the Plaintiffs resulting in damages of $305,176.19 from the sale of 30 pieces of the Jewelry, $736,480.50 constituting the value of the Jewelry retained by the

43

Defendants, and $36,902.38 in customs duty penalties.
Alternatively, the Plaintiffs seek by way of replevin the items
of Jewelry retained by the Defendants. As evidenced by the
recital of facts set forth, the resolution of the Plaintiffs'
motion bristles with factual disputes.

At the outset, there are factual disputes as to the
ownership of a significant number of the 112 pieces of jewelry
based as a consequence of Giachino's alleged failure to pay for
the shipments of Cantamessa jewelry that Helios received from
IGJ in 2009 and Idea Italiana received from Delora in 2008-2009.
The December 31, 2009 invoices issued by IGJ to Helios with
respect to the Cantamessa jewelry are alleged to state: "Goods
herewith invoiced remain the legal property of the seller until
the goods have been paid in full."

In addition to this dispute over title and ownership,
this record does not identify which of the pieces, either sold
or retained, are subject to this dispute.

Moreover, there is a genuine factual dispute as to
whether under the parties' contract Kheit would be owed his
contractually agreed 20% commission for the sale of 30 jewelry

44

pieces of the ATA Carnet and Temporary Export shipments sold by
Defendants for an aggregate value of approximately $305,000. The
Defendants have disputed Plaintiffs' claim that they are
entitled to the entire sales price of these 30 pieces on the
ground that Kheit's commission should necessarily be deducted
from any damages award.

As to the jewelry pieces of the ATA Carnet and
Temporary Export shipments not sold by Defendants, a dispute
exists with respect to the amount of damages. Defendants contend
that the "tag" price does not reflect the actual market value of
the pieces, since the Cantamessa jewelry pieces are not sold for
the tag price but typically for 40% or less of the tag price.

The "declared value" of jewelry pieces to U.S. Customs
is also the subject of dispute as to whether it represents the
"production cost" of the jewelry as a measure of damages. The
Defendants note that it was Plaintiffs, not Defendants, that
arranged for the delivery of the ATA Carnet and Temporary Export
shipments to the United States and prepared the customs invoices
declaring the alleged value of the jewelry and that the
"declared values" for the jewelry pieces in the ATA Carnet and

45

Temporary Export shipments do reflect the jewelry's cost of production.

Indeed, the nature of the entire relationship between the parties is the subject of a factual dispute given the Plaintiffs' denial of the Defendants' Statement of Additional Facts. In addition, although promised, the Defendants' answer and counterclaim in response to AC has yet to be filed.

"Although [Rule 56] allows a motion for summary judgment to be filed at the commencement of an action, in many cases the motion will be premature until the nonmovant has had time to file a responsive pleading or other pretrial proceedings have been had." *See* Fed. R. Civ. P. 56 Advisory Committee's Notes (2010 amendments). Indeed, courts have denied pre-answer motions for summary judgment that seek a premature adjudication of a claim notwithstanding any technical compliance with the timing provisions of Rule 56. *See, e.g.*, *Waters v. Experian Info. Solutions, Inc.*, 2012 U.S. Dist. LEXIS 75697, at *11 n.2 (S.D. Cal. May 31, 2012) ("This Court typically finds pre-answer summary judgments premature and unhelpful"); *Cusamano v. Alexander*, 691 F. Supp. 2d 312, 321 (N.D.N.Y. 2009) ("Plaintiff's cross-motion for summary judgment is premature

46

because defendants have yet to file an answer to the amended complaint").

As the Second Circuit stated in *American Mfrs. Mut. Ins. Co. v. American Broadcasting-Paramount Theatres, Inc.*, 388 F.2d 272 (2d Cir. 1967):

> I am persuaded that a decision after trial will be the more desirable procedure in the matter. It will serve to bring into sharper focus certain issues of importance which have been obscured by the voluminous affidavits with their statements, counter-statements and alternative positions, and the conflicting conclusions which the parties contend are to be drawn from the multitude of facts and statistics presented.
>
> Under all the circumstances the application of the summary judgment rule is questionable and the Court deems it sound judicial administration to permit a trial for such additional evidence and clarification as may be relevant.

*Id.* at 280. *See also Lind v. United Parcel Serv., Inc.*, 254 F.3d 1281, 1285-86 (11th Cir. 2001) ("even in the absence of a factual dispute, a district court has the power to deny summary judgment in a case where there is reason to believe that the better course would be to proceed to a full trial"); *United States v. Bethlehem Steel Corp.*, 157 F. Supp. 877, 879-880 (S.D.N.Y. 1958) ("We consider it the part of good judicial

47

administration to withhold decision of the ultimate questions
involved in this case until this or another record shall present
a more solid basis of findings based on litigation or on a
comprehensive statement of agreed facts. While we might be able,
on the present record, to reach a conclusion that would decide
the case, it might well be found later to be lacking in the
thoroughness that should precede judgment of this importance and
which it is the purpose of the judicial process to provide."
(quoting *Kennedy v. Silas Mason Co.*, 334 U.S. 249, 256-257
(1948))).

Here, Plaintiffs have moved for summary judgment on
two of their sixteen claims, but all claims in this case are
factually and legally intertwined with the existence, nature,
and extent of the oral contract between Kheit, Fabrizio, and
Giachino and the understanding among them. Piecemeal
adjudication of a portion of the Plaintiffs' claims without a
fully developed record may complicate rather than simplify the
ultimate resolution of the dispute between the parties. *See,
e.g.*, *Zamoyski v. Fifty-Six Hope Rd. Music Ltd.*, 718 F. Supp. 2d
128, 140 (D. Mass. 2010) (denying motion for summary judgment
where underlying legal questions "must be resolved at a later
time upon a more fully-developed record"); *North Am. Roofing*

*Servs. v. Nat'l Trust Ins. Co.*, 2009 U.S. Dist. LEXIS 116888, at
*3-4 (S.D. Tex. Dec. 16, 2009) (denying summary judgment motion
on discretionary grounds; although "[i]t may well turn out that
the Court is simply postponing the inevitable interpretation of
the documents, however, testimony in this non-jury trial may be
helpful to the Court by shedding some additional light on these
issues. Moreover, granting [defendant's] Motion at this time
would not resolve [plaintiff's] other claims so as to avoid the
upcoming trial").

In addition, "the entry of a final judgment is
generally appropriate 'only after all claims have been
adjudicated.'" *Novick v. AXA Network, LLC*, 642 F.3d 304, 310 (2d
Cir. 2011) (citation omitted). A district court's discretion
under Rule 54(b) to decide partial final judgment in advance of
final adjudication of all claims should be "exercised sparingly"
and "only if there are interests of sound judicial
administration and efficiency to be served, or in the infrequent
harsh case where there exists some danger of hardship or
injustice through delay which would be alleviated by immediate
appeal." *Harriscom Svenska AB v. Harris Corp.*, 947 F.2d 627, 629
(2d Cir. 1991) (citations omitted).

Entry of partial final judgment is inappropriate "if the same or closely related issues remain to be litigated." *Novick*, 642 F.3d 304 at 311. Even where there has been a finding of liability on summary judgment, courts deny entry of partial final judgment on a single claim where there remain pending interrelated claims. *See, e.g.*, *Brunswick Corp. v. Sheridan*, 582 F.2d 175, 183 (2d Cir. 1978) ("Where the multiple claims at issue in a 54(b) determination are as closely intertwined as they are here, this court and a district court in this circuit have held that final judgment under Rule 54(b) should not be entered"); *Argonaut Ins. Co. v. Goepfert*, 1981 U.S. Dist. LEXIS 11518, at *9-11 (S.D.N.Y. Mar. 16, 1981) (refusing to enter partial final judgment under Rule 54(b) on conversion claim in part because "the [] defendants have asserted various counterclaims against the plaintiff that may be factually and legally intertwined with [the conversion claim]").

This action concerns the disposition of the Jewelry and the business dealings between the parties, and the facts concerning these matters are in dispute. Finding summary judgment on the conversion and replevin claims at this time would necessarily involve findings on the ownership of the Jewelry and amount of damages, issues that are in its infancy in

the evidentiary record. Given such, the Court is not prepared to weigh on these issues at this time.

Summary judgment is inappropriate for the reasons stated above. The Plaintiffs' motion is denied.

**The Motion To Dismiss Counts I-IV (RICO)**
**and Count XI (Fraud) Is Granted**

The July 31 Opinion granted the Defendants' motion to dismiss the RICO claims asserted by Plaintiffs in their initial Complaint as well as the fraud claim.

While Plaintiffs briefly summarize the Court's prior dismissal ruling in an early section of their brief in discussing Plaintiffs' putative RICO predicate acts, Plaintiffs do not address the authorities set forth in the July 31 Opinion, which held that garden-variety commercial claims "cannot be transmogrified into a RICO claim by the facile device charging that the breach was fraudulent, indeed criminal." July 31 Opinion, 2013 WL 3943267, at *9. Because Plaintiffs fail to even address the substantive defects identified in the July 31 Opinion, they have failed to demonstrate how the AC has cured

those defects necessary to withstand Defendants' renewed motion to dismiss.

The July 31 Opinion was based on substantive defects, thus the sufficiency of the Amended Complaint requires consideration to isolate the changes between the complaints. *See, e.g.*, *Salvatierra v. Connolly*, 2012 U.S. Dist. LEXIS 41256, at *20 (S.D.N.Y. Feb. 29, 2012) (dismissing reasserted claims because "Plaintiff's amended pleading introduces nothing new, with respect to the conduct of these individuals"). *Accord Lenczycki v. Shearson Lehman Hutton, Inc.*, 1991 U.S. Dist. LEXIS 10534, at *19 (S.D.N.Y. July 31, 1991) (denying leave to file proposed amended pleading containing previously dismissed claim because it failed to "allege any new facts" remedying identified deficiencies). However, the AC has made no substantive changes to the previously alleged and dismissed RICO claims, which necessitates dismissal. *See, e.g.*, *Lazzarino v. Kenton Assocs. Ltd.*, 998 F. Supp. 364, 366-67 (S.D.N.Y. 1998) (dismissing re-asserted RICO claims where the amended pleading "contain[ed] no meaningful substantive change from the prior complaint"). *Accord Lenczycki v. Shearson Lehman Hutton, Inc.*, 1991 U.S. Dist. LEXIS 10534, at *13 (S.D.N.Y. July 31, 1991).

The AC alleges that Defendants did not maintain proper record-keeping and failed to adhere to "strict procedures" with respect to jewelry pieces removed from the Malca-Amit warehouse which Plaintiffs allege were "stolen." This is not a new factual allegation but merely an elaboration on an allegation found in the original Complaint. *See* Compl. ¶ 52 ("[Defendants] removed the pieces surreptitiously, violated Helios's and Malca-Amit's required 'sign-out' procedures, and did not disclose to Helios or Malca-Amit that they had removed the pieces. Defendants were not authorized to take this jewelry for any purpose except to market and sell to Helios's customers, with prompt accounting and remittitur of the proceeds to Helios").

The AC also alleges that Fabrizio fraudulently persuaded Plaintiffs' Italian trademark attorneys to file applications to register the Cantamessa trademarks in his own name without the proper authorization to do so. This is again an elaboration on the factual allegation made in the original Complaint that Defendants' trademark applications were fraudulently obtained. *See* July 31 Opinion, 2013 WL 3943267, at *8 ("Plaintiffs have alleged that Defendants committed criminal copyright infringement by arranging for the Delora factory to produce 27 pieces of Cantamessa jewelry by the Delora factory in

February 2012, and taking delivery of those pieces in April

2012."). Such allegations of trademark infringement are not

cognizable as a RICO predicate act and therefore do not overcome

the insufficiency of Plaintiffs' RICO claims. *See, e.g.*,

*Patrizzi v. Bourne in Time, Inc.*, 2012 U.S. Dist. LEXIS 146861,

at *15-17 (S.D.N.Y. Oct. 11, 2012) ("All businesses use

interstate mail or wires. Congress did not intend that every

trademark dispute would be brought under RICO." (quoting

*Evercrete Corp. v. H-Cap Ltd.*, 429 F. Supp. 2d 612, 631

(S.D.N.Y. 2006))); Melville B. Nimmer & David Nimmer, 1 Nimmer

on Copyright § 3.04[B][3] (2013) ("Only the most egregious

instances of criminal copyright infringement have ever been

upheld as predicate offenses to racketeering charges under

RICO.").


        The AC alleges that Plaintiff "discover[ed] [] seven

previously unknown co-conspirators in Defendants' scheme to

steal Plaintiffs' Jewelry and counterfeit their Jewelry designs,

each with a unique, identifiable role in the conspiracy." The

alleged new "co-conspirators" include Delora (Plaintiff Idea

Italiana's jewelry manufacturer based in Thailand), Fabrizio's

wife, Paola Brussino ("Brussino"), Brussino's company Piazza San

Carlo s.r.l. ("PSC")), and Piumetto, an employee of PSC.

However, all of these new "co-conspirators" appear frequently in Plaintiffs' own documents, including exhibits attached to the Amended Complaint. Delora was alleged in the original Complaint to have manufactured the allegedly infringing jewelry. Plaintiffs' designation of these known persons as "co-conspirators" fails to alter the scope of the purported RICO "criminal" conspiracy previously pled.

In their opposition to Defendants' motion, Plaintiffs allege that "Defendants are engaging in rampant smuggling and customs fraud," based on Kheit's submission of purportedly false customs declarations. These allegations are not pled under the six purported RICO predicate acts. To support their argument that the alleged customs violations support the putative RICO predicate acts, Plaintiffs referred to a nonspecific money laundering allegation in the AC which does not mention these false customs declarations. Plaintiffs also point to a wire and mail fraud allegation which cites exhibits concerning the allegedly false customs declarations and that "Defendants' smuggling also supports the alleged predicate acts for criminal copyright infringement and violations of the Travel Act," but the AC does not include these purported U.S. customs violations

in the two putative predicate acts. The alleged customs

violations do not serve to constitute viable predicate acts.


        Plaintiffs' allegations that Defendants have continued

to sell Cantamessa jewelry "post-termination" of the Agency

Agreement does not alter the previously reached conclusions. The

initial Complaint alleged that Defendants continued to traffic

in "stolen" jewelry post-October 2011, the point at which

Plaintiffs claim they terminated the alleged Agency Agreement.

Defendants' contractual authorization to "market and sell

Cantamessa jewelry," a similar allegation in the AC "indicates

that the complained-of conduct supports causes of action for

breach of contract and/or breach of fiduciary duty, rather than

federal criminal fraud that was committed as a part of a 'broad-

based' criminal racketeering scheme" as was previously held.

July 31 Opinion, 2013 WL 3943267, at *9.


        The July 31 Opinion determined that because

"Defendants' contract with Plaintiffs granted them authority to

'market and sell Cantamessa jewelry,' []Defendants' alleged

conduct [concerning criminal copyright infringement] falls more

into the realm of breach of contract or breach of fiduciary

duty." *Id.*, at *8. The AC restates this allegation conferring

56

Defendants with the authority "to market and sell" the Cantamessa jewelry. AC ¶ 48. With respect to the Court's secondary basis for rejecting the claim of "criminal" copyright infringement, the AC puts at issue just over 100 pieces of allegedly infringing jewelry which does not constitute large-scale organizing counterfeiting schemes cognizable under § 2319. The Plaintiffs have not cited authority in the civil RICO context holding that a copyright ownership dispute alleging a modest number of infringing items properly states a RICO predicate act. Moreover, the § 2319 government prosecution cases cited by Plaintiffs involved significantly more complex and far-reaching organized counterfeiting schemes than the instant copyright dispute. *See, e.g.*, *United States v. Larracuente*, 952 F.2d 672, 673 (2d Cir. 1992) (defendant bootlegged thousands of copyrighted films via use of a "counterfeiting laboratory"); *United States v. Ndhlovu*, 510 F. App'x 842, 846 (11th Cir. 2013) (defendant committed "high-volume counterfeit manufacturing" of over 6,500 infringing CDs and DVDs); *United States v. Chalupnik*, 514 F.3d 748, 750-51 (9th Cir. 2008) (defendant engaged in counterfeiting scheme involving nearly 4,000 infringing CDs and DVDs); *U.S. v. Xiang Li*, 1:10-cr-00112 (LPS) (D. Del.) (Ressmeyer Decl., Ex. H)(defendant engaged in "software piracy conspiracy" involving distribution over the Internet of 550

57

different software titles to at least 325 purchasers located in
at least 28 states and over 60 foreign countries and whose
aggregate retail value was at least $100 million). While
Plaintiffs cite several cases involving actual government
prosecutions of criminal infringement under § 2319, the proper
inquiry is whether Plaintiffs have sufficiently pled § 2319 as a
predicate act for RICO purposes. Indeed, "[o]nly the most
egregious instances of criminal copyright infringement have ever
been upheld as predicate offenses to racketeering charges under
RICO." Nimmer, § 3.04[B][3]. This statement from Nimmer reflects
not only the legislative history limiting this penal statute to
large-scale organized counterfeiting schemes, but also that
federal courts are wary of allowing traditional copyright claims
to form the basis of a civil RICO claim unconstrained by the
limits of prosecutorial discretion and higher standard of proof
that accompany actual government prosecutions under § 2319.

      For the foregoing reasons, the AC's assertion of the
same copyright ownership dispute does nothing to disturb the
Court's prior holding that, "even if Plaintiffs have adequately
alleged the requisite elements of criminal copyright
infringement, it would nonetheless be inappropriate for such

infringement to constitute a predicate act for RICO purposes."
July 31 Opinion, 2013 WL 3943267, at *8.

Plaintiffs' claim for common-law fraud asserted in the
initial complaint was premised solely upon Defendants' alleged
promise to refund to Plaintiffs the jewelry displayed at the
April 28 Exhibition "immediately thereafter," and Defendants'
subsequent failure to do so.

Plaintiffs' claim for common-law fraud asserted in the
AC is still premised upon Defendants' subsequent failure to
return to Plaintiffs the jewelry displayed at the April 28
Exhibition in New York City. This purported claim for fraud
sounds in breach of contract and therefore fails to state a
claim under well-established principles of New York law. *See,
e.g.*, *Non-Linear Trading Co. v. Braddis Assocs.*, 243 A.D.2d 107,
118 (1st Dep't. 1998) ("a cause of action for fraud does not
arise when the only fraud charged relates to a breach of
contract").

Plaintiffs' allegation that Defendants' fraudulent
intent is manifested by refusal to return the Jewelry upon
Plaintiffs' demand, which continues to the present, does not

59

amplify the allegation that Defendants failed to ultimately
follow through on an alleged promise to return goods, which is
insufficient to plead fraudulent intent. *Nat'l Westminster Bank,
U.S.A. v. Ross*, 130 B.R. 656, 664 (S.D.N.Y. 1991) ("a party may
not establish fraudulent intent solely from the non-performance
of the future event").

"While Rule 9(b) permits scienter to be demonstrated
by inference, this 'must not be mistaken for license to base
claims of fraud on speculation and conclusory allegations.' An
ample factual basis must be supplied to support the charges."
*Ahmed v. Trupin*, 781 F. Supp. 1017, 1025 (S.D.N.Y. 1991)
(citations omitted). The only new allegation in the AC in
support of the claim that Defendants acted with fraudulent
intent is Kheit's contemporaneous submission of a customs
declaration on April 4, 2011 certifying that the jewelry was
only for temporary exhibition in the United States. *See* AC
¶ 242(a). However, because this document evidences that
Defendants possessed a then-existing intention to perform the
contract at the time of the exchange in April 2011 – or is
equally consistent with an absence of fraudulent intent — it is
insufficient to plead scienter under Rule 9(b). *See Scheiner v.
Wallace*, 832 F. Supp. 687 702 (S.D.N.Y. 1993) ("Facts that are

merely as consistent with fraudulent intent as they are with its absence are insufficient. Plaintiffs must allege facts that unambiguously give rise to a strong inference of fraudulent intent.") (citation omitted).

Accordingly, Plaintiffs' claim for common-law fraud is dismissed under Rule 12(b)(6).

**The Motion For Sanctions Is Denied**

The Defendants have moved to sanction the Plaintiffs for repleading their now-dismissed for the second time RICO and fraud claims. Because satellite issues are best resolved in connection with the ultimate conclusion of the litigation, *see Archie Comic Publications, Inc. v. Decarlo*, 2000 WL 1731341, at *1 (S.D.N.Y. Nov. 21, 2000) (noting that sanctions for allegedly frivolous pleadings "normally will be determined at the end of the litigation"); *Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.*, 2000 WL 528633, at *1 (S.D.N.Y. 2000) (denying request for Rule 11 sanctions and noting "collateral litigation regarding sanctions distracts the court and the parties from focusing on the merits and fosters animosity among counsel which disserves the overall objectives of the Federal Rules of Civil

Procedure, the just, speedy and inexpensive determination of the litigation"); *Herrera v. Scully*, 143 F.R.D. 545, 552 (S.D.N.Y. 1992) ("[R]equest for Rule 11 sanctions is premature because the Court is not in a position to make a definitive finding . . . without having the complete evidence of the [non-movants] before it."), the motion for sanctions is denied at this time without prejudice and leave is granted to renew the motion at an appropriate later stage.

## Conclusion

As concluded above, the Plaintiffs' motion for summary judgment is denied, the Defendants' motion to dismiss Counts I-IV and Count V of the AC is granted, and the Defendants' motion for sanctions is denied without prejudice with leave granted to renew.

It is so ordered.

Dated:     New York, New York
           May 20, 2014

           _____
           Robert W. Sweet, U.S.D.J.